IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MICHAEL JACKSON )<br>)<br>Plaintiff, )<br>)<br>v. )<br>MOVIE GALLERY US, LLC )<br>)<br>Defendant. ) | Civil Action No.: 1:06CV0001-MHT |

**DEFENDANT'S BRIEF IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT**

Defendant Movie Gallery, US, LLC ("Movie Gallery") submits the following brief in support of its motion for summary judgment on all claims.

**I.**
**INTRODUCTION**

Michael Jackson ("Jackson") has filed suit against Movie Gallery for violations of Title VII and 42 U.S.C. § 1981. Jackson claims that he was denied two promotions at Movie Gallery based on his race. One of these positions, Director of Game Zone/Trade Zone, was eliminated as a result of the merger of Movie Gallery and Hollywood Entertainment Corporation ("HEC") and was never filled. Jackson has not specified what the other position was that he allegedly applied for, nor is there any record of Jackson applying for another position while employed at Movie Gallery.

Although unclear, Jackson appears to be asserting a claim for discriminatory termination and hostile work environment. See Complaint at ¶¶ 9, 11. Jackson, however, has failed to produce any evidence – must less substantial evidence – in support of these claims. Jackson has not presented a genuine issue of material fact as to any of his claims, and Movie Gallery is entitled to summary judgment on each of these claims.

## II.
## STATEMENT OF UNDISPUTED FACTS

Jackson was initially hired by Movie Gallery on April 20, 1998[1] as a part-time Customer Service Associate ("CSA") at a pay rate of $5.15 an hour at Store No. 299 in Quincy, Florida reporting to store manager ("SM") Issac Randolph (African American). (Thorton Aff., as Exhibit A, ¶ 3; Jackson Depo. 40, attached as Exhibit B). On September 21, 1998, Jackson received a raise to $5.35 an hour. (Thorton Aff., ¶ 4). On September 15, 1999, Jackson voluntarily resigned. (Thorton Aff., ¶ 5).

On November 25, 1999, Jackson was rehired as a part-time CSA at Store 299 making $5.15 an hour. (Thorton Aff., ¶ 6). On February 20, 2000, Jackson was terminated for insubordination for reopening an account of a customer who had stolen two movies despite specific instructions to the contrary. (Thorton Aff., ¶ 7).

On December 16, 2001, Jackson was rehired as a part-time CSA at Store 0023 in Troy, Alabama reporting to reporting to Valerie Poole, African American. (Thorton Aff., ¶ 8). On March 18, 2002, Jackson was promoted to a part-time Senior CSA position ("SCSA") making $5.25 an hour. (Thorton Aff., ¶ 9). On June 1, 2002, Jackson took a leave of absence for military service, but returned to work at Store 0023 on July 24, 2002. (Thorton Aff., ¶ 10). On March 17, 2003, Jackson received a raise to $5.35 an hour. (Thorton Aff., ¶ 11).

On June 27, 2003, Jackson resigned again for military training. (Thorton Aff., ¶ 12). On August 4, 2003, Jackson was rehired as a SCSA reporting to Poole making $5.35 an hour. (Thorton Aff., ¶13).

---

[1] Jackson worked part-time as Movie Gallery while attending high school and later Troy State University. (Jackson Depo.   ).

2

In May 24, 2004, after graduating from college, Jackson applied for a promotion to Quality Assurance Auditor ("QAA"), a full-time, salaried position in Movie Gallery's corporate office in Dothan, Alabama. (Jackson Depo. at 45 Croom Aff., attached as Exhibit C, ¶ 3). Heath Croom ("Croom"), Director of Quality Assurance, interviewed Jackson and recommended to Phillip Kitchens ("Kitchens"), Vice President of Loss Prevention, Collections and Administration, that Jackson receive the promotion. (Croom Aff., ¶ 4). Kitchens approved the promotion, and Jackson began working as a QAA on May 24, 2004. (Croom Aff., ¶ 5). In this position, Jackson was required to travel throughout the United States to evaluate quality assurance ("QA") issues at Movie Gallery's stores and to submit QA reports for review by Croom. (Croom Aff., ¶ 6). Jackson received a substantial raise in his position as QAA and became eligible for Movie Gallery's bonus structure at the time of the promotion. (Croom Aff., ¶ 7).

On August 16, 2004, Croom issued Jackson a Verbal Warning ("VW") regarding audit planning, audit tools and audit reporting. (Croom Aff., ¶ 8). Specifically, Croom counseled Jackson regarding numerous deficiencies in Jackson's QAA reports, including, *inter alia*, inaccurate calculations and figures, incorrect grammar and spelling, tardiness, and use of the wrong template for re-audit summaries. (Croom Aff., ¶ 9). As a result of Jackson's deficiencies, Croom was forced to make extensive revisions to Jackson's audit summaries before distributing them within the company. (Croom Aff., ¶ 10).

Despite counseling, Jackson continued to struggle. On November 8, 2004, Croom issued Jackson a Written Warning ("WW") for the same issues that had been raised in the previous VW. (Croom Aff., ¶ 11). Jackson's audits continued to be replete with factual and grammatical errors. (Croom Aff., ¶ 12) Despite specific instructions to the contrary, Jackson

3

also continued to use the wrong template for re-audit summaries, requiring Croom to spend an inordinate amount of time correcting Jackson's reports. (Croom Aff., ¶ 13). In this warning, Croom made it clear that "repeated errors could not be tolerated or allowed to continue from week to week" and that "much improvement [was] expected." (Croom Aff., ¶ 14). Jackson signed the warning without comment. (Croom Aff., ¶ 15).

Because of the extensive travel required, Jackson, like most Movie Gallery employees who travel, was issued a corporate American Express card. (Jackson Depo. 49; Croom Aff., ¶ 16). All employees who are issued such cards are told in writing that that is his or her responsibility to submit expense reports in a timely manner and to promptly pay the balance in full after receiving reimbursement. (Croom Aff., ¶ 17). At that time, employees were reimbursed every Friday for expense reports submitted before Wednesday at noon. (Croom Aff., ¶ 18). Assuming the reimbursements were submitted in a timely manner, an employee would be reimbursed within ten days after the expense was incurred. (Croom Aff., ¶ 19).

On January 3, 2005, Jackson was scheduled to fly to Virginia to conduct a store audit. (Jackson Depo. 177; Croom Aff., ¶ 20). When Jackson attempted to purchase his ticket at the Dothan airport, however, his American Express card was declined since he had failed to pay off the balance. (Jackson Depo. 177-179; Croom Aff., ¶ 20). Jackson already had been reimbursed for part of the balance on his American Express account, but he apparently had not used the reimbursement money to pay his American Express account. (Croom Aff., ¶21) As a result, Croom instructed Jackson to drive to a district in Georgia to conduct an audit until the matter could be resolved. (Croom Aff. ¶ 22; Jackson Depo. 179). Croom then reviewed Jackson's American Express account and discovered that Jackson was habitually paying his account late. (Croom Aff., ¶ 21).

On January 4, 2005, while on the trip to Georgia, Jackson was unable to purchase gas or obtain lodging since his American Express account remained unpaid. (Jackson Depo. 180; Charles Collins Aff., Exhibit D, ¶ 3). Jackson contacted Charles "Bo" Collins, a Regional Loss Prevention manager who happened to be working in Georgia, who met Jackson in Commerce, Georgia and paid for Jackson's expenses. (Collins Aff., ¶ 4).

Subsequently, on January 14, 2005, Croom issued Jackson a Final Written Warning ("FWW") regarding his expense reimbursements and failure to pay his corporate American Express card on time. (Croom Aff., ¶ 23). Jackson signed the FWW without comment. (Croom Aff., ¶ 23; Jackson Depo. 127).

On January 25, 2005, Croom completed a performance review on Jackson, giving Jackson a 2.6 out of a potential 5. (Croom Aff., ¶ 24). This score placed Jackson in the "Needs Improvement" range. (Croom Aff., ¶ 24). Not surprisingly, areas cited on Jackson's review included Jackson's deficient audit reports and his failure to pay off his American Express account in a timely manner. (Croom Aff., ¶ 24). Croom noted that Jackson's progress in these areas had been and would continue to be monitored. (Croom Aff., ¶ 24). Jackson acknowledged receipt of the review via email without comment. (Croom Aff., ¶ 24; Jackson Depo. 131-132).

On March 21, 2005, a job posting for the position of Director of Game Zone/Trade Zone[2] Operations was distributed to corporate employees. (Amy Vinson Aff., Exhibit D, ¶ 3). This position required the applicant to be "intimately involved in the gaming and trading industry. (Vinson Aff., ¶ 4, and Exhibit A attached thereto). The Director position was designed to oversee training and other aspect of the Game Zone operation and required 1) two to three years of supervisory experience at the District Manger level or above; and 2) either a) a bachelor's

---

[2] Game Zone is a "store within a store" found in some Movie Gallery locations that sells, purchases, trades and rents new and used video games.

5

degree or b) two to three years of experience with game or new product operations. (Vinson Aff., ¶ 5).

On March 25, 2005, Jackson submitted his resume in application for the Director of Game Zone position. (Jackson Depo. 52). Jackson, however, not only had no supervisory experience at the District Manager level, he had no supervisory experience at any level. (Jackson Depo. 142; Croom Aff., ¶ 6). In fact, Jackson had only been a full-time employee with Movie Gallery for approximately ten months in a position that had no supervisory responsibilities. (Croom Aff., ¶¶ 3 & 6). Moreover, during his ten-month employment as QAA, Jackson had received a VW, a WW and a FWW, along with a "Needs Improvement" performance review. (Croom Aff., ¶¶ 8, 11 & 23).

In April 2005, Movie Gallery acquired Hollywood Entertainment Corporation ("HEC"), a video company based out of Portland, Oregon, which, like Movie Gallery, operates games stores within some its video stores under the name "Game Crazy." (Vinson Aff., ¶ 3). Because of the numerous changes that necessarily came about as a result of the integration of Game Zone and Game Crazy, the Director position for Game Zone was eliminated without ever being filled. (Vinson Aff., ¶ 6).

In or about April 2005, Joe Malugen, Movie Gallery's Chief Executive Officer, directed Phillip Kitchens to identify all corporate employees who scored significantly lower than their peers on their performance evaluations for termination. (Kitchens Aff., attached as Exhibit E, ¶ 3). A total of twelve employees, including Jackson, were identified as employees who would be laid off on April 15, 2005.[3] (Kitchens Aff., ¶ 4). Of these twelve employees, only two,

---

[3] Four of these employees were terminated or resigned prior to April 15, 2005. (Kitchens Aff. ). As a result, eight employees, including Jackson, were terminated on April 15, 2005. (Kitchens Aff.   ). All eight of these employees were given the choice of resigning with three weeks severance pay or being terminated. Jackson alone declined the offer and filed an EEOC charge alleging race discrimination. (Kitchens Aff.  ).

including Jackson, were African American. (Kitchens Aff., ¶ 4). Moreover, Jackson and a white female tied in having the lowest performance scores of all those identified for termination. (Kitchen Aff., ¶ 5). One white female and two white males who laid off pursuant to the RIF had performance review scores of 3 or higher, significantly higher than Jackson's score of 2.6 (Kitchens Aff., ¶ 5).

### III.

### ARGUMENT

**A.    Movie Gallery is entitled to summary judgment on Jackson's failure to promote claims.**

**1.    Jackson cannot establish a *prima facie* case of failure to promote.**

"To establish a *prima facie* case of race discrimination[4] in a promotional decision, a plaintiff must prove: (1) that he is a member of a protected minority; (2) that he was qualified and applied for the promotion; (3) that he was rejected despite these qualifications; and (4) other equally or less qualified employees who are not members of the protected minority were promoted." Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253 (11th Cir. 2000)(citations omitted); Alexander v. Fulton Co., GA, 207 F.3d 1303, 1339 (11th Cir. 2000). Jackson cannot satisfy elements two, three or four of his prima facie case for either alleged promotion at issue.

**a.    The Game Zone Director position.**

Jackson contends that he should have received the Game Zone Director position that he applied for in March 2005. There are three fatal problems with this argument. First, the undisputed evidence establishes that Jackson was not qualified for this position. As stated above, the Game Zone Director position required, *inter alia*, two to three years of supervisory

---

4 As Title VII claims and § 1981 claims have the same requirements of proof and analytical framework, MGA will address the claims concurrently throughout the brief. See Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

7

experience at the District Manger level or above. Jackson not only had no supervisory experience at the District Manager level, he had no supervisory experience at any level. (Jackson Depo. 142-143; Croom Aff., ¶ 6). In fact, Jackson had only been a full-time employee with Movie Gallery for approximately ten months in a position that had no supervisory responsibilities and during which time he had received a VW, a WW and a FWW, along with a "Needs Improvement" performance review. (Croom Aff., ¶¶ 3, 6, 8, 11, 23). Moreover, Jackson had little or no experience in the gaming industry. (Croom Aff., ¶ 6).

The second problem with Jackson's failure to promote claim is that he was not rejected for the position since the position was eliminated and was never filled. (Vinson Aff., ¶ 6). Nor can Jackson show that an equally or less qualified applicant who was not a member of a protected class filled the position for the simple reason that no one filled the position. Jackson himself admits that he does know if anyone interviewed for this position or if the position was ever filled. (Jackson Depo., 52). See Gamble v. Aramark Uniform Services, 132 Fed.Appx. 263 (11th Cir. 2005) (plaintiff in discriminatory termination case was not replaced by anyone, let alone a person from outside of his protected class, because the position was eliminated). Jackson cannot establish a prima facie case for failure to promote based on the Game Zone Director position, and this claim is due to be dismissed.

    **b. The other alleged unspecified promotion position.**

Although Jackson alleges that he was denied a second promotion, neither the Complaint nor the EEOC charge identify the other position that Jackson allegedly applied for sometime between November 2004 and March 2005. (Jackson Depo. 53). Jackson, however, did not retain any documents which would prove that such a position was posted or that he applied for it. (Jackson Depo. 135-136). Moreover, like the Director of Game Zone position, Jackson admitted

that he does not know if this position was ever filled. (Jackson Depo. 57). Jackson simply has not and cannot meet his burden of proof with respect to this claim, and it is due to be dismissed.

### 2. Jackson cannot establish that Movie Gallery's articulated, nondiscriminatory reasons are pretexual.

Even assuming Jackson could establish a *prima facie* case of failure to promote, which he clearly cannot, he fails to offer any evidence that Movie Gallery's legitimate, non-discriminatory reasons for not placing him in the position of Director of Game Zone is a pretext for race discrimination. The undisputed evidence establishes that the position was eliminated because of the integration of Movie Gallery and HEC. Jackson has not and cannot offer any evidence to rebut this fact, and this claim is due to be dismissed.

### B. Jackson's hostile environment claim fails as a matter of law

To establish a *prima facie* hostile work environment case, a plaintiff must establish that he (1) belonged to a protected group; (2) that he was subjected to racial harassment; (3) that the harassment was based on race; (4) that the harassment was sufficiently severe or pervasive so as to alter the terms and conditions of his employment; and (5) that there is a basis for holding the employer liable for the harassment, either directly or indirectly. See Faragher v. City of Boca Raton, 524 U.S. 775 (1998).

To determine whether harassment is sufficiently severe or pervasive so as to alter the terms of employment, courts are instructed to look at the totality of the circumstances, including (1) the frequency of the alleged discriminatory conduct; (2) the severity of the alleged discriminatory conduct; (3) *whether the alleged discriminatory conduct is physically threatening or humiliating as opposed to a mere offensive utterance*; and (4) whether the allegedly discriminatory conduct unreasonably interfered with an employee's work performance. Harris v. Forklift Sys., Inc. 510 U.S. 17 (1993) (emphasis added); Edwards v. Wallace Community

9

College, 49 F.3d 1517, 1521-22 (11th Cir. 1995). The Supreme Court has stated that to be actionable, the conduct must be so severe or pervasive that a reasonable person would find it hostile or abusive. Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75 (1998).

**Unlike most hostile work environment cases, this case involves no substantive allegations of racial slurs or offensive/inappropriate racial comments. Instead,** Jackson asserts that Movie Gallery created a racially hostile work environment solely because: 1) there were no non-whites in any managerial positions during his employment at Movie Gallery. (Complaint, ¶ 10)

Jackson's complaints about the lack of whites in executive positions and the failure to post positions fail because these are not harassment complaints. Instead, these complaints relate to discrete disparate treatment claims that cannot support a hostile environment claim. See NAACP v. Florida Dep't of Corrections, 2002 U.S. Dist. LEXIS 27841, n.121 (M.D. Fla. 2002)("Jenkins claims…that he has been subjected to a racially hostile work environment. His deposition testimony, however, focuses primarily on his allegations regarding denial of promotions and other discrete adverse employment actions and is generally devoid of the type of evidence typical of hostile work environment claims, such as complaints of harassment, racial slurs, and derogatory remarks…Consequently, summary judgment is due to be granted on Jenkin's hostile environment claim."); Blalock v. County Bd. of Educ., 84 F.Supp.2d 1291, 1304-1305 (M.D. Ala. 1999)("Plaintiff cannot support a hostile work environment claim with allegations that constitute classic examples of alleged disparate treatment.") citing Cowen v. Prudential Ins. Co. of America, 141 F.3d 751, 759 (7th Cir. 1998)(plaintiff was not permitted to rely on acts of disparate treatment in support of hostile environment claim which could be asserted as separate claims of discrimination); Shields v. Fort James Corp., 167 F.Supp.2d 1322,

1331 (S.D. Ala. 2001)("While [plaintiff's] allegations that Harry gave new tools to white employees and gave him old tools and that foreman Norwood assigned all overtime to white employees could, if proven, support a claim for disparate treatment racial discrimination, they cannot help establish that a hostile work environment exists or support a hostile work environment claim.").

Jackson's claim that there are no whites in executive positions is simply his attempt to recast his failure to promote claims under a second theory. Movie Gallery, however, has established that it is entitled to summary judgment on these claims. Moreover, to the extent Jackson attempts to assert this claim on behalf of anyone but himself, he has no standing. Sholtz v. Cates, 256 F.3d 1077, 1081 (11th Cir. 2001)(Article III standing requires that the plaintiff personally suffer an injury-in-fact); Madsen v. Boise State Univ., 976 F.2d 1219, 1220 (9th Cir. 1992)("There is a long line of cases ... that hold that a plaintiff lacks standing to challenge a rule or policy to which he has not submitted himself by actually applying for the desired benefit."); NAACP v. Harrison, NJ, 907 F.2d 1408, 1414-15 (3d Cir. 1990)(Article III standing required a showing that an interested party had actually applied for the disputed position).

As Jackson has failed to allege any actionable conduct that was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment, his hostile work environment claim fails as a matter of law.

### C. Jackson's claim that he was terminated on the basis of race has no merit

#### 1. Jackson cannot establish a *prima facie* case of discriminatory termination.

To establish a *prima facie* case of discriminatory termination, a plaintiff must show: (1) he is a member of a protected class; (2) he was subjected to adverse employment action; (3) his employer treated similarly situated (non-minority) employees more favorably; and (4) he was

11

qualified to do the job. Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999)(citing Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997); Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973)).

As stated above, Jackson was terminated along with twelve other employees who scored below their peers. The majority of these employees who were terminated were white, most of whom had scored substantially higher on their performance reviews than Jackson. Jackson has not and cannot identify any similarly situated non-minority employee who received a 2.6 on his or her performance review and who was not terminated or allowed to resign as part of the RIF. Accordingly, this claim is due to be dismissed.

### 2. Jackson cannot establish that Movie Gallery's articulated, nondiscriminatory reason for his termination is pretextual.

To prove that a legitimate, non-discriminatory reason for the adverse employment action is a pretext for race discrimination, a plaintiff must show either "that a discriminatory reason more likely motivated the employer or…that the employer's proffered explanation is unworthy of credence." See Jeronimus v. Polk County Opportunity Council, Inc., 2005 U.S. App. LEXIS 17016, *13 (11th Cir. 2005) quoting Tex. Dep't. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981). "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1088 (11th Cir. 2004).

The evidence is clear that Jackson, along with twelve other employees, were selected for termination based on their low performance reviews. Accordingly, Movie Gallery is entitled to summary judgment as a matter of law on Jackson's termination claim.

## CONCLUSION

For the foregoing reasons, there are no genuine issues of material fact, and Movie Gallery is entitled to judgment in its favor on all counts contained in the Complaint.

s/E. Barry Johnson
Attorney for Defendant
Movie Gallery US, LLC

**OF COUNSEL:**

Movie Gallery US LLC
900 W. Main Street
Dothan, Alabama
Telephone: (344) 702-2472
Facsimile: (334) 836-3755

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

                                  s/E. Barry Johnson  
                                  **OF COUNSEL**