**American Court Reporting**
**toll-free (877) 320-1050**

1  (Pages 2 to 5)

## Page 2

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CIVIL ACTION NUMBER
1:06CV0001-MHT

MICHAEL D. JACKSON,
          Plaintiff (s),
vs.
MGA, INC.,
          Defendant (s).

DEPOSITION TESTIMONY OF:
MICHAEL D. JACKSON

JULY 6, 2006
10:00 A.M.

REPORTED BY:  MELISSA S. LEE, CSR

## Page 3

1      S T I P U L A T I O N S
2
3          IT IS STIPULATED AND AGREED,
4   by and between the parties through
5   their respective counsel, that the
6   deposition of MICHAEL D. JACKSON may be
7   taken before MELISSA S. LEE, CSR,
8   Commissioner and Notary Public for the
9   State of Alabama At Large, at the law
10  offices of RAMSEY, BAXLEY & McDOUGLE, 212
11  West Troy Street, Dothan, Alabama, 36303,
12  on the 6th day of July, 2006, commencing
13  at or about 10:00 a.m.
14          IT IS FURTHER STIPULATED AND
15  AGREED that the signature to and the
16  reading of the deposition by the
17  witness is waived, the deposition to
18  have the same force and effect as if
19  full compliance had been had with all
20  laws and rules of court relating to
21  the taking of depositions.
22          IT IS FURTHER STIPULATED AND
23  AGREED that it shall not be necessary

## Page 4

1   for any objections to be made by
2   counsel as to any questions except as
3   to form or leading questions, and that
4   counsel for the parties may make
5   objections and assign grounds at the
6   time of trial, or at the time said
7   deposition is offered in evidence, or
8   prior thereto.

## Page 5

1              I N D E X
2
3   EXAMINATION BY:              PAGE NO:
4   Ms. Johnson
5
6
7          INDEX OF EXHIBITS
8
9   EXHIBITS:              PAGE NO.:
10  Defendant's 1 (Status Change Report)      59
11  Defendant's 2 (Acknowledgement Form)      62
12  Defendant's 3 (Discrimination Form)       67
13  Defendant's 4 (Charge of Discrimination)  70
14  Defendant's 5 (Dismissal Form)            84
15  Defendant's 6 (Complaint)                 86
16  Defendant's 7 (6/16/06 Resume)            101
17  Defendant's 8 (Verbal Counselling)        105
18  Defendant's 9 (Record of Assoc. Develop.) 114
19  Defendant's 10 (Final Written Warning)    126
20  Defendant's 11 (Performance Review Doc.)  129
21  Defendant's 12 (3/24/05 Resume)           133
22  Defendant's 13 (Job Opportunity Form)     136
23  Defendant's 14 (Revised Memorandum)       143

**American Court Reporting**
**toll-free (877) 320-1050**

2 (Pages 6 to 9)

Page 6

1           INDEX OF EXHIBITS
2
3   EXHIBITS:                    PAGE NO.:
4   Defendant's 15 (Requests for Admissions)  151
5   Defendant's 16 (Requests for Admissions)  153
6   Defendant's 17 (Req. for Prod. of Doc)    160
7   Defendant's 18 (Interrogatories to PX)    171
8   Defendant's 19 (Answers to Interrog.)     172
9   Defendant's 20 (Answers to Production)    174
10  Defendant's 21 (Supplemental Answers)     175
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 8

1           I, MELISSA S. LEE, CSR, Court
2   Reporter and Notary Public for the State
3   of Alabama at Large, acting as
4   Commissioner, certify that on this
5   date, pursuant to the Federal Rules of
6   Civil Procedure, and the foregoing
7   stipulations of counsel, there came
8   before me at the law offices of RAMSEY,
9   BAXLEY & McDOUGLE, 212 West Troy Street,
10  Dothan, Alabama, 36303, on the 6th day
11  of July 2006, MICHAEL D. JACKSON,
12  witness in the above cause, for oral
13  examination, whereupon, the following
14  proceedings were had:
15
16          MICHAEL D. JACKSON,
17  Being first duly sworn, was examined
18  and testified as follows:
19
20          COURT REPORTER:  Usual
21  stipulations?
22          MS. JOHNSON:  Yes.
23          MR. NEWMAN:  That's fine.

Page 7

1        A P P E A R A N C E S
2
3   FOR THE PLAINTIFF(S):
4
5       Mr. Malcolm R. Newman
6       Attorney at Law
7       219 W. Crawford Street
8       Dothan, Alabama, 36301
9
10  FOR THE DEFENDANT(S):
11
12      Ms. E. Barry Johnson
13      MOVIE GALLERY CORPORATE ATTORNEY
14      900 West Main Street
15      Dothan, Alabama, 36301
16
17
18
19
20
21
22
23

Page 9

1   EXAMINATION BY MS. JOHNSON:
2        Q   Okay.  Mr. Jackson, my name is
3   Barry Johnson.  I'm an attorney with Movie
4   Gallery, and I obviously represent Movie
5   Gallery in this case.  I'm going to be asking
6   you some questions today.  And if you don't
7   understand anything that I ask, if you would
8   ask me to restate it, I'll be glad to do
9   that.  If you answer it, I'm going to assume
10  you understand the question.  Is that fair?
11       A   Okay.
12       Q   Have you ever given a deposition
13  before?
14       A   No.
15       Q   Would you state your full name for
16  the record?
17       A   Michael Demonte Jackson, Sr.
18       Q   And what's your current address?
19       A   3535 Roberts Avenue, Lot Number 39,
20  Tallahassee, Florida, 32310.
21       Q   And how long have you lived at that
22  address?
23       A   About three months now.

**American Court Reporting**
toll-free (877) 320-1050

3 (Pages 10 to 13)

Page 10

1    Q    And where did you live prior to
2    that?
3    A    Prior to that, it was 2613
4    Robindale Drive, Dothan, Alabama, 36305.
5    Q    And how long did you live at that
6    address?
7    A    I lived at that address about six
8    months, I think.
9    Q    And prior to that, were you in
10   Dothan as well?
11   A    Yes.
12   Q    Okay.  Are you currently married?
13   A    Yes.
14   Q    All right.  And what is your wife's
15   full name?
16   A    Tamika, T-A-M-I-K-A, Nicole
17   Jackson.
18   Q    Does she live with you in
19   Tallahassee?
20   A    Yes.
21   Q    Have you had any previous
22   marriages?
23   A    No.

Page 11

1    Q    Do you have any children?
2    A    Yes.
3    Q    Can you tell me their names and
4    ages?
5    A    Michael Demonte Jackson, Jr.; he's
6    six.  All right.  And we've got Malachi,
7    M-A-L-A-C-H-I, Jackson; he's five.  And we
8    have Myheir, M-Y-H-E-I-R, Jackson, and he is
9    six months.
10   Q    Okay.  Do you have any family --
11   and I'm not talking about your sixth cousin
12   on your mother's side or something like that,
13   but what you would consider close family in
14   the Dothan, Montgomery, Wiregrass area?
15   A    No.
16   Q    Okay.  No relatives at all --
17   A    No.
18   Q    -- that you -- tell me about your
19   education.
20   A    Graduated in the top ten in high
21   school.
22   Q    Of what high school?
23   A    James A. Shanks High School.

Page 12

1    Q    And where is that?
2    A    That's in Quincy, Florida.
3    Q    Where did you grow up?
4    A    Quincy, Florida.
5    Q    And is that where your parents are
6    now?
7    A    Yes.
8    Q    Okay.  Go ahead.  After high
9    school?
10   A    Got a scholarship to Troy State
11   University in Troy, Alabama.  Graduated there
12   with a BA in criminal justice and a minor in
13   information systems.
14   Q    Is that a four-year program?
15   A    It is.
16   Q    And what year did you graduate?
17   A    2003.
18   Q    What year did you graduate high
19   school?
20   A    2000.
21   Q    All right.  Any education after
22   Troy?
23   A    No.

Page 13

1    Q    Have you ever filed for bankruptcy?
2    A    No.
3    Q    Have you ever --
4    A    I need to.
5    Q    Go ahead.  I'm sorry?
6    A    I said I need -- probably need to,
7    but no.
8    Q    Okay.  Have you ever been arrested?
9    A    No.
10   Q    Are you on any medication today
11   that would affect your testimony?
12   A    No.
13   Q    Are you currently employed?
14   A    Yes.
15   Q    Where?
16   A    At T. J. Maxx.
17   Q    In Tallahassee?
18   A    Yes.
19   Q    Did you move to Tallahassee for
20   that job?
21   A    Basically.  And also with my wife.
22   Q    Tell me --
23   A    For my wife.  For my wife.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 14

1    Q   Tell me what that means.
2    A   My wife got a promotion on her job.
3    Q   Okay.  Where is she employed?
4    A   Body Shop.  The Body Shop.  It's a
5   female clothing store.
6    Q   Was she employed with The Body Shop
7   in Dothan?
8    A   Yes.
9    Q   And was transferred and promoted to
10  Tallahassee?
11   A   Yes.
12   Q   Did you have the job at T. J. Maxx
13  before you moved to Tallahassee or after you
14  moved to Tallahassee?
15   A   After.
16   Q   How long have you been employed
17  with T. J. Maxx?
18   A   One month, I think.
19   Q   One month?
20   A   Uh-huh.  Yes.  A month and a half.
21   Q   That's another rule I meant to tell
22  you in the beginning.  If you'll give a
23  verbal response, whatever it is -- yes, no,

Page 15

1   or whatever your answer is -- instead of
2   shaking your head because she can't take that
3   down.
4    A   Okay.
5    Q   Okay?  And what's your position at
6   T. J. Maxx?
7    A   Loss prevention detective.
8    Q   Loss prevention what?
9    A   Detective.
10   Q   Detective?
11   A   Yeah.
12   Q   Okay.  And what is your rate of
13  pay?
14   A   Ten seventy-five.
15   Q   An hour?
16   A   Yes.
17   Q   Are you full time?
18   A   Yes.
19   Q   Are you eligible for any bonuses or
20  anything like that?
21   A   Yes.
22   Q   Tell me about the bonus structure.
23   A   I'm sorry.  No, I'm not.  I'm not.

Page 16

1   I'm eligible for a bonus in six months, but
2   nothing right now.
3    Q   In six months you're eligible for a
4   bonus?
5    A   Yes.
6    Q   And how does that work?
7    A   It depends on how good of a job I
8   do.  I would get an hourly rate increase.
9    Q   You would get an increase in your
10  rate, but would you also get a -- like a lump
11  sum bonus?
12   A   I don't think so.
13   Q   You're not sure?
14   A   I'm not sure.
15   Q   Who is your supervisor?
16   A   Ms. Becky Bruntley.  She's a
17  district loss prevention manager.
18   Q   Any other compensation other than
19  your rate of pay?  Do you have benefits?
20   A   I'll be eligible in thirty more
21  days, I think.
22   Q   For what?
23   A   That will be the health and dental.

Page 17

1    Q   Does your wife have health and
2   dental at Body Shop?
3    A   Yes.  But we don't have it right
4   now.  We don't have it.
5    Q   She elected not to take it?
6    A   Well, she missed the enrollment
7   period.  So the next enrollment maybe
8   she'll --
9    Q   And when is that?
10   A   I think in August.  I think.  I'm
11  not sure, though.
12   Q   This August, '06?
13   A   Yes.  But I'm not sure.
14   Q   And it was her, sort of, mistake
15  that she didn't enroll?  There wasn't
16  anything that she wasn't eligible?
17   A   Right.
18   Q   She was eligible, but she forgot to
19  enroll?
20   A   Well, with her promotion, she
21  became available (sic) for it, so she
22  wasn't -- it was not like something she could
23  do right then because she got the promotion.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 18

1    Q    What -- do you know how much she
2    makes?
3    A    I can estimate. About thirty
4    thousand a year.
5    Q    Okay. Where were you working
6    before T. J. Maxx?
7    A    Title Max.
8    Q    And where was that job?
9    A    Here in Dothan, Alabama.
10   Q    And what was your position there?
11   A    Manager of a Title Bucks location.
12   Q    I'm sorry? Say that again. Of
13   Title?
14   A    Bucks, B-U-C-K-S.
15   Q    And what's Title Bucks?
16   A    It's a subsidiary of Title Max.
17   Same company, just different names.
18   Q    And what kind of business is that?
19   A    It's a title pawn institution,
20   basically. You go there, and you get money
21   for your title.
22   Q    How long were you employed at Title
23   Max?

Page 19

1    A    From -- let me see what was it.
2    When did we move? January, February, May
3    -- so 06 of '05 to 03 of '06.
4    Q    All right. June '05 to March '06?
5    Is that --
6    A    Yes.
7    Q    And what was your position -- oh,
8    you were manager. Who was your supervisor
9    there?
10   A    Dave -- David or Dave? Dave
11   Turner.
12   Q    Turner?
13   A    T-U-R-N-E-R.
14   Q    And what was his position?
15   A    District manager.
16   Q    And what was your rate of pay at
17   Title Max?
18   A    I was on salary there. It might
19   have equalled out to thirteen seventy-five, I
20   think, an hour. Maybe. I don't know. I was
21   on salary.
22   Q    You were salary?
23   A    Yeah.

Page 20

1    Q    And you don't know what it --
2    A    Yes, ma'am.
3    Q    What the --
4    A    Oh, you want my salary? You said
5    hourly. You said rate.
6    Q    Well, whatever you made. Your
7    compensation.
8    A    Okay. I made twenty-eight thousand
9    a year, and I got a three hundred dollar
10   bonus, so it wound up to thirty-one.
11   Q    You got a three hundred dollar
12   bonus?
13   A    I mean, three hundred a month.
14   Q    Extra?
15   A    Extra.
16   Q    So you, total, made thirty-one a
17   year?
18   A    Right.
19   Q    Did you have benefits?
20   A    No. The company didn't offer.
21   Q    No health insurance?
22   A    No.
23   Q    Did they offer them?

Page 21

1    A    No.
2    Q    And why did you leave that job?
3    A    To move to Tallahassee.
4    Q    When did you move to Tallahassee?
5    A    In January, February -- March of
6    '06. Of this year.
7    Q    Were you reprimanded ever at that
8    job?
9    A    No.
10   Q    Were you ever given a verbal or
11   written warning?
12   A    No.
13   Q    Were you terminated?
14   A    No.
15   Q    Could you be rehired there, to your
16   knowledge?
17   A    Yes.
18   Q    Did you attempt at all to transfer
19   or get a job with Title Max in Tallahassee?
20   A    Yes. They don't have any offices
21   in Tallahassee -- or in the state of Florida,
22   period.
23   Q    Did you own your home when you were

**www.AmericanCourtReporting.com**
**July 6, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 22

1    in Dothan working with Title Max?  Did you
2    own a home, or did you --
3        A    No.
4        Q    -- rent?
5        A    Rent.
6        Q    Have you ever owned a home?
7        A    No.
8        Q    And was your wife employed at The
9    Body Shop when you were working at Title Max?
10       A    Yes.
11       Q    Did you have any friends at Title
12   Max?  I guess what I'm trying to get at here
13   is, how did you -- what prompted you to apply
14   at Title Max?
15       A    Well, to be honest with you, we
16   went there to get a title pawn.  And they had
17   an open position, so I applied.
18       Q    Did you get a title pawn?
19       A    Yes.
20       Q    And have you paid that off?
21       A    Yes.
22       Q    Where were you employed prior to
23   Title Max?

Page 23

1        A    Prior to Title Max, that would be
2    Movie Gallery.
3        Q    And when were you terminated from
4    Movie Gallery?
5        A    May of '05.
6        Q    All right.  And you told me you
7    went to work for Title Max in June '05.  How
8    long a period, in weeks, were you unemployed?
9        A    Okay.  So it must have been in July
10   of '05 then.
11       Q    What?
12       A    Because I was unemployed for about
13   a month -- at least a month.
14       Q    Okay.  Did you apply for
15   unemployment?
16       A    Yes.
17       Q    And what happened with that?
18       A    I received it.
19       Q    You received unemployment?
20       A    Yes.
21       Q    For how long a period?
22       A    About a month.
23       Q    Do you recall how much you

Page 24

1    received?
2        A    No, I do not.  I cannot remember.
3        Q    Was your wife employed while you
4    were unemployed?
5        A    For a short period because we found
6    out she was pregnant.  No, no.  I'm sorry.
7    She was.  She was employed the whole time, I
8    think.
9        Q    Did you apply for any jobs other
10   than Title Max when you were unemployed?
11       A    Uh-huh.
12       Q    Where?  And you need to say yes or
13   no.  I'm sorry.
14       A    Yes.  Rent-A-Center.
15       Q    Is that in Dothan?
16       A    I applied online.  It was wherever.
17       Q    And what happened with that
18   application?
19       A    I found out it was -- the hourly
20   rate was just too low.
21       Q    Were you offered the job?
22       A    I think so.  Yes.
23       Q    Any other jobs you applied for?

Page 25

1        A    Nationwide Insurance.  That was in
2    Montgomery.  Too long of a travel.
3        Q    Too long a travel?
4        A    Yes.
5        Q    Were you offered a job?
6        A    Yeah.  Interview.  I -- it was an
7    interview.
8        Q    Do you know what the compensation
9    would have been?
10       A    It ranged.  That was another
11   problem.  It was a hundred percent
12   commission, so --
13       Q    What was the hourly rate at
14   Rent-A-Center?
15       A    I think eight fifty.
16       Q    Any other jobs you applied for
17   while you were unemployed?
18       A    Let me see.  What else?  I think
19   AIG Insurance.
20       Q    In Dothan?
21       A    Uh-huh.
22            MR. NEWMAN:  Yes.
23       Q    Were you offered a job?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 26

1     MS. JOHNSON: Go ahead.
2     A   Yes.
3     MR. NEWMAN: No. I was just
4  telling him to say "yes."
5     MS. JOHNSON: Oh, okay.
6     Q   (BY MS. JOHNSON) You were offered
7  a job?
8     A   Yes.
9     Q   Okay. Who offered you the job? Do
10  you remember his name or her name?
11     A   No.
12     Q   And what job were you offered?
13     A   Sales agent, insurance agent.
14     Q   And why did you turn that down?
15     A   Well, eventually it was because I
16  got the job with Title Max.
17     Q   How long a gap was there between
18  the time AIG offered you a job and Title Max
19  offered you a job?
20     A   Maybe a week or two.
21     Q   What kind of money did AIG offer
22  you?
23     A   Again, a hundred percent

Page 27

1  commission. And I think they had, when you
2  joined, three or four hundred dollars that
3  they --
4     Q   Like a sign-on bonus?
5     A   Yes.
6     Q   Did you apply anywhere else while
7  you were unemployed?
8     A   No. I think that's it. I cannot
9  remember anything else.
10     Q   All right. Prior to Movie Gallery,
11  did you hold any jobs?
12     A   Prior to Movie Gallery?
13     Q   Uh-huh.
14     A   I worked with K & W while working
15  with Movie Gallery, in college.
16     Q   What is K & W?
17     A   K & W Recycling. That's a
18  recycling plant in Troy, Alabama.
19     Q   What was your position there?
20     A   Machine operator. It was called an
21  extruder, E-X-T-R-U-D-E-R.
22     Q   And were you part time?
23     A   Full time.

Page 28

1     Q   You worked full time and went to
2  school and worked for Movie Gallery?
3     A   It was during the summer, so --
4     Q   What does that mean? Oh. So you
5  weren't in school?
6     A   Right. I wasn't in school.
7     Q   So how did you hold a full-time job
8  there and work at Movie Gallery?
9     A   I was part time, always, at Movie
10  Gallery.
11     Q   What were your hours at K & W?
12     A   Seven -- seven to five, I think.
13     Q   Seven in the morning to five?
14     A   Yes.
15     Q   So did you have the night shift at
16  Movie Gallery?
17     A   Yes.
18     Q   What was your rate of pay at K & W,
19  or salary, if it was salary?
20     A   I cannot remember exactly. I can
21  estimate. Guesstimate, about eleven fifty.
22     Q   An hour?
23     A   Yes.

Page 29

1     Q   Did you ever receive any verbal or
2  written warnings or reprimands while you were
3  there?
4     A   While I was at K & W? Maybe at
5  K & W. I don't remember exactly. I can't
6  remember.
7     Q   Why did you quit that job -- or did
8  you quit that job?
9     A   Yeah. I quit that job to --
10  because of school and -- that's it. Because
11  of school. I was still in college.
12     Q   Any other jobs you've ever held
13  other than what you've already told me today?
14     A   No. I think that's it.
15     Q   You think that's it?
16     A   I'm trying to think of my -- where
17  all I've worked. No. That's it.
18     Q   Okay. Have you ever been
19  terminated from any job other than Movie
20  Gallery?
21     A   No.
22     Q   When you applied for any of the
23  jobs that you've held or applied for after

**American Court Reporting**
**toll-free (877) 320-1050**

Page 30

1  Movie Gallery, including the two you've held,
2  did you tell them, either on the application
3  or verbally, that you were terminated from
4  Movie Gallery?
5      A   No.  Because it was my
6  understanding that I was laid off.
7      Q   Okay.  So did you tell the people
8  that you applied with that you were laid off?
9      A   Uh-huh.
10     Q   Is that a "yes"?
11     A   Yes.
12     Q   Did you put that on the
13  application?  And I'm asking you about
14  several employers.  So if you just -- if you
15  don't remember, that's fine.  But if you
16  specifically remember putting "laid off" on
17  any of the employers' applications, that's
18  what I'm looking for.
19     A   On the application -- let me -- no.
20  I probably did not.  No.
21     Q   Did they ask you --
22     A   No.
23     Q   -- why you left Movie Gallery?

Page 31

1      A   No.
2      Q   So when you told me -- you said you
3  were laid off, in what context do you mean?
4      A   Like in the interview with my --
5  whoever did --
6      Q   You brought it up and said --
7      A   Yeah.
8      Q   -- I was laid off from Movie
9  Gallery?
10     A   Yes.
11     Q   Is it your understanding you were,
12  in fact, laid off from Movie Gallery?
13     A   Well, I don't really understand
14  that because in talking with my supervisor,
15  he was like we're going to lay you off, but
16  if you don't sign this, you're going to be
17  terminated or classified as being terminated.
18  So I assumed laid off, but you know what they
19  say about assumptions.
20     Q   Who was the supervisor that told
21  you that?
22     A   Heath Croom.
23     Q   Was it your understanding that

Page 32

1  other people were laid off the same day you
2  were laid off?
3      A   The same day.
4      Q   Same time period.
5      A   I don't know.
6      Q   Okay.  You don't know of anyone
7  else that was laid off during this time
8  period that you were laid off?
9      A   No.
10     Q   Okay.  You hadn't heard that?
11     A   What?
12     Q   That other people were laid off.
13     A   Maybe weeks or months later I heard
14  it.  But during that time, I did not know.
15     Q   What -- do you have a personal
16  belief as to whether you were laid off or
17  terminated?
18     A   Eventually, I believe I was
19  terminated.
20     Q   And why do you believe that?
21     A   Because I did not sign the document
22  that they handed me.
23     Q   When you told the -- your -- the

Page 33

1  employers that you applied with that you had
2  been laid off, at that time, did you believe
3  you had been laid off or terminated?
4      A   Well, I believe I had been laid
5  off, you know.  But no, I didn't sign the
6  document.
7      Q   Right.
8      A   So I really didn't know I was laid
9  off, terminated, or whatever.  But I felt
10 like I had been terminated.
11     Q   All right.  Well, let me get -- let
12 me try to get the time frame straight on this
13 because I'm a little confused.  You
14 believe -- and correct me if I'm misstating
15 anything.  Okay?
16        You believe you were terminated
17 because you wouldn't sign the document?
18     A   Right.
19     Q   And that would have been when you
20 were terminated, in May of '05?
21     A   Uh-huh.
22     Q   Okay.  So since May of '05, you
23 have believed that you were terminated

**American Court Reporting**
toll-free (877) 320-1050

Page 34

1  because you didn't sign the documentation in
2  May of '05; correct?
3      A    As far as Movie Gallery was
4  concerned, they would say I was probably
5  terminated.
6      Q    Okay.  And yet, when you applied
7  for jobs, you told the employers you were
8  laid off; is that correct?
9      A    Yeah.  Because I didn't know if I
10  had been laid off or was it classified as
11  termination.
12      Q    Okay.  And sitting here today, you
13  still don't know whether you were laid off or
14  terminated?
15      A    I don't know a hundred percent
16  because I have not heard from Movie Gallery.
17      Q    Right.
18      A    But I feel as though they --
19      Q    Right.
20      A    -- terminated me, but they could
21  have classified it as laid off.  I don't
22  know.
23      Q    And the basis for your belief that

Page 35

1  you were terminated is just you're guessing
2  or you're assuming; correct?
3      A    Right.  Because that's what my
4  supervisor told me:  If you don't sign this,
5  you know, you -- they're probably going to
6  classify you as being terminated.
7      Q    All right.  And what is it that he
8  asked you to sign?
9      A    Basically, it was a document
10  stating that I'm going to get three weeks'
11  worth of severance pay and that I'm not going
12  to sue Movie Gallery for any blah, blah,
13  blah, or whatever.  I don't know.  I can't
14  remember it word for word.
15      Q    Did you keep a copy of it?
16      A    I did.
17      Q    And did you turn that over to your
18  attorney?
19      A    I believe I did.  Yes.
20      MS. JOHNSON:  Okay.  I have not
21  seen that, and that's responsive to my
22  request.
23      MR. NEWMAN:  He's saying he

Page 36

1  believes.
2      MS. JOHNSON:  Okay.
3      MR. NEWMAN:  He believes he did.
4      MS. JOHNSON:  Well, if you will,
5  check on that.
6      Q    (BY MS. JOHNSON)  You're under
7  oath.  You understand you're under oath?
8      A    I believe I did.
9      Q    Okay.
10      A    But I'm not sure.
11      Q    All right.  Was anybody else
12  present at the meeting?
13      A    What meeting?
14      Q    The meeting where he asked you to
15  sign the severance agreement.
16      A    No.
17      Q    So just the two of you?
18      A    Yes.
19      Q    Did he tell you during that meeting
20  that Movie Gallery was downsizing and laying
21  off anyone else besides you?  And I'm not
22  saying that he mentioned names, but did he
23  tell you that we're letting several people

Page 37

1  go?
2      A    He may have.  I don't remember.
3      Q    What do you remember him telling
4  you in that meeting, other than asking you to
5  sign a document?
6      A    Besides asking me to -- you mean,
7  to sign a document?  We had a discussion
8  which I asked him, you know, do you believe
9  and do you feel like I should be terminated,
10  you know, before because -- I asked him that
11  for a reason.  And he said no, that I would
12  not have terminated you.
13      And, also, I discussed why was this
14  happening.  And he was telling me that my
15  evaluation was below the company standard or
16  whatever of two point o, but I pointed out it
17  was a two point five, you know.  And he just
18  said, well, you know, I'm just doing what I
19  was told, so --
20      Q    Did he tell you who told him to do
21  it?
22      A    No.  I can only assume it, you
23  know, his boss or his boss' boss.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 38

1  Q   You assume that?
2  A   Yeah.
3  Q   Did he mention any names of
4  anybody?
5  A   No.
6  Q   Anything else discussed in that
7  meeting?
8  A   No.  Because I was basically just
9  wanting to know if he would do it, and no, he
10  wouldn't, so --
11  Q   He wouldn't -- oh, he wouldn't fire
12  you?
13  A   He wouldn't fire me.
14  Q   Okay.
15  A   Or lay me off or anything.
16  Q   Did you get along with Mr. Croom?
17  A   Yes.
18  Q   What race was he?
19  A   He is Caucasian.
20  Q   And what was his title at the time?
21  A   Director of human resources.
22  Q   And who did --
23  A   I mean, director of quality

Page 39

1  assurance.  I'm sorry.
2  Q   And he was your immediate
3  supervisor?
4  A   Yes.
5  Q   Who was his supervisor, if you
6  know?
7  A   I cannot remember his name.
8  Q   Was it Phillip Kitchens?
9  A   Yes.
10  Q   All right.  I'm going to go back
11  and talk about when you first applied --
12  A   Uh-huh.
13  Q   -- to Movie Gallery.
14  A   Uh-huh.
15  Q   Do you recall what year that was or
16  what month and year?
17  A   I can remember.  The month, not
18  precisely.
19  Q   Okay.
20  A   But the year was 1998.  And it was
21  through the work -- school-to-work program at
22  James A. Shanks.
23  Q   So you were in high school still?

Page 40

1  A   Right.
2  Q   And what was your position?
3  A   Customer sales associate, CSA.
4  Q   And that is, in laymen's terms, the
5  associates on the floor that rent movies --
6  A   Right.
7  Q   -- to customers?
8  A   Exactly.
9  Q   And you were -- were you part time?
10  A   Yes.
11  Q   And do you recall who your
12  supervisor was then?
13  A   Isaac Randolph.  Isaac Randolph,
14  like Isaac in the Bible.
15  Q   What was his title?
16  A   Manager.  Store manager.
17  Q   Do you recall your rate of pay?
18  A   No.
19  Q   And how long did you work in that
20  position?
21  A   I was at that position for six
22  years.
23  Q   Part time?

Page 41

1  A   Part time, six years.
2  Q   In Dothan?
3  A   Between Quincy and Dothan and Troy.
4  Q   You worked at all of them?
5  A   Yes.
6  Q   Was Isaac your manager the whole
7  time?
8  A   No.
9  Q   Okay.  Tell me the names of your
10  other managers.
11  A   In Quincy, it was Isaac.  Troy --
12  Q   What race was Quincy?
13  A   Excuse me?
14  MR. NEWMAN:  Quincy?
15  A   Quincy?
16  Q   (BY MS. JOHNSON)  Oh, I'm sorry.
17  Was Quincy -- Isaac, yeah.  I wrote down
18  Quincy.
19  A   Isaac, he's black.
20  Q   All right.  And then in Troy, who
21  was your --
22  A   Valerie Murphy.
23  Q   And what was her race?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 42

1     A    Black. Afro-American.
2     Q    And where else? What other town?
3 Dothan?
4     A    Oh, no. I did not -- I didn't work
5 as a CSA. It was corporate in Dothan.
6     Q    Okay. So the two stores you worked
7 in were Quincy and Troy?
8     A    Right.
9     Q    Okay. Did you get a promotion
10 during that six-year period? And this is
11 before you go to the corporate office.
12     A    Uh-huh.
13     Q    Well, let me back up and get this
14 clarified. This six-year period you were
15 talking about, were you always a sales --
16     A    Associate, yeah.
17     Q    Okay. In Quincy or Troy?
18     A    Right.
19     Q    All right. Did you get a promotion
20 or increase in pay during that time period?
21     A    Yes.
22     Q    And tell me about that -- when?
23 How much?

Page 43

1     A    Well, with Movie Gallery, your rate
2 of increase would be ten cents as an
3 associate, and I always received that. It
4 would be -- they're supposed to do it every
5 six months, but it did not always happen that
6 way. But whenever they did decide to do it,
7 I would get it. And I got a promotion to
8 MOD. That's like an in-store position.
9 Manager on duty, senior CSA.
10     Q    When was that?
11     A    That was when I was in, I think,
12 Troy.
13     Q    And what -- did you get a raise as
14 well?
15     A    Yes.
16     Q    And what -- to what amount?
17     A    To what? I don't remember the
18 amount. I mean, I know it was at least ten
19 cents of whatever I was making.
20     Q    Did anybody else apply for that
21 position other than you?
22     A    It's not something -- well, no. I
23 don't know. Okay?

Page 44

1     Q    When you said that sometimes you
2 didn't get the ten cent raise, is that
3 something --
4     A    I never said I did not get the ten
5 cent raise.
6     Q    Well, when the company didn't give
7 it -- didn't you say on occasion they didn't
8 always give it?
9     A    When I said that, I meant that they
10 did not always do the evaluation deemed
11 necessary to get the raise.
12     Q    Okay. Did that happen to people
13 other than you?
14     A    Yes.
15     Q    Okay. It happened across the
16 board?
17     A    Yes.
18     Q    It wasn't just you?
19     A    Right.
20     Q    All right. And then, after six
21 years, you came with the corporate office?
22     A    Right.
23     Q    How did that come about?

Page 45

1     A    Through graduation and getting my
2 degree. I asked my store manager, Valerie,
3 at the time. And she asked her district
4 manager, Cathy, at the time, and -- about any
5 open positions at corporate. And I gave my
6 -- no. Yeah. She gave me the name of the
7 person to call.
8     Q    Do you recall who that was?
9     A    I think it was -- yeah. Mr.
10 Kitchens. Yeah. And he gave me -- no. He
11 told me to come by the office and bring my
12 resume with me, and I did, so -- and he told
13 me -- any position he had open at that point,
14 you know, I'm ready to move on with the
15 company. I've been with the company for a
16 long time. I want to stay with the company.
17 Like it. I want, you know, to grow with the
18 company. And a month -- maybe a month later,
19 he gave me a call.
20     Q    And what did he say in the call?
21     A    Come in and have an interview with
22 Mr. Heath Croom.
23     Q    And did you do that?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 46

1   A   Yes.
2   Q   And how long was the interview?
3   A   About an hour or so.
4   Q   Did you meet with anybody other
5   than Mr. Croom?
6   A   For the interview?  No.
7   Q   Did he offer you a job during the
8   interview?
9   A   No.
10  Q   When did he offer you a job?
11  A   He called me back.  Between me
12  calling him and him calling me, somewhere in
13  between there.  I don't know exactly when.
14  Q   Do you recall how long after the
15  interview?  Was it a couple days, a --
16  A   Maybe --
17  Q   -- month?
18  A   -- a couple days.
19  Q   And what position did he offer you?
20  A   Quality assurance auditor.
21  Q   Was that a full-time job?
22  A   Yes.
23  Q   And did it involve an increase in

Page 47

1   pay?
2   A   Yes.
3   Q   All right.  Do you recall how much?
4   Did you go to a salaried position?
5   A   Yes.  Salary.
6   Q   All right.  Do you recall what it
7   was?
8   A   Thirty-two thousand.
9   Q   Thirty-two thousand?  Okay.  Did
10  that include benefits?
11  A   Yes.
12  Q   Any other compensation, bonus plan
13  or --
14  A   Yes.  Bonus.  Yes.
15  Q   How did the bonus plan work?
16  A   Basically through -- same as with
17  the stores.  Through the evaluation of your
18  supervisor.
19  Q   Did you understand how much you
20  could receive, maximum amount, in the bonus
21  plan?
22  A   Not quite.  Because with Movie
23  Gallery, it -- the scales go up and down,

Page 48

1   depending on how good the company is doing
2   throughout that year.  So it would be a
3   percentage of however good or however much
4   they could spare to give to whomever or
5   whatever department.
6   Q   Did you ever receive a raise in
7   that position?
8   A   A raise?  No.
9   Q   So when -- at the time you were
10  terminated, you were making thirty-two
11  thousand?
12  A   Yes.
13  Q   Did you ever receive a bonus?
14  A   Yes.
15  Q   How much?
16  A   I think that bonus was seven
17  hundred and something bucks.
18  Q   And when was that?
19  A   When?  I don't know.  I can't
20  remember.
21  Q   Is that the only bonus you received
22  in the quality assurance position?
23  A   Yes.

Page 49

1   Q   Is the only person you ever
2   reported to in that position Mr. Croom?
3   A   Yes.
4   Q   What were your job duties?
5   A   Job duties basically were to go to
6   stores and conduct quality assurance audits,
7   LP mess audits.  It entailed knowing all the
8   company's procedures, policies, and store
9   requirements based off revenue class.
10  Travel, documentation of all facts found
11  through a report that we sent to the district
12  manager, the director of quality assurance,
13  and also the regional manager.
14  Q   Okay.  Did you travel quite a bit?
15  A   Yes.
16  Q   Were you given a corporate credit
17  card?
18  A   Yes.
19  Q   To pay for your travel expenses?
20  A   Yes.
21  Q   How did that work as far as -- did
22  the bill go to the company or to you?
23  A   To me.

**American Court Reporting**
**toll-free (877) 320-1050**

13 (Pages 50 to 53)

Page 50

1    Q    Okay.  And was it your
2    understanding that you were to get reimbursed
3    for that and pay off the credit card in a
4    timely fashion?
5    A    Yes.
6    Q    And did you do that?
7    A    Most of the time.
8    Q    Did you ever not do that?
9    A    Yes.  There was an incident where
10   something happened with -- there at corporate
11   where I did not receive my reimbursement, had
12   to use my personal funds.  And it was all
13   just confusing.
14   Q    When you say you didn't receive the
15   reimbursement, did you ever receive the
16   reimbursement?
17   A    Eventually.
18   Q    Do you have any documentation that
19   shows that you didn't receive the
20   reimbursement in a timely fashion?
21   A    No.  That would be on my laptop
22   because we kept track of all that stuff,
23   so --

Page 51

1    Q    So are you saying that there would
2    have been an e-mail message from you to
3    somebody saying you hadn't been reimbursed?
4    A    No.  There would be direct
5    communication between me and Mr. Croom.
6    Q    That's what I'm asking.  About the
7    fact that you weren't reimbursed?  Did you
8    ever put in writing to anyone, by e-mail or
9    otherwise, that you had not been reimbursed?
10   A    I can't -- I don't remember.
11   Q    Is that the only time you were late
12   paying your American Express bill?
13   A    I believe so.  I don't remember.
14   Q    Okay.  Would you agree with me that
15   that would have been a violation of company
16   policy?
17   A    That would have been of the Amex.
18   Q    Corporate policy?
19   A    Yes.
20   Q    To your knowledge, did you ever
21   violate any other company policies?
22   A    Company policies?
23   Q    Or whatever you want to call them,

Page 52

1    but policies that you knew that you were
2    under an obligation to fulfill or comply
3    with.
4    A    No.
5    Q    All right.  Did you ever apply for
6    any other positions while you were employed
7    with Movie Gallery?
8    A    Yes.
9    Q    Tell me about those.
10   A    One was for the director of Game
11   Zone.
12   Q    All right.  And was that job
13   posted?
14   A    Yes.
15   Q    And do you recall when you applied
16   for it?
17   A    The exact date?  No.
18   Q    Approximately.
19   A    Around March of '05.
20   Q    Did you interview for that
21   position?
22   A    No.
23   Q    All right.  Do you know if anybody

Page 53

1    interviewed for that position?
2    A    Do I know?  No, I don't know.
3    Q    Do you know if that position was
4    filled?
5    A    No.  I do not know for sure.
6    Q    Are you aware that that position --
7    the opening for that position was removed and
8    it was never filled?
9    A    Was I -- no.  I was never notified
10   of such.
11   Q    Any other positions you applied
12   for?
13   A    Yeah.  Also, with the Game Zone
14   department, something with game purchasing.
15   Q    You don't recall the position?
16   A    I can't recall the exact name of
17   it, but I know it was at the Game Zone --
18   something with Game Zone.
19   Q    And when was that?
20   A    That was -- it would have been
21   around November.
22   Q    Of what?
23   A    Of '04.  January, February, March.

**American Court Reporting**
**toll-free (877) 320-1050**

14 (Pages 54 to 57)

Page 54

1  They're fairly close together.
2      Q    All right. Let's go back to
3  director of Game Zone. Did you fill out a
4  written application for that?
5      A    No. According to the attached --
6  the e-mail that was posted, I was to inform
7  my supervisor, give him my resume. And he
8  was -- the supervisor was supposed to forward
9  it on to HR or whomever.
10     Q    Do you know whether or not he did
11  that?
12     A    Do I know? No.
13     Q    Okay. Do you know how much money
14  you would have made if you had been hired as
15  director of Game Zone?
16     A    I cannot remember. I know it was a
17  lot more than what I was making.
18     Q    Do you remember how much more,
19  approximately?
20     A    Approximately five to eight
21  thousand dollars more.
22     Q    Okay. And what did you do to apply
23  for the other position, that you can't

Page 55

1  remember the name of, for Game Zone?
2      A    I also did the same thing.
3      Q    Gave your resume?
4      A    Gave my resume.
5      Q    To Mr. Croom?
6      A    Yes. That's what the attachment --
7  that's what all of them say.
8      Q    So you saw a written announcement
9  for that position?
10     A    Posted on e-mail.
11     Q    On both of them?
12     A    Yes.
13     Q    And do you know whether Mr. Croom
14  forwarded your resume on for that position?
15     A    No.
16     Q    You don't know?
17     A    I don't know that he did it. The
18  only thing I know is that I gave it to him
19  and asked him to do it and he said he would.
20  And that's all I know.
21     Q    Okay. Did you ever follow up with
22  him to see if he had done that?
23     A    I know I probably asked him. I

Page 56

1  know I did.
2      Q    On which one? On both of them?
3      A    On both of them. He would have
4  told me -- said yes.
5      Q    He would have said yes, or you
6  recall him saying yes?
7      A    I recall him saying yes, I mean.
8  Because if he would have said no, I know I
9  would have said why didn't you do this or why
10  didn't you -- what happened with this one,
11  what happened with that?
12     Q    Did you interview for that second
13  position?
14     A    No.
15     Q    Did you ever go to Mr. Croom and
16  ask why you hadn't heard about these
17  positions?
18     A    I don't recall doing that.
19     Q    Okay. Do you know how much money
20  you would have made for that second job? And
21  I keep calling it "the second job" because
22  you don't recall the title of it, the game
23  purchasing.

Page 57

1      A    Yeah.
2      Q    Do you know how much?
3      A    No, I don't. I do not know.
4      Q    Do you know whether that position
5  was ever filled?
6      A    I do not know.
7      Q    Okay. Did you ever apply for any
8  other positions while you were at Movie
9  Gallery?
10     A    Apply? No.
11     Q    Well, what did you mean by -- there
12  was an insinuation in your tone that you
13  might have informally applied. Did you ever
14  informally apply?
15     A    You know how you -- I had had it
16  out there, you know, like with Mr. Croom, you
17  know, and -- what was his name? Anyway, if
18  there was other positions closer to home that
19  I could apply for, just let me know.
20     Q    What do you mean "closer to home"?
21     A    Not so much travel.
22     Q    Any specific position other than
23  those two that you've named?

**American Court Reporting**
**toll-free (877) 320-1050**

15 (Pages 58 to 61)

Page 58

1   A   It would be anything. Anything
2  that would not --
3    Q   I know. But my question is, was
4  there any specific position that you were
5  interested in that you mentioned to Mr. Croom
6  or anyone else?
7    A   It would be loss prevention
8  manager, anything in the corporate office
9  there with the security.
10   Q   I don't think we're communicating.
11  I know -- I think what you're trying to tell
12  me is that you made it clear you would like a
13  promotion; is that correct?
14   A   Yes. I guess.
15   Q   Okay.
16   A   Well, hold on. Would I like a
17  promotion? Of course, I would always like a
18  promotion.
19   Q   Right.
20   A   So what are you asking?
21   Q   My question is, other than those
22  two specific positions that you knew about,
23  did you ever express interest in any other

Page 59

1  particular position other than, hey, guys,
2  you know that I'm looking -- if there's an
3  opening one day, I'm interested.
4    Other than that, saying that, was
5  there a specific position you said the
6  position of blank is open, I would like that
7  job, I'm interested in that job?
8    A   No. It was just --
9    Q   Just those two?
10   A   Right. That I went for and applied
11  for.
12   Q   All right. A minute ago you said
13  you talked with someone else other than Mr.
14  Croom about your desire to be promoted. Who
15  -- do you recall who that was?
16   A   I was trying to remember. The only
17  thing I remember is Bo.
18   Q   Bo Collins?
19   A   Yes.
20   Q   And what was his title?
21   A   LP manager. Loss prevention
22  manager or something like that.
23   Q   Was he a supervisor of yours?

Page 60

1   A   No.
2    Q   What was his relationship to Mr.
3  Croom -- do you know -- hierarchy-wise?
4    A   I really don't know because --
5  hierarchy-wise, Mr. Croom should have been
6  over --
7    Q   Bo?
8    A   -- Bo. He should have been over
9  him, so -- but they communicated as equals,
10  so I don't know.
11   Q   Did he have any hiring or firing
12  authority over you, Mr. Collins?
13   A   No.
14   Q   I'm going to show you what I'm
15  marking as Defendant's Exhibit 1 and ask you
16  to identify that document.
17    (WHEREUPON, a document was marked
18  as Defendant's Exhibit 1 and is attached to
19  the original deposition.)
20   Q   (BY MS. JOHNSON) Do you know what
21  it is?
22   A   A status change report.
23   Q   Okay. Have you seen this before?

Page 61

1   A   Yes.
2    Q   Okay. And is this a document that
3  reflects your promotion from senior sales
4  associate to quality assurance auditor?
5    A   Yes.
6    Q   And it shows that as a senior sales
7  associate, you had been making five forty an
8  hour, and as quality assurance auditor, you
9  were making thirty-two thousand dollars a
10  year; is that correct?
11   A   Yes.
12   Q   Okay. And that is, in fact,
13  accurate information as to your compensation;
14  correct?
15   A   Yes.
16   Q   And it shows that this occurred in
17  May of '04?
18   A   Uh-huh.
19   Q   All right. And is signed by Mr.
20  Croom?
21   A   Where?
22   Q   Up there, it says "initiator."
23   A   All right.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 62

1    Q    Do you recognize that signature?
2    A    Uh-huh.
3    Q    Okay.  And he showed you this at
4    the time?
5    A    Right.
6    Q    Okay.  And this document also notes
7    that you're eligible for the bonus plan; is
8    that accurate?  At the bottom.
9    A    Where at the bottom.
10    Q    Last -- last sentence on the
11    document.
12    A    Awe.  Yeah.  You mean the
13    handwriting.  Okay.
14    Q    Is that your handwriting?
15    A    The first line is my handwriting.
16    Q    What first line?  Brundidge?
17    Brundidge --
18    A    Yes.
19    Q    -- Street?
20    A    Yes.  Eight, two thousand -- yeah.
21    23rd South Brundidge Street.
22    Q    All right.  This is a little bit
23    off topic, but is that your correct Social

Page 63

1    Security Number on there, 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?
2    A    Uh-huh.
3    Q    And is that your correct date of
4    birth, 11/13/1981?
5    A    11/13/1981, yes.
6    Q    Let me show you what I'm marking as
7    Defendant's Exhibit 2.
8        (WHEREUPON, a document was marked
9    as Defendant's Exhibit 2 and is attached to
10    the original deposition.)
11    Q    (BY MS. JOHNSON) Can you identify
12    this document for me?
13    A    Okay.
14    Q    All right.  What is it?
15    A    Movie Gallery code of business
16    conduct and ethics.
17    Q    Well, it's actually your
18    acknowledgment --
19    A    All right.
20    Q    -- of receiving that; is that
21    correct?
22    A    Uh-huh.
23    Q    Is that your signature?

Page 64

1    A    Yes.
2    Q    All right.  And it's dated
3    August 16th, '04; is that correct?
4    A    Uh-huh.
5    Q    You need to say yes or no.
6    A    Yes.  I'm sorry.
7    Q    And do you recall receiving the
8    Movie Gallery code of business conduct and
9    ethics?
10    A    Yes.
11    Q    And did you read it as you agreed
12    to do on this document?
13    A    Yes.
14    Q    All right.  And did you understand
15    that if you violated it, you were subject to
16    being fired or disciplined?
17    A    Yes.
18    Q    All right.  And you also understood
19    that you could ask the general counsel at
20    Movie Gallery any questions that you had
21    regarding the code of ethics; is that
22    correct?
23    A    Yes.

Page 65

1    Q    Do you know who the general counsel
2    was at that time?
3    A    No.
4    Q    If I tell you it was Todd, does
5    that refresh your recollection?
6    A    No.
7    Q    Did you know Mr. Todd?
8    A    No.
9    Q    Did you ever ask the legal
10    department any questions about anything --
11    A    No.
12    Q    -- when you were employed there?
13    A    No.
14    Q    Do you still have a copy of the
15    business conduct and ethics --
16    A    No.
17    Q    All right.  What did you do with
18    it?
19    A    I lost it with -- between the
20    moves, somewhere.
21    Q    Did you ever receive an employee
22    handbook when you were working for Movie
23    Gallery either as a sales associate or in the

**American Court Reporting**
toll-free (877) 320-1050

17  (Pages 66 to 69)

Page 66

1   corporate department?
2       A    As a sales associate.
3       Q    Do you still have a copy of that?
4       A    No.
5       Q    Did you read it?
6       A    Yes.  As a sales associate.
7       Q    Did you understand -- well, let me
8   back up.  Were you aware that, and are you
9   aware that, Movie Gallery has a policy
10  against discrimination of any kind?
11      A    Yes.
12      Q    Okay.  Was that in the employee
13  handbook?
14      A    Yes.
15      Q    Okay.  Did you understand what you
16  were supposed to do if you felt like you had
17  been discriminated against?
18      A    Yes.
19      Q    And what was that?
20      A    Basically, get a lawyer.
21      Q    Did you understand that you were to
22  report it internally to someone if you felt
23  like you had been discriminated against?

Page 67

1       A    Yes.
2       Q    And who were you to report it to?
3       A    It would be your direct supervisor.
4       Q    Okay.
5       A    And, you know, it would go from
6   there.
7       Q    In that case -- in your case, it
8   would have been Mr. Croom?
9       A    Mr. Croom.
10      Q    Okay.  Did you ever feel like Mr.
11  Croom discriminated against you?
12      A    Mr. Croom?
13      Q    Yes.
14      A    No.  Not Mr. Croom.
15      Q    So if you felt like you had been
16  discriminated against, you would have had no
17  problem reporting it to him; correct?
18      A    Mr. Croom?
19      Q    Yes.
20      A    Yes.
21      Q    You -- we need to clarify that for
22  the record.  You would have had no problem.
23  Is that accurate?

Page 68

1       A    I would have had no problem.
2       Q    Okay.  Did you ever complain to Mr.
3   Croom about discrimination at Movie Gallery?
4       A    No.
5           (WHEREUPON, a document was marked
6   as Defendant's Exhibit 3 and is attached to
7   the original deposition.)
8       Q    (BY MS. JOHNSON)  I want to show
9   you what's been marked as Defendant's Exhibit
10  3.  Have you ever seen this document before?
11      A    Yes.
12      Q    Okay.  And what is it?
13      A    The equal employment opportunity.
14      Q    Is this Movie Gallery's policy on
15  equal employment opportunity?  And take as
16  much time as you want to review it.
17      A    This is not what I remember seeing
18  in the handbook, but --
19      Q    But you've seen this document
20  before?  Well, a minute ago you said you had.
21  And that's okay if you're changing your
22  testimony.  I just need to understand what it
23  is.

Page 69

1       A    Equal employment?  I remember in
2   the handbook there was maybe one or two
3   pages.
4       Q    On their policy against
5   discrimination?
6       A    Discrimination.  Equal employment
7   opportunity.
8       Q    Okay.  Well, take a minute to look
9   at this paragraph, and tell me if the policy
10  you recall seeing differed in any substantial
11  way with what you see here.
12      A    Ask that question again.  I'm
13  sorry.
14      Q    If you'll take a minute to read
15  this first paragraph under the heading "equal
16  employment opportunity" and tell me whether
17  it differs in any substantial way from what
18  you recall reading in the employee handbook.
19      A    Okay.  The very first paragraph?
20      Q    Right.
21      A    No.
22      Q    So you don't recall anything in the
23  handbook that differed substantially from

**American Court Reporting**
**toll-free (877) 320-1050**

Page 70

1    this document?
2        A    That differed?  No.
3        Q    Okay.
4        A    It's the rest of the document that
5    I didn't --
6        Q    That you don't recognize?
7        A    Yeah.
8        Q    And when you say "the rest of the
9    document," you mean the other headings that
10   have nothing to do with the EEO; is that
11   correct?  The immigration, the conflicts of
12   interest --
13       A    Right.
14       Q    -- et cetera?
15       A    Correct.
16       Q    You need to say --
17       A    Yes.
18       Q    Did you ever notice, also, at Movie
19   Gallery in the break room or elsewhere in the
20   building, in the corporate office, the policy
21   against discrimination being posted?
22       A    In the break room?
23       Q    Yes.  Or anywhere.

Page 71

1        A    No.  Not in the break room.  At the
2    corporate office, but it was required for the
3    stores, so --
4        Q    What -- at the corporate office,
5    did you ever see a poster?
6        A    I don't remember seeing a poster.
7        Q    Okay.  So if there was one, you're
8    not disagreeing that there was one?
9        A    No.  I'm not disagreeing.  Correct.
10       Q    If you need a break at any time,
11   just let me know.  I saw you looking at your
12   watch.
13            (WHEREUPON, a document was marked
14   as Defendant's Exhibit 4 and is attached to
15   the original deposition.)
16       Q    (BY MS. JOHNSON)  I'm going to show
17   you what I'm marking as Defendant's Exhibit
18   4.  Can you tell me what this document is?
19       A    Charge of discrimination.
20       Q    Is that your signature at the
21   bottom?
22       A    Yes.
23       Q    All right.  And did you fill this

Page 72

1    out by yourself, or did you have assistance?
2        A    Assistance.
3        Q    With your attorney?
4        A    Yes.
5        Q    And was that Malcolm Newman?
6        A    Yes.
7        Q    Did you attempt to get -- scratch
8    that.  Let me re-ask it.  Did you talk with
9    -- and I'm not interested in the substance of
10   your conversations, but did you talk to any
11   other attorneys, other than Mr. Newman, about
12   bringing a lawsuit against Movie Gallery?
13       A    About bringing -- yes.
14       Q    Okay.  And who -- who were they?
15   What attorneys?
16       A    I cannot remember, honestly.  I
17   just know where they're located.
18       Q    Where are they located?
19       A    They're here in town, Dothan.
20       Q    How many?
21       A    Just one.  It's right down the
22   street as a matter of fact.
23       Q    Okay.  And you don't recall his

Page 73

1    name?
2        A    I cannot recall his name.
3        Q    Does he practice by himself or with
4    a firm?
5        A    I think it's his firm.
6        Q    And did you talk with him before
7    you met with Mr. Newman or after?
8        A    Very briefly before.
9        Q    And tell me why you chose not to
10   use him as an attorney.
11       A    Actually, we were just going to him
12   to see who in town handles this type of case,
13   and he pointed us to --
14       Q    He referred you to Mr. Newman?
15       A    Yes.
16       Q    Did he refuse to take the case
17   himself?
18       A    No.
19       Q    Is the information contained in the
20   charge of discrimination accurate to the best
21   of your knowledge?
22       A    Yes.
23       Q    Okay.  Did you consult with Mr.

**American Court Reporting**
**toll-free (877) 320-1050**

19 (Pages 74 to 77)

Page 74

1   Newman or the -- this other attorney that you
2   can't remember the name of before you were
3   fired or after, the first time?
4       A    After.
5       Q    Did you ever consult with any
6   attorney about suing Movie Gallery before you
7   were fired?
8       A    No.
9       Q    Does this document reflect your
10  recollection as to when you applied for the
11  position of director of Game Zone/Trade Zone?
12      A    Approx -- yes.  Close enough.
13      Q    You think this date is accurate,
14  March 23 of 2005?
15      A    I believe so.  I'm not sure.
16      Q    Okay.  And you say that -- in this
17  document, you say that you were entitled to
18  at least an interview, but you were not given
19  an interview.
20          Do you know if anybody was
21  interviewed?
22      A    No.  I do not know if anyone was
23  interviewed.

Page 75

1       Q    You -- later down -- further down
2   in the paragraph, you say that the CEO
3   changed the cutoff score to justify his
4   decision to fire me.
5           Who are you talking about there?
6       A    The CEO of Movie Gallery.
7       Q    Yes.  What's his name?
8       A    His name is Joe Malugen.
9       Q    Okay.  And what led you to believe
10  that Joe Malugen had changed the cutoff score
11  for you?
12      A    Because I was told it was two
13  point o at one point, and then later on it
14  became two point five, I believe.
15      Q    What became two point five?
16      A    The cutoff point.
17      Q    Okay.  My question is, though --
18  you state here that you believe it was Joe
19  Malugen who did -- who made that change;
20  correct?
21      A    Yes.
22      Q    Okay.  And why do you believe it
23  was Joe?

Page 76

1       A    Because he was CEO.  He controls
2   the cutoff point of -- first of all, I was
3   told, also, that it was something that came
4   straight from Joe, the whole layoff
5   situation, through mister -- my conversations
6   with Mr. Croom.
7       Q    Okay.  But that's a different
8   question.  Mr. Croom told you that Joe
9   Malugen made the decision for the layoffs?
10      A    Right.
11      Q    Okay.  This document, Defendant's
12  Exhibit 4, states, does it not, that you
13  believe Joe Malugen also changed the cutoff
14  score to justify his decision to fire you?
15      A    Yes.
16      Q    Is that accurate?
17      A    Yes.
18      Q    Okay.  What makes you believe --
19  what's the basis for your belief --
20      A    The direct correlation for him
21  setting the two point o cutoff, whereas mine
22  is the two point five.  My evaluation is a
23  two point five, and I'm still getting laid

Page 77

1   off, fired.
2       Q    Did anyone ever tell you that it
3   was Joe Malugen's decision to change the
4   cutoff score?
5       A    No.  They wouldn't tell me that.
6       Q    All right.  Did anyone tell you it
7   was Joe Malugen's decision to fire you, fire
8   you in particular?
9       A    To fire me in particular?  Well,
10  that question -- just deductive reasoning,
11  yeah.  It's Joe Malugen that --
12      Q    I'm not asking about deductive
13  reasoning.  I'm asking you did anyone tell
14  you --
15      A    No.  No one told me directly.
16      Q    Okay.  So is it fair to say that
17  you assumed -- the statement in here about
18  the CEO changing the cutoff score to justify
19  his decision to fire you is an assumption?
20      A    Yes.
21      Q    The next sentence you say, I'm
22  African-American, and I believe my race was a
23  contributing reason for the company's

**American Court Reporting**
**toll-free (877) 320-1050**

20  (Pages 78 to 81)

Page 78

1  decision to not interview me and force my
2  resignation.  What's the basis for that
3  belief, that it was your race?
4      A    That I -- I've been with the
5  company for six years -- or seven if you
6  count the time at the corporate office.  And
7  I have yet, throughout my whole travels
8  throughout the United States and everywhere
9  else -- that I've never met, number one, a
10  black district manager.  Okay?  I've never
11  seen a black VP.  Okay?  I've never -- and
12  minimum, black store managers at that point.
13  It just seems as though there is a problem
14  with non-whites or black people or Mexicans,
15  anybody.
16      Q    You said "it seems."  Again, are
17  you saying that you're assuming that it's
18  race related?
19      A    Yes.
20      Q    Okay.  Anybody ever tell you it's
21  race related?
22      A    No.
23      Q    Okay.  Have you ever seen any

Page 79

1  documents or any evidence at all, other than
2  your assumption, that it has to do with race?
3      A    Well, the evidence would be me
4  looking out in the corporate office and
5  seeing a bunch of white people around.
6      Q    Other than that.  Do you have any
7  evidence at all, other than your assumption
8  and your observations, that it's race
9  related?
10      A    No.
11      Q    You said that the managers were --
12  non-white managers were limited.  You
13  reported -- in fact, the only two managers
14  you ever had were black, were they not?
15      A    Uh-huh.
16      Q    You need to say yes or no.
17      A    Yes.
18      Q    And you say you never saw a black
19  district manager.  How many district managers
20  did you meet with?
21      A    At least five.  At least.
22      Q    How many -- what was your district?
23  What was the territory?

Page 80

1      A    The whole United States, Canada,
2  and Mexico.
3      Q    The whole United States was your
4  district?
5      A    Yeah.  We had no district.  It was
6  wherever we -- wherever.
7      Q    Okay.  But -- all right.  Do you
8  know how many district managers Movie Gallery
9  has?
10      A    How many?
11      Q    Uh-huh.
12      A    No.  I do not know the exact
13  number.
14      Q    Approximately.  I mean, is it ten,
15  fifteen, a hundred, two hundred?
16      A    Well, let's see.  It has to be over
17  -- over a hundred and fifty.
18      Q    Over a hundred and fifty?
19      A    Yes.  Throughout the whole United
20  States.
21      Q    Okay.  And you met with about five
22  of them?
23      A    Yeah.

Page 81

1      Q    Okay.  And those five of the
2  hundred and fifty were not black?
3      A    Right.
4      Q    And you don't know whether any
5  African-American or non-whites applied for
6  the positions for these five district
7  managers you met with, do you?
8      A    Do I know that?
9      Q    Uh-huh.
10      A    No.
11      Q    Do you know of any position where a
12  black employee applied for a management
13  position and a white got it?
14      A    The only thing that comes into mind
15  now -- it is true that I did not apply for
16  the position myself, but just within our
17  -- the LP office there, it was myself and
18  Anthony Love.  He was a Caucasian coworker of
19  mine that -- we were working out of Dothan.
20  Okay?
21          As you -- as I stated earlier, it
22  was put out there that I wanted a position,
23  you know, with less travel and everything,

**American Court Reporting**
**toll-free (877) 320-1050**

Page 82

1 but -- there was an LP position that came
2 open. Now, knowing that I wanted the -- you
3 know, to be closer to home or whatever, it
4 was told to me by Anthony Love that they
5 offered him the position, so to speak, or
6 they asked him, well, what -- you think you
7 want this position or whatever, you know.
8 And knowing that I wanted to be closer to
9 home, you know. And they didn't ask me. You
10 know what I'm saying?
11     Q   Okay. Do you know what the name of
12 the position was?
13     A   Loss prevention manager.
14     Q   Same position you had? Same title
15 you had?
16     A   I'm sorry?
17     Q   Was it the same title that you
18 already had?
19     A   No. Different.
20     Q   Different. Was it a promotion or
21 same level?
22     A   Basically the same level.
23     Q   So it wouldn't have involved an

Page 83

1 increase in pay?
2     A   I don't think. I don't know.
3     Q   Okay. Did he take the position?
4     A   I think he did. I'm not sure. I
5 don't know.
6     Q   Do you know whether he applied for
7 the position?
8     A   No. He did not apply. I remember
9 him telling me he didn't even apply for the
10 position.
11     Q   Did you complain to anybody about
12 that?
13     A   Jokingly, I may -- I may have asked
14 Bo, you know, like what's up with that, you
15 know. But --
16     Q   You're not sure?
17     A   No. I'm not sure.
18     Q   Okay. And do you recall, if you
19 did say that, what Bo's response was?
20     A   No. I don't remember what his
21 response was. No. It was jokingly. No.
22     Q   Was the position posted?
23     A   I don't remember. I cannot

Page 84

1 remember it being posted, but I cannot say
2 that it wasn't posted.
3     Q   Do you know who made the decision
4 to offer Anthony that job?
5     A   His direct contact -- it was Bo
6 Collins, so I mean --
7     Q   Do you believe he was offered that
8 position because he was white?
9     A   Yes.
10     Q   And what's the basis of your
11 belief?
12     A   That he was white. I mean --
13     Q   Any other reason other than you're
14 assuming it was because he was white?
15     A   And he was close friends with Mr.
16 Collins.
17     Q   Do you know what he was making?
18     A   No, I do not.
19     Q   Do you know whether he made more or
20 less than you?
21     A   I don't know. I can only assume we
22 were making the same because we were in the
23 same position.

Page 85

1     Q   Any other positions that you know
2 of -- and you admit that you did not apply
3 for that position; correct?
4     A   Right.
5     Q   All right. Do you know of any
6 positions at Movie Gallery where you applied
7 or any other African-American employee
8 applied and a white employee got the
9 position?
10     A   I cannot remember right now, no.
11     Q   I'm going to show you what I'm
12 marking as Defendant's Exhibit 5 and ask you
13 if you recognize that document.
14         (WHEREUPON, a document was marked
15 as Defendant's Exhibit 5 and is attached to
16 the original deposition.)
17     A   Do I recognize this?
18     Q   Uh-huh.
19     A   No.
20     Q   You've never seen that before?
21     A   I don't remember.
22     Q   Okay. Do you know what it is,
23 looking at it today?

**American Court Reporting**
**toll-free (877) 320-1050**

22  (Pages 86 to 89)

Page 86

1    A    Yes.
2    Q    Okay.  And what is it?
3    A    It's Equal Employment Commission
4  dismissal and notice of rights.
5    Q    And what does that mean to you?
6    A    That this -- basically it's saying
7  that EEO is closing the file, and the reason
8  is the EEO issues the following
9  determination.
10    Q    Is it your understanding that the
11  EEO dismissed your charge and issued you a
12  notice of right to sue?
13    A    Say that again.
14    Q    Is it your understanding that the
15  EEOC -- you know, the charge -- Defendant's
16  Exhibit -- is that 3?  Look and see what
17  that's marked as.
18    A    Four.
19    Q    Defendant's Exhibit 4.  That's your
20  charge.  Was dismissed by the EEOC?
21    A    Uh-huh.
22    Q    You need to say yes or no.
23    A    Yes.

Page 87

1    Q    Okay.  And that's what this
2  document is telling you; is that right?
3    A    Yes.  That is what this is telling
4  me.
5    Q    All right.  And that occurred in,
6  approximately, October 7th, '05; is that
7  correct?
8    A    Yes.  Date mailed.
9    Q    All right.
10    MS. JOHNSON:  We've been going an
11  hour and five minutes.  Can we take a two
12  minute break?
13    MR. NEWMAN:  Sure.
14    (11:06 a.m.)
15    (WHEREUPON, a break was taken.)
16    (11:09 a.m.)
17    Q    (BY MS. JOHNSON)  Mr. Jackson, I'm
18  going to show you what I'm marking as
19  Defendant's Exhibit 6.  I'm going to ask you
20  if you recognize this document.
21    (WHEREUPON, a document was marked
22  as Defendant's Exhibit 6 and is attached to
23  the original deposition.)

Page 88

1    A    Yes.
2    Q    And what is it?
3    A    This is a complaint.
4    Q    Is this your complaint in this
5  case?
6    A    Yes.
7    Q    And did you see it -- have you seen
8  it prior to today?
9    A    Yes.
10    Q    Okay.  Did you review it before it
11  was filed with the Court?
12    A    Did I review it?
13    Q    Uh-huh.
14    A    I don't remember.
15    Q    Well, could you review it at this
16  time and tell me whether the information
17  contained in here is accurate to the best of
18  your knowledge?
19    A    (Witness complies.)  Yes.
20    Q    Okay.  Look at paragraph seven on
21  page two.  Do you see that?
22    A    Uh-huh.
23    Q    It says, contrary to its custom,

Page 89

1  defendant refused to interview plaintiff for
2  said position.
3    A    Uh-huh.
4    Q    A minute ago, I believe you told
5  me -- correct me if I'm wrong -- that you
6  applied for the position and you were not
7  interviewed; is that right?
8    A    That's right.
9    Q    All right.  Did anyone refuse to
10  interview you?
11    A    Through -- no.
12    Q    Do you know if anybody interviewed
13  for that position?
14    A    I don't know that.  No.
15    Q    Did you ever go to anyone and say I
16  want to be interviewed and they said no,
17  we're not going to interview you?
18    A    No.
19    Q    Paragraph eight, this was the
20  second time plaintiff had applied for a
21  management position and was completely
22  rebuffed by defendant.
23    A    Uh-huh.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 90

1    Q   Are you talking about the other
2  position you can't remember the name of?
3    A   Yes.
4    Q   All right.  And, again, you didn't
5  interview for that position either, did you?
6    A   No.
7    Q   But you don't know if anybody else
8  interviewed for that position; correct?
9    A   No.  I don't know.
10   Q   Okay.  So when you say were
11 "completely rebuffed by defendant," you don't
12 know if other people were rebuffed -- to use
13 your terminology -- as well; correct?
14   A   Uh-huh.  Correct.
15   Q   For all you know, a white person
16 could have applied and not received that
17 position or interview as well; isn't that
18 true?
19   A   Anyone.
20   Q   Anyone.  Okay.  Paragraph nine, on
21 April 15th, plaintiff was constructively
22 terminated after he exposed the defendant's
23 bogus evaluation that had noted him

Page 91

1  unqualified for continued employment.
2        Tell me what you mean by that
3  paragraph.
4    A   In relation to the evaluation that
5  I was led to my dismissal or layoff or
6  whatever.  Basically, the evaluation I got
7  for my bonus said one thing for me, you know,
8  to get my bonus of seven hundred and some odd
9  dollars, whereas this evaluation here came
10 maybe -- I don't know.  It was a short term.
11 A couple of months maybe.  And it had a two
12 point five accumulated score, and the two
13 conflicted with each other, you know.  And
14 that's why I said the evaluation.  And it
15 deemed me unqualified for continued
16 employment based off the cutoff rate -- or
17 cutoff point that I was told.
18   Q   All right.  And did you keep copies
19 of those two evaluations that conflicted?
20   A   I believe I did.  Yes.
21   Q   Did you turn them over to your
22 attorney?
23   A   Yes.

Page 92

1        MS. JOHNSON:  Okay.  I don't have
2  those either.
3        MR. NEWMAN:  Well, let me just go
4  ahead and say on the record, I've turned over
5  everything I have from him.  And I think what
6  he's getting confused about is letting me see
7  things, but not letting me keep things.
8        MS. JOHNSON:  It doesn't matter if
9  he only lets you see them.
10       MR. NEWMAN:  Well --
11       MS. JOHNSON:  He's under an
12 obligation to produce that to me through you.
13       MR. NEWMAN:  That is his
14 obligation, but I want you to understand that
15 I don't have them.
16       MS. JOHNSON:  Okay.
17       MR. NEWMAN:  And I will get back
18 with him and say you need to give me
19 everything.
20       MS. JOHNSON:  Right.  I mean, you
21 understand you have an obligation to get it
22 from him.  It's not just that you --
23       MR. NEWMAN:  I have an obligation

Page 93

1  to tell him he has to give it to me.
2        MS. JOHNSON:  Right.  Okay.
3    A   All right.  Well, I don't have
4  those.  They're in my personnel records, and
5  I don't have them.
6    Q   Okay.  Well, a minute ago you said
7  you thought you did and you gave them --
8    A   Yeah.  I thought I --
9    Q   Okay.
10   A   That's what I thought happened.
11   Q   Okay.
12   A   If I'm wrong, then I'm wrong.
13   Q   Tell me about the conversation --
14 well, scratch that.  You said that -- I think
15 you said you had a conversation with Mr.
16 Croom about the conflicting evaluations; is
17 that accurate?
18   A   No.
19   Q   You did not?
20   A   No.
21   Q   Did you have a conversation with
22 anybody to say, wait, what's going on here,
23 there's something wrong?

**American Court Reporting**
**toll-free (877) 320-1050**

24  (Pages 94 to 97)

Page 94

1    A    I never said that I -- you did
2  that.
3    Q    Okay.  I misunderstood you.
4    A    Okay.
5    Q    Did you call it to anybody's
6  attention, that the cutoff had been changed
7  or that the evaluations conflicted?
8    A    I questioned my evaluation with Mr.
9  Croom.
10    Q    This is when you're being laid off,
11  during the --
12    A    Right.
13    Q    -- meeting?
14    A    Right.
15    Q    And what did you -- how did you
16  question him?  What did you say?
17    A    I was asking him about the cutoff
18  rate.  He said two point o.  I said, well,
19  mine is a two point five.  And he didn't have
20  nothing to say, but that it came -- it was
21  directly -- this came directly from Joe
22  Malugen and, you know, this is what it is,
23  so --

Page 95

1    Q    What do you mean, then, that you
2  were constructively terminated after you
3  exposed the defendant's bogus evaluation?
4  What do you mean by that?  And I'm
5  particularly focusing on "exposed."
6    A    That would be me questioning the
7  evaluation.
8    Q    Okay.  And you're saying that you
9  were constructively terminated because you
10  did that, because you called attention to
11  that?
12    A    In my belief.
13    Q    Well, you were being laid off
14  anyway, were you not?
15    A    Well, according to what he was
16  saying, I should not have been.
17    Q    All right.
18    A    But still yet, I was.
19    Q    All right.  Well, let me ask it
20  this way:  When he came in there, the purpose
21  of the meeting was to lay you off, was it
22  not?
23    A    Eventually.  I guess that was his

Page 96

1  agenda.  My agenda was just to have a
2  meeting.
3    Q    But -- I know.  But his -- the
4  purpose was he came in there to tell you you
5  were being laid off; correct?
6    A    Yes.  I guess.
7    Q    He didn't just make up his mind to
8  terminate you or lay you off after you called
9  attention to the discrepancy in your
10  evaluation; is that accurate?
11    A    Yes.
12    Q    So it's not true that you were
13  terminated because you exposed this alleged
14  variance, or discrepancy; is that right?
15    A    I didn't keep my job either because
16  of --
17    Q    Right.  But you weren't terminated
18  for that reason; correct?  You would agree
19  with me?
20    A    The reason I was -- the term
21  "terminated" --
22    Q    Uh-huh.
23    A    Because I did not sign the --

Page 97

1    Q    Right.
2    A    -- document.
3    Q    And even before that, you were --
4  your being laid off had nothing to do with
5  your saying this evaluation says this and
6  this evaluation says that?  That's not the
7  reason for the layoff; correct?
8    A    Well, I don't know because, you
9  know, we had a conversation about the
10  evaluation and then the conversation about
11  the letter -- or the document that I didn't
12  sign.  So yes, I guess.
13    Q    When he came in there, though, he
14  told you you were being laid off; correct?
15    A    Eventually, yeah.  Right.  Yes.
16    Q    Well, your response that this
17  doesn't make since because of the discrepancy
18  in the evaluation would have in response to
19  him telling you you were being laid off;
20  correct?
21    A    Right.  Now, this was all -- this
22  was not just one conversation.  I want you to
23  understand, now.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 98

1    Q    All right.
2    A    We had two separate conversations.
3    Q    Well, I need to know about that.
4    A    The evaluation and me not signing
5  because I held onto the document to sign
6  overnight.  You get what I'm saying?
7    Q    Uh-huh.
8    A    So it was different.
9    Q    All right.  When you first met, the
10  first meeting, did he tell you you were being
11  laid off?
12    A    Yes.
13    Q    Okay.  And that would have
14  necessarily been before you called attention
15  to the discrepancy; correct?
16    A    Well, I called the discrepancy
17  during that meeting.  And it --
18    Q    After he told you you were being
19  laid off because of the cutoff?
20    A    Uh-huh.  Correct.
21    Q    Correct?
22    A    Correct, correct.
23    Q    Okay.  So he wasn't laying you off

Page 99

1  because you had called attention to the
2  discrepancy because you hadn't called
3  attention to the discrepancy yet; isn't that
4  fair?
5    A    Right.  Okay.
6    Q    Okay.  All right.  Look at
7  paragraph eleven.  The defendant had a long
8  history of hostility to racial diversity at
9  its support center.
10        Other than what you told me about,
11  not seeing any white managers, had you
12  personally witnessed any hostility toward
13  African-Americans?
14    A    Well -- hostility?
15    Q    Yes.
16    A    No.  I guess not.  It was just --
17  everything just seemed separated.  That's
18  all.
19    Q    Because there were no white
20  managers?
21    A    Well, no white managers and -- no
22  black managers.
23    Q    I mean no black managers.

Page 100

1    A    Yeah.
2    Q    Okay.  Did you --
3    A    And --
4    Q    -- witness any hostility though?
5  Other than the fact that there were no black
6  managers, did you personally witness any
7  hostility to African-Americans?
8    A    I witnessed, you know,
9  communications -- communication gaps, you
10  know, between the store managers or the
11  managers there at the support center with the
12  workers in, you know, just how they talk to
13  each other, you know.
14    Q    Is that race related or because --
15    A    Yeah.  It's race related because,
16  you know, black people have a way of talking
17  and what they receive (sic) from white
18  people, and black -- and white people have a
19  way of talking and what they receive from
20  black people as well.
21    Q    I'm not sure I'm following you.
22    A    Basically the way that they talk to
23  each other, you know, sometimes it -- it

Page 101

1  would cause for a little argument here and
2  there.  I've witnessed that.  I've seen that.
3  But other than that, no.
4    Q    Did you see any -- did you ever
5  hear any white managers use any racially
6  derogatory terms?  And if you don't know what
7  I mean by that, let me know.
8    A    Store manager or anything -- not to
9  my face, no.  I've never seen any.
10    Q    Okay.  Did you see it done to
11  anyone else?
12    A    To anyone else?
13    Q    Uh-huh.
14    A    No.  I haven't seen it done to
15  anyone else.
16    Q    Okay.  So other than not seeing any
17  black managers at the corporate office --
18  because you've already admitted you had two
19  African-American --
20    A    Right.
21    Q    -- managers; right?
22    A    In predominantly black cities,
23  yeah.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 102

1    Q   Right. Other than not seeing any
2    black managers at the corporate office and
3    maybe a communication gap between the races,
4    did you ever witness any hostility to
5    African-American employees?
6    A   No. Because all the
7    African-American employees are always
8    subordinate to the -- so I would never see
9    anything -- acting out or anything like that,
10   no. Or -- go ahead.
11   Q   So the answer is "no"?
12   A   No.
13   Q   I'm going to show you what I'm
14   marking as Defendant's Exhibit 7.
15        (WHEREUPON, a document was marked
16   as Defendant's Exhibit 7 and is attached to
17   the original deposition.)
18   Q   (BY MS. JOHNSON) Can you identify
19   this document for me?
20   A   My resume. Yeah.
21   Q   Is it current?
22   A   GMX. Yes.
23   Q   Anything on here not accurate?

Page 103

1    A   I think everything is accurate.
2    Q   Okay. Earlier, when you were
3    telling me about your employment history, I
4    don't believe we talked about Wal-Mart. Does
5    this document reflect --
6    A   Oh, yeah. I forgot about Wal-Mart.
7    Q   Refresh your recollection?
8    A   Yes.
9    Q   Tell me about Wal-Mart. When were
10   you employed there?
11   A   02 of '06 -- 02 of '04 through 06
12   of '04.
13   Q   Were you part time or full time?
14   A   That was full time.
15   Q   All right. Were you also employed
16   at Movie Gallery at that time?
17   A   Yes.
18   Q   How did you work two full-time
19   jobs?
20   A   No. I was part time at Movie
21   Gallery.
22   Q   Okay. Who was your supervisor at
23   Wal-Mart?

Page 104

1    A   I think his name was Ivan
2    Christian. I'm not sure.
3    Q   Do you recall what you made, what
4    your rate of pay was?
5    A   Eleven seventy-five -- or was it
6    eleven thirty-five? Eleven seventy-five or
7    eleven thirty-five.
8    Q   Were you ever written up or
9    reprimanded?
10   A   No.
11   Q   Were you terminated?
12   A   No.
13   Q   Okay. Why did you quit that job?
14   A   I found out about -- I got a
15   promotion to the corporate office at Movie
16   Gallery.
17   Q   All right. I'm confused about the
18   date on this. It says that you worked at
19   Wal-Mart from February '04 to June '04, and
20   you were in a full-time position; correct?
21   A   Uh-huh.
22   Q   All right. And then it also -- but
23   on the front page, it says you worked at

Page 105

1    Movie Gallery as a quality assurance auditor
2    from May '01 to May '05?
3    A   Woe. That's wrong.
4    Q   Did you work at Wal-Mart, ever,
5    when you were a quality assurance auditor?
6    A   No.
7    Q   Those jobs never overlapped?
8    A   No. And the date is wrong there.
9    Q   Which one's wrong?
10   A   The one for quality assurance
11   auditor.
12   Q   That should be '04?
13   A   Yeah. Typo.
14   Q   Well, then you didn't quit in June
15   '04 either at Wal-Mart, did you, because
16   there would have been a month overlap?
17   A   No. No, no. That was five. As
18   soon as I got hired. 5/04.
19   Q   Did you tell me about K & W
20   Recycling Plant already?
21   A   Yes.
22   Q   All right. Did you apply for any
23   jobs, when you were the quality assurance

**American Court Reporting**
**toll-free (877) 320-1050**

27 (Pages 106 to 109)

Page 106

1   auditor with Movie Gallery, with other
2   employers?
3       A   I may have.  I don't remember.
4       Q   Have you applied for any jobs,
5   since you've been employed with T. J. Maxx,
6   with other employers?
7       A   No.  Not since I've been there.
8       Q   What was the purpose of creating
9   this resume?
10      A   To find a job.
11      Q   Well, you've already got T. J. Maxx
12  on here.
13      A   Right.
14      Q   So are you looking for another job?
15      A   Yes.  I'm always looking for -- to
16  make more money.
17      Q   Okay.  Have you applied?
18      A   Applied anywhere?  No.
19      Q   I'm going to show you what I'm
20  marking as Defendant's Exhibit 8.
21      (WHEREUPON, a document was marked
22  as Defendant's Exhibit 8 and is attached to
23  the original deposition.)

Page 107

1       Q   (BY MS. JOHNSON)  Take a minute to
2   review it, and then tell me if you recognize
3   this document.
4       A   (Witness complies.)
5       And what do you want me to do with
6   this?
7       Q   Do you recognize this document?
8       A   No.
9       Q   Okay.  You've never seen it before?
10      A   No.  I don't believe I have.
11      Q   Do you recall --
12      A   I don't remember seeing this.
13      Q   Okay.  Do you recall receiving a
14  verbal warning from Mr. Croom -- Croom on
15  August 16th, '04?
16      A   Do I remember it?  No, I do not
17  remember it.
18      Q   Well, I don't mean specifically as
19  to that date.  Do you recall on or about --
20  during this time period receiving a verbal
21  warning from Mr. Croom regarding these
22  matters that are discussed in Defendant's
23  Exhibit 8?

Page 108

1       A   Only one.
2       Q   Only one issue?
3       A   Yes.  Well, two.  Everything,
4   except for the audit and the -- tools.
5       Q   Well, let's talk about it.  What do
6   you recall talking to him about?
7       A   The planning.  Audit -- audit
8   planning and audit reporting.
9       Q   Okay.  You remember him telling you
10  that you weren't doing it correctly; is
11  that right?
12      A   Yes.
13      Q   Or warning you that you needed to
14  start doing it correctly?
15      A   Right.
16      Q   All right.  You don't recall him
17  telling you that you need to make flight and
18  car reservations at least a week in advance
19  to reduce expenses?
20      A   Do I -- no.  I don't remember that,
21  but, of course --
22      Q   It could have happened?
23      A   It could have happened.

Page 109

1       Q   And you knew that that was the
2   policy?
3       A   The policy?  We didn't have a
4   policy.
5       Q   Well, did you know that you were
6   supposed to -- and it was in the company's
7   best interest -- to make travel plans as soon
8   as possible to reduce cost?
9       A   Well, first of all, our travel and
10  everything -- we did a little bit at first.
11  And then it was all through our travel
12  agency, through corporate.  Okay?  So
13  anything like this would have been before the
14  travel agency.  Even before then.  But we
15  didn't -- it was not like we had to make it a
16  week before.  That was not the case because
17  we didn't know where we were going.
18      Q   Do you recall him telling you that
19  you needed to do it as soon as you could to
20  reduce cost?
21      A   In those words, yeah.  Maybe.
22      Q   Okay.  Do you recall him telling
23  you that you needed to contact the regional

**American Court Reporting**
**toll-free (877) 320-1050**

28 (Pages 110 to 113)

Page 110

1  manager and the district manager prior to
2  conducting an audit?
3      A    Yes.
4      Q    Okay.  And do you remember being
5  warned about that?
6      A    No.
7      Q    Okay.  Well, when he told you about
8  that, was that when you were hired or after
9  you were hired in this position?
10     A    That was like during the hiring and
11  training on how to be a quality assurance
12  auditor.
13     Q    And it's your testimony he never
14  had to counsel you that you were not
15  contacting them in advance?
16     A    Right.  Yes.  That's my -- yes.
17     Q    Do you recall him talking to you
18  about fraud reviews?
19     A    No.  Other than the fact that we
20  needed to find it.  That's the only --
21     Q    But you weren't counselled about
22  that?
23     A    No.

Page 111

1      Q    To the best of your knowledge?
2      A    To the best of my knowledge.  Why
3  would I be counselled for that when I had --
4  I found the biggest case in Virginia.  I
5  don't understand that, why would that even be
6  right here on this document.
7      Q    You need to explain what you --
8      A    Well, in EDRC fraud reviews, what
9  we would have to do is actually review the
10  print-off from the computer and see what is
11  actually going on with the associates.
12  Basically, they had to enter the last four
13  numbers on this EDRC.  And if you have
14  multiple numbers of the same number, or zero
15  zero zero one, you know something is going
16  on.
17          Well, I found that in Virginia.
18  And I had over -- it come up to -- the store
19  manager, assistant manager, and one of the
20  associates was involved.  It was over five
21  thousand dollars, you know.  And that was
22  like the biggest case we had -- or one of the
23  biggest cases.

Page 112

1      Q    So you don't recall him ever
2  talking to you about discrepancies and your
3  need to --
4      A    No.
5      Q    -- double check?
6      A    No.
7      Q    Okay.  What about income statement
8  reviews?  Double check all figures and
9  calculations and report percentages
10  correctly.  Do you remember him counselling
11  you about that?
12     A    No.
13     Q    All right.  What about the
14  department and district summaries?  Double
15  check all information for accuracy and --
16     A    Yes.
17     Q    -- using spelling and --
18     A    Yes.
19     Q    -- grammar checks?
20     A    Yes.
21     Q    You do recall him counselling --
22     A    Yes.
23     Q    -- you about that?  Okay.  And that

Page 113

1  would have been -- do you disagree that it
2  was in about August of '04?
3      A    Roughly.  Yeah.
4      Q    Okay.  Do you recall submitting
5  reports that had typos in it?
6      A    Yes.
7      Q    Okay.  And you did that on more
8  than one occasion?
9      A    Yes.  That's when we had this
10  meeting, this discussion here about it.
11     Q    Okay.  And do you recall discussing
12  with him all reports and summaries must be
13  submitted by o-eight-hundred hours on
14  Tuesday?
15     A    Yes.
16     Q    Okay.  Anything else you recall in
17  this meeting where -- you had with Mr. Croom?
18     A    Well, first of all, it's not a
19  meeting.  Okay?  It wasn't a meeting.  Let's
20  not -- because it wasn't like that.
21     Q    Okay.  Well, explain it to me.
22     A    It was just a casual conversation
23  here that we would be talking about this

**American Court Reporting**
**toll-free (877) 320-1050**

Page 114

1    -- the audit reporting or anything else. And
2    it would be like him, Bo Collins, me, and
3    Anthony in the office. And he would just
4    bring up something.
5        Q    Anthony who?
6        A    Anthony Love.
7        Q    Okay.
8        A    And just bring it up, you know --
9    something. Mike, I noticed -- or, Mike, this
10   right here happened on your report or
11   whatever, whatever. And, you know --
12       Q    You need to fix it?
13       A    And I fixed it, you know, right
14   then, you know. And that was it.
15       Q    You understood that he was
16   correcting you at that time?
17       A    Right. But on this (indicating),
18   it's like it was a major deal, but he didn't
19   convey it that way when we was talking right
20   then.
21       Q    Okay.
22       A    You know what I'm saying?
23       Q    This document, Defendant's Exhibit

Page 115

1    8, reflects that it was a verbal counselling;
2    correct?
3        A    Uh-huh. Right.
4        Q    And you understood it -- whether it
5    was formal or informal, you understood it to
6    be a verbal --
7        A    No.
8        Q    I didn't say a verbal warning. A
9    verbal instruction to fix things; correct?
10       A    A verbal instruction? Yeah. But
11   not a verbal warning or counselling.
12       Q    Okay. I'm going to show you what
13   I'm marking as Defendant's Exhibit 9.
14           (WHEREUPON, a document was marked
15   as Defendant's Exhibit 9 and is attached to
16   the original deposition.)
17       Q    (BY MS. JOHNSON) Do you recall
18   ever seeing this document? Take as much time
19   as you want to review it.
20       A    The back page, this page here, yes.
21   This front page, no.
22       Q    Okay. Look at the second page.
23   You agree you've seen this page?

Page 116

1        A    The second page, yes.
2        Q    And it's page two of a document; is
3    that correct?
4        A    It looks to be that way.
5        Q    All right. Is that your signature?
6        A    Yes.
7        Q    And is it dated November 8th, '04?
8        A    Uh-huh.
9        Q    Are you telling me that, when you
10   were presented this document, you weren't
11   presented the complete document or that the
12   first page is different than the first page
13   you saw?
14       A    It's different. Some of this stuff
15   was not on here.
16       Q    I'm sorry? Say that --
17       A    It's different. It looks
18   different.
19       Q    In what way does it look different?
20       A    The audit planning, audit tools.
21   The number three was not -- first of all,
22   this whole outline here, was not here. Okay?
23   The whole outline of everything was not

Page 117

1    there.
2        Q    You're talking about one, two,
3    three?
4        A    One, two, three. Yes.
5        Q    It was missing off the first page?
6        A    Right.
7        Q    And you're a hundred percent sure
8    about that?
9        A    Yes. Yes. I'm pretty sure about
10   that.
11       Q    Any other differences?
12       A    Hold on. Woe, woe, woe.
13       Q    Take as much time as you need.
14       A    All right. The second paragraph --
15   third paragraph.
16       Q    Starting with "all department"?
17       A    All department -- okay. The "all
18   department" on down.
19       Q    Was not there?
20       A    I do not remember seeing that.
21       Q    So the only thing that you saw on
22   page one would have been the importance of
23   professionally reporting audits? Is that

**American Court Reporting**
**toll-free (877) 320-1050**

30 (Pages 118 to 121)

Page 118

1  your testimony?
2       A    (Witness nods head.)
3            I do remember that.  I do remember
4  that.
5       Q    Okay.  Can you explain to me how,
6  if you recall seeing page two and you admit
7  that that's your signature -- how the
8  sentence on page one runs into the top of the
9  first sentence on page two?
10      A    What do you mean?
11      Q    All right.  Well, you -- that's
12  your signature?
13      A    The first paragraph right there?
14      Q    Yeah.  Okay.
15      A    Ninety-five percent of all
16  communications between the QA department and
17  other departments takes place through the
18  documentation audits.
19      Q    That's the only thing you remember
20  seeing on page one.
21      A    Really, yes.
22      Q    Are you telling me that page one
23  only had one short, little paragraph on it?

Page 119

1       A    I'm telling you that this right
2  here, that's what I remember.  And I know for
3  sure this last paragraph here because I
4  remember -- for the next two weeks, I
5  remember him saying that he was going to
6  monitor my work and everything.
7       Q    All right.  Well, try following me
8  here because I don't see -- I'm not following
9  you.
10      A    Okay.
11      Q    Did you sign a one-page document or
12  a two-page document?
13      A    One page.
14      Q    Okay.  So you're telling me that
15  they somehow, after you signed this document,
16  divided this into a two-page document and
17  added stuff to it?
18      A    That's what it looks like.  I mean,
19  if you're going to give it to me and let me
20  read it some more --
21      Q    I'll be glad to let you read -- you
22  can take thirty minutes to read it, but I'm
23  just trying -- I'm having a hard time

Page 120

1  understanding or, I guess, accepting that you
2  -- I'm trying to understand what you believe.
3  And it sounds like, to me, that you believe
4  that this document you signed -- and that's
5  your signature?
6       A    Uh-huh.
7       Q    Was somehow altered after the fact.
8  Is that what you're testifying to?
9       A    That's what it seems like.  Yes.
10  That's what it seems like.
11      Q    All right.  And even though your
12  signature is on the second page and the
13  sentence at the top, the very first sentence,
14  "made within the department and district
15  summaries" is a half of a sentence following
16  directly from the other half a sentence on
17  the first page, you still believe that this
18  was altered?
19      A    Uh-huh.  Yes.
20      Q    Can you explain to me how they
21  would have done that when the second page
22  starts in the middle of a sentence?
23      A    I don't know.  I'm just telling you

Page 121

1  what I remember seeing.
2       Q    Is it possible, Mr. Jackson, you
3  were given this whole document and you just
4  don't remember it?
5       A    Not with this all on here.  I would
6  remember this outline.
7       Q    Is it possible --
8       A    Because I would -- we would have
9  talked about the EDRC and the flight and RM
10  and DM contact and everything, and I don't
11  remember talking about that.
12      Q    Okay.  Is it possible you were
13  given a two-page document and you just don't
14  remember that?
15      A    A two-page document?  Maybe.  I
16  don't -- I don't --
17      Q    You don't recall, in this meeting,
18  talking about flight and car reservations?
19      A    No.
20      Q    You don't recall talking about
21  audit tools?
22      A    Uh-uh.
23      Q    You don't recall talking about

**www.AmericanCourtReporting.com**
**July 6, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

31 (Pages 122 to 125)

Page 122

1  audit reporting?
2      A   That I do.
3      Q   Okay.  Do you recall talking about
4  your repeated grammatical errors?
5      A   Uh-huh.
6      Q   And, in fact, he attached your
7  reports to this document, did he not?  And
8  take as much time as you need to look at
9  them.
10     A   These are the basic formats of what
11 we used.
12     Q   Are you disputing that these
13 reports, your reports that are attached to
14 Defendant's 9, were attached to this written
15 warning that you signed on --
16     A   That they were attached?
17     Q   Uh-huh.
18     A   Especially when I signed it?
19     Q   Uh-huh.
20     A   Oh, no.  They were not attached.
21     Q   Okay.  You didn't see -- he didn't
22 show them to you that day?
23     A   No.

Page 123

1      Q   He didn't go over these with you
2  that day?
3      A   These documents were not -- were
4  not attached.
5      Q   All right.  Let's let go of the
6  word "attached" because I don't care if they
7  were physically attached.  Did you talk about
8  these documents --
9      A   Yeah.
10     Q   -- during this meeting?
11     A   We talked about my summaries.
12 Okay?  Not these specifically.  Just my
13 summaries.
14     Q   Okay.  Could you have gone over --
15 did you go over particular summaries that he
16 had problems with?
17     A   I don't remember doing it.  No.
18     Q   Okay.
19     A   Any particular ones.
20     Q   Now, on page two, at the top, if
21 you would, it says attached are Michael's
22 original summaries, track changes for those
23 summaries, and final summaries.  It says

Page 124

1  that; correct?
2      A   As a matter of fact, I showed him
3  how to track the changes.
4      Q   Listen to my --
5      A   Go ahead.
6      Q   Listen to my question, Mr. Jackson.
7  The sentence on page two says, attached are
8  Michael's original summaries, track changes
9  for those summaries, and final summaries.
10     A   Uh-huh.
11     Q   Is that accurate?  You need to say
12 yes or no, not uh-huh.
13     A   No.  I'm following you.  What are
14 you asking me?
15     Q   Is that what it says?  The track
16 changes have been forwarded to each auditor.
17 Attached are Michael's original summaries,
18 track changes for those summaries, and final
19 summaries.
20         Do you see that sentence?
21     A   Yes, I do.
22     Q   And you signed two paragraphs below
23 that; is that correct?

Page 125

1      A   Yes.
2      Q   All right.  And the last sentence
3  right above your signature says "much
4  improvement is expected and required"; is
5  that correct?
6      A   Yes.
7      Q   All right.  And did you read this
8  before you signed it?
9      A   Yes.  I think I did.
10     Q   All right.  Now --
11     A   The first sentence you just read
12 there, that would go along with that first
13 page.  I do remember this -- this second --
14 the first and second paragraph, these two
15 paragraphs right here that --
16     Q   The one that says attached are
17 the --
18     A   No.  "In addition to both
19 grammatical and factual errors."  You know,
20 those is what I remember.
21     Q   You just remember those two
22 paragraphs?
23     A   Yes.  You get what I'm saying?

**American Court Reporting**
**toll-free (877) 320-1050**

32 (Pages 126 to 129)

Page 126

1    Q    Yeah.
2    A    Because the rest of it was over at
3    the front page, and I do remember that.
4    Q    So the only paragraphs you remember
5    are, on the first page, "the importance of
6    professionally reporting." And then on the
7    second page, "in addition to" and "each
8    department"?
9    A    Yes.
10    Q    You remember signing three
11    paragraphs? That's it?
12    A    Uh-huh.
13    Q    Okay. You understood that you --
14    this was a written warning; correct?
15    A    Yes.
16    Q    And that "much improvement is
17    expected and required" is noted right above
18    your signature?
19    A    Uh-huh.
20    Q    Okay?
21    A    Yes.
22    Q    I'm going to show you what I'm
23    marking as Defendant's Exhibit 10. Take as

Page 127

1    much time as you need to review this
2    document.
3        (WHEREUPON, a document was marked
4    as Defendant's Exhibit 10 and is attached to
5    the original deposition.)
6    A    (Witness complies.) Okay.
7    Q    Is that your signature on page two?
8    A    Yes.
9    Q    And it's dated January 14th, '05?
10    A    Yes.
11    Q    And do you recall signing this
12    document on that day?
13    A    Yes.
14    Q    Okay. And does this document
15    differ, in any way, than the document you
16    recall signing?
17    A    No.
18    Q    Okay. And you understood, on
19    January 14th, 2005, you were receiving a
20    final written warning?
21    A    No.
22    Q    You did not -- it says that on the
23    first page; correct?

Page 128

1    A    Okay.
2    Q    Is that a yes or a no?
3    A    Yes. It says that on the first
4    page.
5    Q    And you don't recall seeing that?
6    A    I don't recall seeing that, but
7    that's what it says.
8    Q    All right. Is the information
9    contained in this document accurate to the
10    best of your knowledge?
11    A    The only thing that's missing out
12    of this document is that there was a
13    reimbursement issue with my Amex, American
14    Express, card that we talked about and he was
15    seeing about as well through this whole time.
16    Q    Well, look at paragraph two. It
17    talks about a reimbursement issue, does it
18    not?
19    A    Okay. Okay. Yes.
20    Q    And is that the reimbursement issue
21    you were telling me about previously?
22    A    Yes. That's it.
23    Q    And it appears you were told that

Page 129

1    you were going to be reimbursed on
2    January 4th, but it was actually January 5th;
3    is that correct?
4    A    Yes.
5    Q    So it was a one-day delay; is that
6    accurate?
7    A    It may have been longer than that,
8    but it -- it was probably the 5th. I don't
9    know.
10    Q    According to this, it was one day.
11    A    According to this. Yeah. Right.
12    Q    And you signed this document;
13    correct?
14    A    Yes.
15    Q    You didn't protest that, did you?
16    A    No. I just --
17    Q    All right. This document also
18    notes that you had -- based on all the
19    math -- and I'm not going to sit here and
20    attempt to do math right now unless you make
21    me, but you had an available credit of eight
22    hundred and five dollars and forty-eight
23    cents -- if you'll look at the last

**American Court Reporting**
**toll-free (877) 320-1050**

Page 130

1  paragraph.  You should have had a balance of
2  eight hundred and five dollars and
3  forty-eight cents.
4          Do you see that?
5      A   Uh-huh.  Yes.  I see that.
6      Q   Do you dispute that fact, sitting
7  here today?
8      A   No.
9      Q   And you knew, when you signed this
10 document on January 14th, '05, that if you
11 continued to fail to pay your corporate Amex
12 on time that it would result in your
13 termination; correct?
14     A   Yes.
15     Q   And, in fact, it says that right
16 above your signature, doesn't it?
17     A   Yes.
18     Q   Let me show you what I'm marking as
19 Defendant's Exhibit 11 and ask you if you
20 recognize that document.  And take as much
21 time as you need.
22         (WHEREUPON, a document was marked
23 as Defendant's Exhibit 11 and is attached to

Page 131

1  the original deposition.)
2      A   Yes.  I remember this.
3      Q   And what is it?
4      A   This is my performance review.
5      Q   And when were you given this
6  performance review?
7      A   January 24th.
8      Q   Of '05?
9      A   Of '05.
10     Q   And what period did it cover?
11     A   May 24th, '04.
12     Q   Okay.  And who gave you this
13 review?
14     A   Heath Croom.
15     Q   Okay.  And look at the last page of
16 this document, which appears to be an e-mail
17 from you to Heath Croom --
18     A   Uh-huh.  Yes.
19     Q   -- dated January 25, '05.
20     A   Yes.
21     Q   Do you recall sending that e-mail?
22     A   Yes.
23     Q   And it's basically telling Mr.

Page 132

1  Croom that you consider --
2      A   Yes.
3      Q   -- this e-mail your signature on
4  this?
5      A   Yes.
6      Q   Do you agree with the comments that
7  are in this review?
8      A   The comments?
9      Q   Uh-huh.
10     A   I have -- the comments are fine,
11 except for the one with -- on number one.
12     Q   For "adaptability"?
13     A   (Inaudible.)
14     Q   You can't mumble.  You have to
15 talk --
16     A   I'm just reading.
17     Q   Well, she's got to take everything
18 that comes out of your mouth.  So either talk
19 out loud or kind of talk to yourself, in your
20 head.
21         MR. NEWMAN:  I ordinarily take my
22 lunch break at noon.
23         MS. JOHNSON:  That's fine.

Page 133

1          MR. NEWMAN:  Do you have any
2  problem with that?
3          MS. JOHNSON:  Not at all.  In fact,
4  I'm very hungry.  That would be great.  Then
5  I'll probably have about an hour or a little
6  bit more.
7          MR. NEWMAN:  That's fine.
8          THE WITNESS:  Really?
9      A   Just the first one.  The comments
10 about the Amex card doesn't seem relevant to
11 the adaptability.  Actually, that's it.
12     Q   It doesn't seem relevant?
13     A   No.
14     Q   But it's accurate that you had
15 problems with the Amex card?
16     A   Right.
17     Q   All right.  And you got a two point
18 six out of a five; is that correct?
19     A   Yes.
20     Q   All right.  And as you see -- and
21 you understood, at the time, that a two point
22 six meant "needs improvement"; is that
23 correct?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 134

1      A   Yes.
2      Q   All right.  And on the last page,
3   it again notes that your progress has been
4   and will continue to be monitored for
5   improvement; is that correct?
6      A   Yes.
7      Q   Okay.  And, in fact, you had been
8   given the written warning we just looked at a
9   minute ago about ten days before this; is
10  that correct?
11     A   Yes.
12     MS. JOHNSON: Let's just do this
13  one last exhibit, and then take a break.
14     MR. NEWMAN: Sure.
15     Q   (BY MS. JOHNSON) Let me show you
16  what I'm marking as Defendant's Exhibit 12.
17     (WHEREUPON, a document was marked
18  as Defendant's Exhibit 12 and is attached to
19  the original deposition.)
20     Q   (BY MS. JOHNSON) Do you recognize
21  this document?
22     A   Yes.
23     Q   Okay.  And what is it?

Page 135

1      A   My resume, cover letter, and
2   references for the position applied for at
3   Game Zone/Trade Zone operations -- director
4   of Game Zone and Trade Zone operations.
5      Q   And who did you send this to?
6      A   I gave this to Mr. Croom.
7      Q   And, again, just to make sure I'm
8   straight, you never followed back up with him
9   after that to see what happened with this
10  position?
11     A   Just questioning has he heard
12  anything.  That was it.
13     Q   And what did he say?
14     A   He said no.
15     Q   And sitting here today, you don't
16  know if this position was ever filled, do
17  you?
18     A   No.  I do not know that.
19     Q   You don't have a similar letter
20  like this in your possession regarding the
21  other position, do you?
22     A   No.  It was on my laptop.
23     Q   Do you have a copy of this,

Page 136

1   Defendant Exhibit 12, this letter?
2      A   No.
3      Q   Do you know if another letter
4   exists -- well, let me ask it this way:  The
5   previous position, the one you can't remember
6   the name of, did you send a letter similar to
7   this?
8      A   Yes.  Similar.  Yes.
9      Q   So if it doesn't exist in Movie
10  Gallery's files, you can't explain that?
11     A   Right.  It should because I gave it
12  to him, same as I did with this one.
13     MS. JOHNSON: All right.  Let's
14  take a -- how long do you need, Malcolm?
15     MR. NEWMAN: An hour is fine with
16  me.
17     MS. JOHNSON: All right.
18     (11:55 a.m.)
19     (WHEREUPON, a lunch break was taken.)
20     (12:59 p.m.)
21     Q   (BY MS. JOHNSON) Mr. Jackson, I'm
22  going to show you what I'm marking as
23  Defendant's Exhibit 13 and ask you if you

Page 137

1   recall seeing this document.
2      (WHEREUPON, a document was marked
3   as Defendant's Exhibit 13 and is attached to
4   the original deposition.)
5      A   Yes.
6      Q   Okay.  And is this the posting of
7   the position for the Game Zone --
8      A   Yes.
9      Q   -- director that you gave Mr. Croom
10  your resume about?
11     A   That's correct.
12     Q   Okay.  And it's dated March 21st,
13  2005?
14     A   Uh-huh.
15     Q   And was this sent out by e-mail?
16     A   Uh-huh.
17     Q   Okay.  So everybody in the office
18  got it, the corporate office?
19     A   Yes.
20     Q   If you would -- had you ever worked
21  at a Game Zone store before?
22     A   No.
23     Q   Okay.  And Game Zone -- tell me

**American Court Reporting**
**toll-free (877) 320-1050**

Page 138

1    what a Game Zone is as opposed to the Movie
2    Gallery where you worked.
3        A    Well, they have the game parts for
4    Nintendo and X-Box and all that. They
5    specialize in those parts. And they also
6    have a spot where you can go in and rent out
7    the stations there and play them hourly for
8    like twenty-five cents, fifty cents an hour,
9    or something like that.
10       Q    Look down at "a successful
11   candidate shall."
12       A    Uh-huh.
13       Q    And then those bullets under there.
14       A    Yeah. I --
15           MR. NEWMAN: Let her ask you a
16   question.
17           THE WITNESS: Oh, I'm sorry.
18       Q    (BY MS. JOHNSON) Okay. It says,
19   have two to three years supervisory
20   experience at the DM level or above. Do you
21   see that?
22       A    Yes.
23       Q    Had you been a DM before?

Page 139

1        A    As a quality assurance -- the DM
2    and the quality assurance is on the same
3    level.
4        Q    Who told you that?
5        A    That's what -- Mr. Croom has made
6    it in that referendum of like we are almost
7    equal to the DMs.
8        Q    Tell me what Mr. Croom told you
9    specifically as to your relationship with the
10   DMs.
11       A    Basically, we were checking up on
12   the DMs is what our jobs was.
13       Q    Did you have hiring and firing
14   authority over a DM?
15       A    Not directly, no. Of course, if we
16   found something, I'm sure it would lead to a
17   firing.
18       Q    Could you personally fire --
19       A    No.
20       Q    -- a district manager?
21       A    No.
22       Q    Did any district managers report to
23   you?

Page 140

1        A    Report to --
2        Q    Were you their --
3        A    No.
4        Q    -- supervisor?
5        A    No.
6        Q    Okay. Have you ever been a
7    district manager?
8        A    I have never. No. But as a
9    quality assurance auditor, it's the same --
10       Q    Well, according to you --
11       A    I had to know everything that they
12   know to be a quality assurance --
13       Q    All right. But my question is,
14   have you ever been a district manager?
15       A    Okay.
16       Q    Had you? Have you ever been a
17   district manager?
18       A    No.
19       Q    Have you ever supervised a district
20   manager?
21       A    I had -- that would be the same
22   question. No. No, I'm not.
23       Q    Okay. Do you -- did you, at the

Page 141

1    time, have working knowledge of Microsoft
2    Office Suite?
3        A    Yes.
4        Q    Okay. And where did you learn
5    that?
6        A    In college and also through my
7    experience with Movie Gallery.
8        Q    And it said you would be willing to
9    travel fifty percent of the time; is that
10   correct?
11       A    Right.
12       Q    How much were you travelling in --
13       A    Hundred percent of the time.
14       Q    Okay. All right.
15       A    Now, as a quality assurance
16   auditor, like I was saying, I have to know
17   everything a DM knows. And not only that.
18   Our reports did lead to several DMs losing
19   their position. And that was directly from
20   Heath Croom and everybody else in the
21   department.
22       Q    That's okay. That's just -- that's
23   not my question.

**American Court Reporting**
**toll-free (877) 320-1050**

36 (Pages 142 to 145)

Page 142

1    A    Okay.
2    Q    My question was, did you have
3  supervisor experience at the district manager
4  level or above. Were you a district manager?
5  The answer is no; correct?
6    A    The experience, yes, but not --
7    Q    I didn't ask you --
8    A    -- the title.
9    Q    -- about experience. I asked you
10  if you had been a district manager.
11    A    That --
12    Q    I can ask you whatever I want to
13  ask you.
14    A    Okay.
15    Q    My question is, have you ever been
16  a district manager?
17    A    No.
18    Q    Have you ever supervised a district
19  manager?
20    A    Supervised as?
21    Q    As their supervisor.
22    A    Oh, as their supervisor?
23    Q    Yes.

Page 143

1    A    No.
2    Q    Was there a similar e-mail sent out
3  about the previous job that you can't
4  remember the name of?
5    A    Yes.
6    Q    All right. And if Movie Gallery
7  doesn't have a copy of such job, you don't
8  have any explanation for that; is that
9  accurate?
10    A    Do I have an explanation? No. I
11  mean, it was sent out by Movie Gallery. So I
12  don't know what you guys do with this after
13  you put it out.
14    Q    I'm going to show you what's been
15  marked as -- let me go back a minute. On
16  this job that you applied for in March of
17  '05, you had already, at this point, received
18  that written warning we discussed you
19  received in January of '05; correct?
20    A    Correct. Yes. January's before
21  March. Yes.
22    Q    And Mr. Croom -- you also testified
23  that Mr. Croom had talked with you previously

Page 144

1  in an informal capacity about your audit
2  reports, correct, in the fall? Remember that
3  testimony?
4    A    Yes. That was when I first --
5  yeah. And I also asked him, you know, does
6  he think I would be qualified for the
7  position, and he said yes.
8    (WHEREUPON, a document was marked
9  as Defendant's Exhibit 14 and is attached to
10  the original deposition.)
11    Q    (BY MS. JOHNSON) I'm going to show
12  you Defendant's Exhibit 14. Do you recall
13  seeing this document?
14    A    Yes.
15    Q    Okay. What is it?
16    A    The corporate American Express
17  policies.
18    Q    All right. And did -- were you
19  provided with a copy of this on or about
20  March 25th, 2003?
21    A    Yes. But not -- yes. Go ahead.
22    Q    What were you about to say. But
23  not what?

Page 145

1    A    Nothing. Nothing.
2    Q    Who do you plan on calling as a
3  witness in the trial of this case?
4    A    Who do I plan on calling?
5    Q    Uh-huh.
6    A    I don't know. I don't know.
7    Q    Well, have you talked with any
8  employees about your lawsuit or about your
9  claims in this case?
10    A    Me personally? No.
11    Q    Have you talked with any former
12  employees?
13    A    No.
14    Q    To your knowledge, has your
15  attorney talked to any employees or former
16  employees about testifying in this case?
17    A    To my knowledge, I don't know. No.
18    Q    Do you know, or do you not know?
19    A    I do not know.
20    Q    Okay. So sitting here today, you
21  know of no witnesses that you intend to call
22  or that your lawyer intends to call at your
23  trial to support your allegations?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 146

1    A   Right.  Correct.
2    Q   Okay.  Do you have any documents --
3  and when I say "in your possession," I don't
4  mean literally in your possession.  Do you or
5  your attorney have any documents or other
6  evidence that you know about that you intend
7  to introduce at the trial of this case?
8    A   No.  Everything I have, Movie
9  Gallery has had possession of.
10   Q   All right.  Well, tell me -- that
11  doesn't matter.  I can have possession of
12  everything, but I still need to know what you
13  think -- what documents you have or that I
14  have that will help prove the allegations in
15  your case?
16   A   I don't know.  I have to see.  I
17  don't know.
18   Q   Do you know --
19   A   I don't understand exactly what
20  you're saying.
21   Q   Well, you intend to go to trial in
22  this case, correct, if the Court doesn't
23  throw the case out?  You intend to go to

Page 147

1  trial; correct?
2    A   Correct.
3    Q   And you understand it's your burden
4  to prove your case?  Do you understand that?
5    A   Yeah.  That's why I hired a lawyer,
6  though.
7    Q   Okay.  Do you know what evidence
8  your lawyer --
9    A   No, I do not.
10   Q   -- intends to put on at trial,
11  whether it's documents or witnesses, to prove
12  your case?
13   A   I don't know.
14   Q   You don't know of anything?
15   A   I don't know what -- I don't know.
16  That's why I hired a lawyer, so he can do all
17  that kind of stuff.
18   Q   Have you reviewed or seen -- have
19  you seen any documents?
20   A   No.  Everything is with Movie
21  Gallery.
22   Q   It doesn't matter who has the
23  documents.

Page 148

1    A   Okay.
2    Q   Do you know of any documents that
3  you believe prove that your allegations are
4  true?
5    A   Do I know of any?
6    Q   Uh-huh.
7    A   There probably are, but I don't
8  know of any right off.
9    Q   Do you know of any?  That's the
10  question.  Not -- not whether they exist or
11  not.  Do you know of any that you believe
12  prove your case?
13   A   My resume, the fact that I applied
14  for it is what I know.
15   Q   Just your resume and the fact that
16  you applied for it.  Is that the only two
17  documents you know of that you think support
18  your case.
19   A   That I know of.
20   Q   Okay.
21   A   But, again, I have a lawyer to --
22   Q   Okay.  And how does your resume
23  prove your case?

Page 149

1    A   It shows that I'm qualified for the
2  position at, at least, the Game Zone.  And,
3  also, with the -- I asked my supervisor who
4  saw the requirements, and he said yes, I
5  think you're qualified.
6    Q   If you found out that no one
7  received that position and that, in fact, it
8  was eliminated before it was filled --
9    A   Then why wasn't I --
10   Q   Let me finish my question.
11   A   Okay.
12   Q   Okay.  We can't talk over each
13  other.  If you found out the position was
14  eliminated as a result of the -- let me back
15  up.  Were you aware that Movie Gallery bought
16  Hollywood Video last year?
17   A   Yes.
18   Q   As a result of that merger of those
19  two corporations, are you aware that certain
20  positions were eliminated?
21   A   No.
22   Q   Okay.  Well, if you were to learn
23  that particular position was never filled

**www.AmericanCourtReporting.com**
**July 6, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 150

1  because of the merger, would you still
2  contend that you were discriminated against
3  when you didn't receive that position?
4      A  Yes. Because, again, I think I at
5  least -- anybody, white, black, whatever,
6  deserves the knowledge to know that this is
7  what happened. Some kind of communication is
8  what --
9      Q  Okay.
10     A  Something.
11     Q  Communication problem; correct?
12     A  Partly. Partly.
13     Q  Okay. Well, let me ask this: If a
14 white employee applied for that same position
15 and wasn't interviewed and didn't receive it
16 because it wasn't filled and he wasn't told
17 as to why, do you think he was discriminated
18 against?
19     A  Perhaps. I don't know.
20     Q  Okay. Well, in that situation,
21 would you have been treated any differently
22 than a white employee?
23     A  Yes. That's why I'm with this

Page 151

1  lawsuit today.
2      Q  No. Listen to my question.
3      A  Okay.
4      Q  If a white employee applied for the
5  position, wasn't interviewed, and wasn't
6  offered the job, and wasn't told why he
7  wasn't offered the job, was he treated any
8  differently than you -- he or she?
9      A  He or she? And they weren't told
10 or anything?
11     Q  Uh-huh.
12     A  I don't know. I guess not. I
13 don't know.
14     Q  You guess not?
15     A  I guess not. I don't know. I
16 don't know how they feel.
17     Q  It's a hypothetical question.
18     A  Right. It's -- I don't know how
19 they feel. I know how I feel. I don't know
20 how they feel.
21     Q  Well, I'm not talking about
22 feelings. I'm talking about facts.
23     A  Okay. I don't know then.

Page 152

1      Q  I'm talking about facts.
2      A  I don't know.
3      Q  If somebody was treated the exact
4  same way as you and they were white, would
5  you still believe you were discriminated
6  against?
7      A  Yes.
8      Q  Why?
9      A  Because I felt like I was
10 discriminated against because there was
11 nobody that I felt that I can go in and talk
12 to about this and nobody that -- that's just
13 how I feel. This is how I feel, period.
14     Q  Okay. But even if you found out a
15 white employee was treated the exact same
16 way, you would think it's because of your
17 race?
18     A  Yes.
19     Q  I'm going to show you what I'm
20 marking as Defendant's Exhibit 15 and ask you
21 if you've seen this document before.
22        (WHEREUPON, a document was marked
23 as Defendant's Exhibit 15 and is attached to

Page 153

1  the original deposition.)
2      Q  (BY MS. JOHNSON) And take --
3        MS. JOHNSON: What did I just hand
4  you? I'm sorry.
5        MR. NEWMAN: Request for production
6  of documents.
7      Q  (BY MS. JOHNSON) And what did I
8  hand you?
9      A  Request for admission.
10       MS. JOHNSON: Yeah. My assistant
11 got them mixed up. Hang on one second. That
12 may be the only copy.
13       MR. NEWMAN: Go ahead. It will be
14 okay.
15     Q  (BY MS. JOHNSON) Have you seen
16 that document?
17     A  Yes.
18     Q  Okay. And when did you see it --
19     A  That I don't know.
20     Q  -- for the first time?
21     A  What?
22     Q  For the first time, when did you
23 see it?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 154

1    A   I don't know. I don't remember.
2    Q   Well, did you assist your
3  attorney --
4    A   No. I'm sorry.
5    Q   Let me get the question out. Did
6  you assist your attorney in responding to
7  this?
8    A   No.
9    Q   You didn't provide him any
10  information to assist him in answering these
11  questions?
12    A   I answered the questions. That was
13  it.
14    Q   All right. Let me show you what
15  I'm marking as Defendant's Exhibit 16.
16       (WHEREUPON, a document was marked
17  as Defendant's Exhibit 16 and is attached to
18  the original deposition.)
19    Q   (BY MS. JOHNSON) If you would,
20  flip to the last page.
21    A   This is the same thing.
22    Q   No. These are your answers,
23  actually.

Page 155

1    A   Oh.
2    Q   If you'll review the questions and
3  your answers, and let me know whether your
4  answers are still accurate as of today.
5    A   (Witness complies.)
6       I think that's right. Yeah.
7    Q   You need to speak --
8    A   I think, yes.
9    Q   Yes or no. Are your answers
10  accurate?
11    A   Yes.
12    Q   Okay. Number five says, admit that
13  as of March 24th, 2005, you did not have at
14  least two to three years related retail
15  experience related to game or new product
16  operations and marketing and/or training or
17  equivalent combination of education
18  experience. And your answer is, cannot admit
19  or deny.
20       Why can't you admit or deny that?
21    A   That is because, number one, I had
22  been working with the company for so long
23  that I do have working knowledge of the Game

Page 156

1  Zone and the retail and all that aspect of
2  the actual Game Zone, but like -- you asked
3  me had I ever worked in one, physically
4  worked in a Game Zone.
5    Q   Right.
6    A   No, I have not.
7    Q   Okay. Well, what experience did
8  you have working with Game Zone at the time
9  you applied for this position?
10    A   Well, as an auditor, I had to learn
11  each and every aspect of everyone's position.
12  And that includes Game Zone and Sun Bed
13  -- the sunbathing department of Movie
14  Gallery. Everything. So I have a working
15  knowledge of --
16    Q   And you did that as an auditor,
17  though; right?
18    A   Right.
19    Q   You didn't work in the store as an
20  associate?
21    A   As an associate, as a gamer.
22    Q   Okay. So it's true, is it not,
23  that you have never worked -- let me rephrase

Page 157

1  that. That you did not have -- and listen to
2  my question closely. You did not have actual
3  experience in a game operation, the retail
4  experience?
5       I didn't ask you whether you were
6  familiar, as an auditor, with the job duties.
7  My question is, did you have actual two to
8  three years experience working in a Game
9  Zone?
10    A   Working in the Game Zone?
11    Q   Right. Or any game store.
12    A   Well, see --
13    Q   That's my question. You don't get
14  to change the question. You can --
15    MR. NEWMAN: So you're asking a
16  different question than number five itself.
17    Q   (BY MS. JOHNSON) I'm asking you,
18  did you have two to three years retail
19  experience working in a Game Zone or a game
20  store?
21    A   Then yes.
22    Q   You did have retail experience
23  working in a Game Zone?

**American Court Reporting**
**toll-free (877) 320-1050**

40  (Pages 158 to 161)

Page 158

1    A    Retail experience, yes.  Because --
2    yes.
3    Q    Working in a Game Zone?
4    A    I wasn't -- I worked in a Game
5    Zone?
6    Q    Yes.
7    A    As an auditor, you -- I'm working
8    in every -- I have to know everything --
9    Q    Well, do you know what "retail
10   experience" means?  Do you know --
11   A    Yes.
12   Q    What does that mean?
13   A    That means that -- that's what
14   Movie Gallery -- Movie Gallery is a retailer
15   of movies.  Okay?
16   Q    I understand that.
17   A    And the Game Zone is also a
18   retailer of games.
19   Q    As an auditor, were you renting or
20   selling games?
21   A    Yes.  If a customer came up, that's
22   -- I would do that.  That's what I had to
23   know.

Page 159

1    Q    You had to know the job duties;
2    correct?
3    A    I had to know the job duties.
4    Q    Did you actually sell on the floor?
5    Were you --
6    A    Nobody sells on the floor.
7    Q    Nobody sells on the floor?
8    A    Nobody goes out, you know, and
9    -- all right.  Go ahead.  Just go ahead.
10   Q    Okay.  Well, tell me what the
11   employees are called that work in the Game
12   Zone?
13   A    Customer sales associate.
14   Q    Okay.  And they work in retail?
15   They're selling or renting the games;
16   correct?
17   A    Right.
18   Q    All right.  Did you ever work in a
19   Game Zone or a game store where you sold or
20   rented the product?
21   A    To answer your question, yes, I
22   have because --
23   Q    When?

Page 160

1    A    As a -- throughout my auditing,
2    whenever.  If they need help, then we could
3    assist them and help.
4    Q    How many times did you do that?
5    A    I don't know.  I didn't keep count
6    of how many.  It was numerous times that that
7    situation would come up.
8    Q    Are you saying that as an
9    auditor --
10   A    But I --
11   Q    -- that your job was to be a sales
12   associate?
13   A    If they needed help, we could
14   assist.
15   Q    And you don't have any recollection
16   as to how many times you did that?
17   A    No.
18   Q    Would you say that was a primary
19   function of your job?
20   A    No.
21   Q    I'm going to show you what I'm
22   marking as Defendant's Exhibit 17.  Take a
23   minute to review it, and tell me if you've

Page 161

1    ever seen this document before.
2         (WHEREUPON, a document was marked
3    as Defendant's Exhibit 17 and is attached to
4    the original deposition.)
5    Q    Okay.  Yes.
6    Q    And when was the first time you saw
7    it?
8    A    I don't remember the first time I
9    saw it.
10   Q    Okay.  Did you provide all the
11   documents that are requested in this document
12   to your attorney?
13   A    That I had access of.
14   Q    Which documents don't you have
15   access to?
16   A    Don't I?
17   Q    Yeah.
18   A    It's a lot of them.  Number five.
19   Q    You don't have your tax returns?
20   A    No.
21   Q    Where are they?
22   A    I don't know.
23   Q    You don't know where your tax

**American Court Reporting**
**toll-free (877) 320-1050**

Page 162

1  returns are?
2    A   No.
3    Q   Have you filed tax returns every
4  year?
5    A   Yes.
6    Q   Okay.  And you don't keep copies of
7  those?
8    A   Yes.  But I don't know where it is.
9  Seriously, I don't know where it is.
10   Q   Do you have an accountant?
11   A   Huh?
12   Q   Do you have an accountant?
13   A   Yeah.  I guess.  H & R Block.
14   Q   Okay.  And do they maintain copies
15  of your tax returns?
16   A   I would hope so.
17   Q   Have you asked them for copies?
18   A   I attempted to call them, but I
19  could not get in contact with anyone.
20   Q   Okay.  Well, that's something you
21  need to do.  There is -- it's not an excuse
22  that you can't get your documents from your
23  accountant.  You've brought a lawsuit, and

Page 163

1  you've got to turn those over.
2    A   Uh-huh.
3    Q   Do you have any diaries or notes or
4  any kind of tapes related to this lawsuit?
5    A   No.
6    Q   What other documents do you not
7  have access to?
8    A   I have -- no.  I don't have number
9  ten.
10   Q   And why not?
11   A   Oh, okay.  I'm sorry.  That was a
12  mistake.  I thought that was the one about
13  the unemployment.  Okay.  I think that's it.
14   Q   Any other documents?
15   A   No.  I think that's it.
16   Q   So other than the tax returns,
17  you've turned over everything that you have
18  that's requested in this exhibit?
19   A   Yes.
20   Q   Have you seen a doctor at all, any
21  kind of doctor, related to your allegations
22  in this lawsuit?
23   A   No.  I couldn't afford one.  I

Page 164

1  mean --
2    Q   Well, what kind of problems have
3  you been having?
4    A   Well, first of all, not only me,
5  but my wife as well.  We almost lost our baby
6  due to the stress because she had to continue
7  to work after this happened, and she was
8  pregnant.  She had to stand up all day.
9  Eight or more hours, she had to stand up.
10       What else?
11   Q   Did she have to go to the hospital?
12   A   Yes.
13   Q   Did she -- are there records of
14  that?
15   A   There should be.
16   Q   Okay.  Well, you need to produce
17  those.  They're requested in here?
18   A   Okay.
19   Q   What other problems?  Did she
20  deliver prematurely?
21   A   I think she did.  A couple days.
22   Q   A couple days?
23   A   Uh-huh.

Page 165

1    Q   All right.
2       MR. NEWMAN:  Which one relates to
3  medical records of a spouse?
4       MS. JOHNSON:  Well, my question
5  was, have you seen -- have you -- it would be
6  number sixteen.  And it says for plaintiff,
7  but his answer to my question was that his
8  wife suffered too.  So if he's claiming his
9  wife suffered as a result of the lawsuit,
10  you've --
11      MR. NEWMAN:  But you didn't really
12  ask for that, did you?
13      MS. JOHNSON:  I asked for it now,
14  and he's --
15      MR. NEWMAN:  He's not making a
16  claim on behalf of his wife.
17      MS. JOHNSON:  I also have a
18  question as for any documents that support or
19  explain the damages claimed by you.  And
20  apparently he's claiming damages.
21      MR. NEWMAN:  Where?  Where does he
22  claim damages --
23      MS. JOHNSON:  I just asked him.

**American Court Reporting**
**toll-free (877) 320-1050**

42 (Pages 166 to 169)

Page 166

1    MR. NEWMAN: -- to his wife?
2    MS. JOHNSON: I said --
3    MR. NEWMAN: But I mean, in the
4    lawsuit itself, do I make any claim for --
5    MS. JOHNSON: Well, he's telling me
6    now.
7    MR. NEWMAN: -- consortium? A
8    consortium claim?
9    MS. JOHNSON: What he's telling me
10   right now is that his wife --
11   MR. NEWMAN: Well, that's not
12   really relevant because we don't claim that.
13   MS. JOHNSON: I have to go with
14   what his testimony is, not what his lawyer's
15   opinion of his testimony is.
16   MR. NEWMAN: Well, it's not my
17   opinion. It's the law. The complaint itself
18   is the --
19   MS. JOHNSON: The complaint is very
20   broad.
21   MR. NEWMAN: But it doesn't say
22   anything about claims for --
23   MS. JOHNSON: If he tells me his

Page 167

1    wife delivered early, I have the right to ask
2    for information about that.
3    MR. NEWMAN: Well, you can ask for
4    it. I'm not going to try -- I'm not going to
5    tell him to get that because it's irrelevant.
6    MS. JOHNSON: Okay. Well, I'll
7    move to compel, and we'll --
8    MR. NEWMAN: Fine. Move.
9    Q    (BY MS. JOHNSON) Okay. What other
10   doc -- have you seen any -- what other
11   physical problems --
12   A    I couldn't afford a doctor. My --
13   and the insurance was cancelled, after a
14   while, with Movie Gallery. So we still got
15   bills from that. That's why she was able to
16   go and see the doctor in the first place. Me
17   --
18   Q    I didn't follow that. Why was she
19   able to go see a doctor?
20   A    Because we had -- the insurance had
21   not cancelled just yet. The insurance that
22   we had.
23   Q    From Movie Gallery?

Page 168

1    A    From Movie Gallery.
2    Q    Y'all didn't have insurance
3    after you were terminated?
4    A    Right. We had no insurance
5    whatsoever?
6    Q    What kind of doctor?
7    A    She needed to see an OB/GYN.
8    Q    Talking about you.
9    A    Oh, me.
10   Q    What kind of doctor is it -- you
11   said you couldn't afford to go to the doctor.
12   What kind of doctor did you want or need to
13   see?
14   A    A psychiatrist would have been
15   fine. That would have been great, to express
16   how I feel and get some sleep, you know.
17   That's it.
18   Q    Did you attempt to -- did you have
19   COBRA with Movie Gallery? Did you apply for
20   COBRA after you were terminated?
21   A    No.
22   Q    You didn't?
23   A    No.

Page 169

1    Q    Okay. Did you know --
2    A    It was too expensive. We couldn't
3    afford it.
4    Q    All right. Did you try to find out
5    if there was any kind of psychiatrist you
6    could go see on Medicaid or that was offered
7    to the public at a reduced or free charge?
8    A    I have no knowledge of that.
9    Q    Okay. My question is, did you
10   attempt to find out about it?
11   A    No.
12   Q    What other doctors did you want to
13   see that you didn't see because you didn't
14   have any money?
15   A    That was pretty much it.
16   Somebody -- some way to try to get some sleep
17   and stressing about everything going on. I
18   mean --
19   Q    Okay. What happened with your
20   sleep? Tell me about your sleep problems.
21   A    Well, I couldn't get none.
22   Q    You didn't sleep at all?
23   A    There would be some nights where I

**American Court Reporting**
**toll-free (877) 320-1050**

Page 170

1    couldn't get any sleep at all because --
2        Q    Okay.
3        A    And not only that.  I'm keeping my
4    wife up, and she's been working, you know,
5    ten hours.  So it was -- it was just bad.
6        Q    Okay.  How long did you have
7    sleeping problems for?
8        A    Probably for months.  At least two
9    or three months because even after -- it was
10   just -- it was crazy.
11       Q    Well, I think you testified -- and
12   correct me if I'm wrong -- that you were
13   unemployed for about a month.
14       A    Uh-huh.
15       Q    Is that correct?
16       A    Yeah.
17       Q    Did you continue to have sleep
18   problems after you got a job?
19       A    Yeah.  Because we were like --
20   within that month, we got behind.  And it
21   brought on more problems.  Then we found out
22   about the insurance being cancelled, and, you
23   know, it was --

Page 171

1        Q    What do you mean you found out
2    about the insurance being cancelled?
3        A    Well, that's what we got.  We got a
4    letter in the mail saying that we owe for
5    this and this and this.
6        Q    I don't know what you're --
7        A    Well, we got a letter in the mail
8    that basically said that we didn't have
9    insurance, that we needed to pay the doctor.
10       Q    Well, you knew that when you were
11   terminated that you were going to have to get
12   COBRA or not have health insurance, didn't
13   you?
14       A    I thought -- when I got that
15   packet, I did.  Yes.
16       Q    Right.  When did your wife deliver
17   the baby?
18       A    November 15th.
19       Q    Of what year?
20       A    '05.
21       Q    And at that point, you were
22   employed; correct?
23       A    Yes.

Page 172

1        Q    All right.
2        A    Yes.
3        Q    Any other physical or mental
4    problems you had other than what you've
5    already told me?
6        A    I don't think so.  My wife might
7    differ, but --
8        Q    Let me show you what I'm marking as
9    Defendant's Exhibit 18.
10           (WHEREUPON, a document was marked
11   as Defendant's Exhibit 18 and is attached to
12   the original deposition.)
13       Q    (BY MS. JOHNSON)  Have you seen
14   this document?
15       A    Yes.
16       Q    And when is the first time you saw
17   it?
18       A    I don't remember.
19       Q    Did you provide the information to
20   your attorney so that he could answer these
21   questions?
22       A    Yes.
23       Q    I'll show you what I'm marking as

Page 173

1    Defendant's Exhibit 19.
2           (WHEREUPON, a document was marked
3    as Defendant's Exhibit 19 and is attached to
4    the original deposition.)
5        Q    (BY MS. JOHNSON)  Are these the
6    answer to the interrogatories, or Defendant's
7    Exhibit 18 -- your answers?
8        A    Oh, yes.
9        Q    Okay.  Take a minute to review it
10   and let me know if anything in here is
11   inaccurate.
12       A    (Witness complies.)
13           Okay.
14       Q    Is everything in here accurate?
15       A    Yes.
16       Q    Okay.  It says that you were in a
17   -- a defendant in a lawsuit filed by Trinity
18   Day Care?
19       A    Uh-huh.
20       Q    Is that the only lawsuit you've
21   ever been involved in --
22       A    Yes.
23       Q    -- other than this one?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 174

1    A    Yes.
2    Q    Okay.  And when was that lawsuit?
3    A    I don't remember.
4    Q    How long ago?  How many years?  How
5    many months?
6    A    Not -- it was somewhere right after
7    I had been laid off with Movie Gallery.  I
8    think that month -- the next month, they sued
9    us.
10    Q    And what happened with that
11    lawsuit?
12    A    Basically, we had to pay the day
13    care because --
14    Q    Did you settle, or did you go to
15    court?
16    A    Settled.  I guess so.
17    Q    And did you have a lawyer in that
18    case?
19    A    No.
20    Q    Let me show you --
21    A    That came about because -- oh,
22    yeah.  We didn't have any income coming in.
23    I had just gotten laid off, fired, whatever.

Page 175

1    Q    Do you have any documents related
2    to that lawsuit in your possession?
3    A    No.
4    Q    Where are they?
5    A    I don't know.
6    Q    You just lost them?
7    A    Yeah.  Well, we've moved a couple
8    times.  It really wasn't anything for me to
9    keep.
10    Q    Well, there would have been a
11    complaint; correct?
12    A    Huh?
13    Q    There would have been a complaint;
14    correct?
15    A    Yes.
16    Q    Okay.  Did you sign the settlement
17    agreement?
18    A    Tell you the truth, the only thing
19    I remember is just paying the amount.
20        (WHEREUPON, a document was marked
21    as Defendant's Exhibit 20 and is attached to
22    the original deposition.)
23    Q    (BY MS. JOHNSON) Let me show you

Page 176

1    what I've marked as Defendant's Exhibit 20.
2    And I'll represent to you that these are the
3    answers to the request for production which,
4    I believe, was Defendant's Exhibit -- I think
5    it's 18.  You might want to look through your
6    stack.
7        And I just -- all I want to ask you
8    is whether your answers to the request for
9    production are accurate.
10    A    Yes.
11    Q    Take as much time as you need to
12    review it.
13    A    I remember this.
14    Q    And are your answers to the request
15    for production accurate?
16    A    Uh-huh.  Yes.
17    Q    Okay.  I'm going to show you what
18    I'm marking as Defendant's Exhibit 21.
19        (WHEREUPON, a document was marked
20    as Defendant's Exhibit 21 and is attached to
21    the original deposition.)
22    Q    (BY MS. JOHNSON) Have you seen
23    this document before?

Page 177

1    A    I don't remember seeing this one.
2    I don't remember seeing it.
3    Q    Take your time.
4    A    Okay.  Yes.
5    Q    Do you remember providing
6    supplemental answers to our interrogatories?
7    A    Yes.
8    Q    And are these those answers?
9    A    Yes.
10    Q    And are they accurate?
11    A    Yes.
12    Q    Do you recall an occasion, back in
13    January of '05, where you had to call Croom
14    from the Dothan airport because you
15    couldn't -- because they wouldn't approve the
16    cost of the flight on your American Express
17    card?
18    A    Yes.
19    Q    And he had to come out there and
20    buy your ticket; is that correct?
21    A    Yes.  That, again, is with the
22    reimbursement.  Something was happening there
23    with the reimbursement, so --

**American Court Reporting**
**toll-free (877) 320-1050**

Page 178

1    Q    Well, we've been over that.  And as
2  the record shows, it was one day late; is
3  that accurate?
4    A    Yeah.  It happened more than once,
5  though.
6    Q    And I'm talking about this
7  particular occasion.
8    A    And I'm telling you it was
9  something with the reimbursement as well, so
10  yes.  That is -- yes, he did pay for it.
11    Q    I can pull -- I can go back through
12  the documents, but as I recall, it was
13  January of '05 where you were one day late.
14  And that would have been related to this
15  attempt to buy --
16    A    Okay.
17    Q    -- your ticket; is that correct?
18    A    Yes.
19    Q    All right.  And, in fact, after
20  that, Mr. Croom audited your American Express
21  card payment history and found that you had
22  been continuously and repeatedly late; is
23  that correct?

Page 179

1    A    Not repeatedly late.  No.
2    Q    Okay.  So if we pulled the American
3  Express records, it won't show that you were
4  late on numerous occasions?
5    A    I don't remember.  No.
6    Q    You don't remember, or you don't
7  know?
8    A    I don't know.
9    Q    Okay.  Do you have any reason to
10  dispute that?
11    A    No.
12    Q    All right.  Actually, on that day
13  you couldn't buy the ticket, did you get a
14  ticket or did he instruct you to drive to
15  Georgia to do an audit?  Do you recall?
16    A    I can't remember, actually.  I know
17  I was with -- I think, yeah -- Bo.
18    Q    Originally, you were in the airport
19  to buy a ticket; correct?
20    A    Uh-huh.
21    Q    And then you wound up driving to
22  Georgia instead; is that correct?
23    A    Perhaps.  I don't remember.  Yeah.

Page 180

1    Q    Okay.  And then you had to contact
2  Bo Collins so he could pay for your hotel
3  room and gas; is that right?
4    A    Yes.
5    Q    Okay.  Are there any other facts
6  that we haven't talked about today that you
7  contend support your claims of discrimination
8  in this case, anything I've left off?
9    A    Well, let me think.  Well, earlier
10  -- I was talking with my wife during the
11  lunch break, and she reminded me of -- I
12  think you asked me have I ever heard of
13  anything referring to the hostile -- any
14  hostility toward anybody.
15        And the only incident that I can
16  remember, really, is that we were in the
17  office talking about our political parties
18  and -- anyway, there was some hostility
19  between myself and Bo Collins and, I think,
20  Heath.  Anyway, it was the thing about being
21  a Democrat and a Republican.  And not only
22  -- there was also one point where -- some
23  kind of way, something was brought up about

Page 181

1  the HNIC, which is head nigger in charge.
2  And Bo Collins --
3    Q    Who told you that that's what that
4  meant?
5    A    Well, Bo Collins actually said it,
6  that's what it meant.  And I remember Ms.
7  Margie, Margie, Margaret -- somebody -- came
8  in.  And she was like -- she told them, you
9  know, don't be saying that in front of Mike,
10  you know, don't be saying that.  So that is
11  what I remember.
12    Q    Okay.  And what was the context of
13  him saying that?
14    A    Was telling me what HNIC means.
15    Q    Why did that come up?
16    A    We were talking about -- something
17  about something -- I don't know.  I was
18  feeling good or something, and I was saying
19  something in reference to doing this task
20  good or something -- or something like that,
21  you know.  And it was brought up that way.
22    Q    And how was it brought up?  Was he
23  just -- was it a joke?  Was he saying it

**American Court Reporting**
**toll-free (877) 320-1050**

Page 182

1  about you?  What was the context?
2       A   He may have meant it as a joke, but
3  it was not taken that way.  And it was --
4  okay.  I think it went something like this.
5  We were talking, and I was saying that --
6  Heath was giving me something to do.  And I
7  was like, well, all right, you know, I guess
8  I'm in charge now -- you know, I guess
9  And -- or I'm taking lead or whatever it was.
10  But it was brought up in that manner.  It
11  was, I guess you feel -- I guess I feel like
12  the HNIC.
13       Q   You said that?
14       A   Yes.  And then he said, head nigger
15  in charge?  So you the head nigger?  Like
16  that.
17       Q   Did he ask you what it meant?
18       A   No.  He -- no.  He said what it
19  meant.
20       Q   But you brought it up first?
21       A   Yes.
22       Q   Okay.  And is that what you meant
23  when you brought it up?  Is that what it

Page 183

1  stood for in your mind?
2       A   Well, yes.
3       Q   Okay.  Who was standing there when
4  that conversation took place?
5       A   I know Heath was there because we
6  was in his office.  And Margie, Margaret.
7       Q   Who was that?
8       A   It's an older lady in the office.
9  She's the oldest lady in the office, as a
10  matter of fact.  She does accounting or
11  something.
12       Q   Okay.  Anybody else?
13       A   No.  That was it.  Just us three
14  -- four.
15       Q   When was that?
16       A   That was somewhere close to all
17  this happening.
18       Q   To the termination?
19       A   Uh-huh.
20       Q   Did you report that to anyone?
21       A   Well, I mean, my supervisor was
22  right there.
23       Q   Did you report it to anybody --

Page 184

1       A   No.
2       Q   -- that you were offended?
3       A   Well, he --
4       Q   Well, let me ask you this:  Were
5  you offended?
6       A   Yes, I was.
7       Q   Okay.  Did you report that to
8  anyone?
9       A   No.  Because at the -- it was like,
10  you know -- I don't know.  No.  Because my
11  supervisor was right there.  Who else, you
12  know -- and I did not know I was about to be
13  laid off.
14       Q   If you had known you were about to
15  be laid off, you would have complained?
16       A   Yes.  Because maybe I wouldn't have
17  lost my job or anything.
18       Q   You would have complained so you
19  wouldn't have lost your job?
20       A   Right.  I had feared losing my job.
21  So if I said anything, I probably --
22       Q   You were in fear of losing your
23  job?

Page 185

1       A   If I would have said something.
2       Q   Why?
3       A   Because that is a tightknit group
4  there with -- the LP office, period.  But
5  Heath, Bo Collins, and Margie -- her name was
6  Margie -- Margaret?  It's just a very
7  tightknit group.  And it is what it is, you
8  know.  So if I complained to, maybe -- I
9  don't know -- Mr. Kitchens, I mean, it would
10  have leaked out.  It would have gotten
11  somewhere.
12       Q   Okay.  Did you know of any
13  employee, ever, at Movie Gallery that
14  complained about anything discrimination-wise
15  and was terminated?
16       A   No.  It's so big of a company.  I
17  don't know --
18       Q   Well, what was your basis --
19       A   -- for sure.
20       Q   -- for feeling that you would have
21  been fired if you complained?
22       A   Because I know how tight they are,
23  how close they are.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 186

1    Q   So, again, it was an assumption on
2   your part that, because they were close, if
3   you complained, you would be fired?
4    A   I know I would have. Yeah.
5    Q   You believe that, but you have no
6   factual basis for that belief; is that
7   correct?
8    A   It's what I believe, yes.
9    Q   Okay. Any other facts that you
10  haven't discussed or told me about that you
11  think support your claims in this case?
12   A   Let me see. I think I mentioned
13  earlier that I had a white coworker that was
14  offered a position and actually given a
15  position without -- I never saw it posted
16  anywhere, but was actually given a promotion.
17   Q   But you actually told me before
18  that you don't know if he was making more
19  money or not?
20   A   Yeah. But, I mean, it was like --
21  they offered -- you know, they came to him.
22   Q   Right.
23   A   You know.

Page 187

1    Q   Okay.
2    A   So I mean --
3    Q   Any others?
4    A   And he wasn't even thinking about
5   it.
6    Q   Any others?
7    A   That's it.
8    Q   When you were promoted to the audit
9   department, the corporate office, that was
10  Mr. Croom's decision; is that correct?
11   A   I guess. It was between Mr.
12  Kitchens and --
13   Q   Mr. Croom?
14   A   Mr. Croom.
15   Q   Together; right?
16   A   Uh-huh.
17   Q   And I guess any raises you received
18  or bonuses you would have received would have
19  been by them as well; correct?
20   A   Uh-huh.
21   Q   Is that yes?
22   A   Yes.
23   Q   Were you aware that there's a legal

Page 188

1   department at the corporate office in Dothan?
2   Well, it's on the code of conduct thing you
3   signed earlier.
4    A   Yeah.
5    Q   Do you recall that? I can pull it
6   back out if you want me to.
7    A   Yeah. I think I -- I think I was
8   aware of that. I think.
9    Q   And were you also aware that the
10  policy said that if you are uncomfortable
11  talking to your supervisor, you can complain
12  to someone else?
13   A   Uh-huh.
14   Q   Are you aware of that?
15   A   Yes.
16   Q   And I believe you told me earlier
17  that you got along with Mr. Croom and you
18  were comfortable working with him; is that
19  correct?
20   A   Working with him. Yes.
21   Q   That's all I have.
22       MR. NEWMAN:  No questions.
23       (1:42 p.m.)

1       (FURTHER DEPONENT SAITH NOT.)
2        C E R T I F I C A T E
3   STATE OF ALABAMA)
4   JEFFERSON COUNTY)
5       I hereby certify that the
6   above and foregoing deposition was
7   taken down by me in stenotype and the
8   questions and answers thereto were
9   transcribed by means of computer-aided
10  transcription, and that the foregoing
11  represents a true and correct
12  transcript of the testimony given by
13  said witness upon said hearing.
14      I further certify that I am
15  neither of counsel, nor of kin to the
16  parties to the action, nor am I in
17  anywise interested in the result of
18  said cause.
19
20  Melissa S. Lee, CSR
21  Certificate No: AL-CSR-555
22  Notary Public
23  My Commission Expires 9/16/2006

**American Court Reporting**
**toll-free (877) 320-1050**

| A | | | | | |
|---|---|---|---|---|---|
| **able** 167:15 | 121:18,20 | **accepting** | 63:18 | 110:15 | 135:7 |
| 167:19 | 121:23 | 120:1 | **across** 44:15 | **affect** 13:11 | 148:21 |
| **about** 3:13 | 122:3 | **access** | **acting** 8:3 | **afford** | 150:4 |
| 9:23 10:7 | 123:7,11 | 161:13,15 | 102:9 | 163:23 | 177:21 |
| 11:11,18 | 128:14,15 | 163:7 | **action** 2:5 | 167:12 | 186:1 |
| 15:22 18:3 | 128:17,21 | **according** | 189:16 | 168:11 | **against** |
| 23:12,22 | 133:5,10 | 54:5 95:15 | **actual** 156:2 | 169:3 | 66:10,17 |
| 28:21 | 134:9 | 129:10,11 | 157:2,7 | **African-A...** | 66:23 |
| 30:13 | 137:10 | 140:10 | **actually** | 77:22 81:5 | 67:11,16 |
| 31:19 | 142:9 | **accountant** | 63:17 | 85:7 | 69:4 70:21 |
| 39:11 | 143:3 | 162:10,12 | 73:11 | 101:19 | 72:12 |
| 42:15,22 | 144:1,19 | 162:23 | 111:9,11 | 102:5,7 | 150:2,18 |
| 44:23 45:4 | 144:22 | **accounting** | 129:2 | **African-A...** | 152:6,10 |
| 46:3 51:6 | 145:8,8,16 | 183:10 | 133:11 | 99:13 | **agency** |
| 52:9 56:16 | 146:6 | **accumulat...** | 154:23 | 100:7 | 109:12,14 |
| 58:22 | 151:21,22 | 91:12 | 159:4 | **Afro-Ame...** | **agenda** 96:1 |
| 59:14 | 152:1,12 | **accuracy** | 179:12,16 | 42:1 | 96:1 |
| 65:10 68:3 | 163:12 | 112:15 | 181:5 | **after** 12:8,21 | **agent** 26:13 |
| 72:11,13 | 166:22 | **accurate** | 186:14,16 | 14:13,15 | **ages** 11:4 |
| 74:6 75:5 | 167:2 | 61:13 62:8 | 186:17 | 29:23 | **ago** 59:12 |
| 77:12,17 | 168:8 | 67:23 | **adaptability** | 44:20 | 68:20 89:4 |
| 80:21 | 169:10,17 | 73:20 | 132:12 | 46:14 73:7 | 93:6 134:9 |
| 83:11 90:1 | 169:20 | 74:13 | 133:11 | 74:3,4 | 174:4 |
| 92:6 93:13 | 170:13,22 | 76:16 | **added** | 90:22 95:2 | **agree** 51:14 |
| 93:16 | 171:2 | 88:17 | 119:17 | 96:8 98:18 | 96:18 |
| 94:17 97:9 | 174:21 | 93:17 | **addition** | 110:8 | 115:23 |
| 97:10 98:3 | 178:6 | 96:10 | 125:18 | 119:15 | 132:6 |
| 99:10 | 180:6,17 | 102:23 | 126:7 | 120:7 | **agreed** 3:3 |
| 103:3,4,6,9 | 180:20,23 | 103:1 | **address** 9:18 | 135:9 | 3:15,23 |
| 104:14,17 | 181:16,17 | 124:11 | 9:22 10:6,7 | 143:12 | 64:11 |
| 105:19 | 182:1 | 128:9 | **admission** | 164:7 | **agreement** |
| 107:19 | 184:12,14 | 129:6 | 153:9 | 167:13 | 36:15 |
| 108:5,6 | 185:14 | 133:14 | **Admissions** | 168:3,20 | 175:17 |
| 110:5,7,18 | 186:10 | 143:9 | 6:4,5 | 170:9,18 | **ahead** 12:8 |
| 110:21 | 187:4 | 155:4,10 | **admit** 85:2 | 174:6 | 13:5 26:1 |
| 112:2,7,11 | **above** 8:12 | 173:14 | 118:6 | 178:19 | 92:4 |
| 112:13,23 | 125:3 | 176:9,15 | 155:12,18 | **again** 18:12 | 102:10 |
| 113:2,10 | 126:17 | 177:10 | 155:20 | 26:23 | 124:5 |
| 113:23 | 130:16 | 178:3 | **admitted** | 69:12 | 144:21 |
| 117:2,8,9 | 138:20 | **Acknowle...** | 101:18 | 78:16 | 153:13 |
| 121:9,11 | 142:4 | 5:11 | **advance** | 86:13 90:4 | 159:9,9 |
| | 189:6 | **acknowled...** | 108:18 | 134:3 | |

**American Court Reporting**
toll-free (877) 320-1050

AIG 25:19
26:18,21
airport
177:14
179:18
Alabama 2:2
3:9,11 7:8
7:15 8:3,10
10:4 12:11
18:9 27:18
189:3
allegations
145:23
146:14
148:3
163:21
alleged
96:13
almost 139:6
164:5
along 38:16
125:12
188:17
already
29:13
82:18
101:18
105:20
106:11
143:17
172:5
altered
120:7,18
always 28:9
42:15 43:3
43:5 44:8
44:10
58:17
102:7
106:15
AL-CSR-5...
189:21

American
51:12
128:13
144:16
177:16
178:20
179:2
Amex 51:17
128:13
130:11
133:10,15
amount
43:16,18
47:20
175:19
and/or
155:16
announce...
55:8
another
14:21
25:10
106:14
136:3
answer 9:9
15:1
102:11
142:5
155:18
159:21
165:7
172:20
173:6
answered
154:12
answering
154:10
answers 6:8
6:9,10
154:22
155:3,4,9
173:7

176:3,8,14
177:6,8
189:8
Anthony
81:18 82:4
84:4 114:3
114:5,6
anybody
36:11 38:4
43:20 46:4
52:23
74:20
78:15,20
83:11
89:12 90:7
93:22
150:5
180:14
183:12,23
anybody's
94:5
anyone 32:6
36:21 51:8
58:6 74:22
77:2,6,13
89:9,15
90:19,20
101:11,12
101:15
162:19
183:20
184:8
anything 9:7
15:20
17:16 27:9
33:15 38:6
38:15 58:1
58:1,8
65:10
69:22
101:8
102:9,9,23

109:13
113:16
114:1
135:12
147:14
151:10
166:22
173:10
175:8
180:8,13
184:17,21
185:14
anyway
57:17
95:14
180:18,20
anywhere
27:6 70:23
106:18
186:16
anywise
189:17
apparently
165:20
appears
128:23
131:16
application
24:18 30:2
30:13,19
54:4
applications
30:17
applied
22:17
24:16,23
25:16
29:22,23
30:8 33:1
34:6 39:11
52:15
53:11

57:13
59:10
74:10 81:5
81:12 83:6
85:6,8 89:6
89:20
90:16
106:4,17
106:18
135:2
143:16
148:13,16
150:14
151:4
156:9
apply 22:13
23:14 24:9
27:6 43:20
52:5 54:22
57:7,10,14
57:19
81:15 83:8
83:9 85:2
105:22
168:19
approve
177:15
Approx
74:12
approxim...
52:18
54:19,20
80:14 87:6
April 90:21
area 11:14
argument
101:1
around
52:19
53:21 79:5
arrested
13:8

asked 35:8
36:14 37:8
37:10 45:2
45:3 55:19
55:23 82:6
83:13
142:9
144:5
149:3
156:2
162:17
165:13,23
180:12
asking 9:5
30:13 37:4
37:6 51:6
58:20
77:12,13
94:17
124:14
157:15,17
aspect 156:1
156:11
assign 4:5
assist 154:2
154:6,10
160:3,14
assistance
72:1,2
assistant
111:19
153:10
Assoc 5:18
associate
40:3 42:16
43:3 61:4,7
65:23 66:2
66:6
156:20,21
159:13
160:12
associates

**American Court Reporting**
**toll-free (877) 320-1050**

Page 3

| | | | | | |
|---|---|---|---|---|---|
| 40:5 | 125:16 | 114:1 | 187:23 | 111:12 | 14:22 |
| 111:11,20 | 127:4 | 116:20,20 | 188:8,9,14 | 131:23 | **behalf** |
| **assume** 9:9 | 130:23 | 121:21 | **Awe** 62:12 | 139:11 | 165:16 |
| 37:22 38:1 | 134:18 | 122:1 | **a.m** 2:19 | 171:8 | **behind** |
| 84:21 | 137:3 | 144:1 | 3:13 87:14 | 174:12 | 170:20 |
| **assumed** | 144:9 | 179:15 | 87:16 | **basis** 34:23 | **being** 8:17 |
| 31:18 | 152:23 | 187:8 | 136:18 | 76:19 78:2 | 31:17 35:6 |
| 77:17 | 154:17 | **audited** | _____ | 84:10 | 64:16 |
| **assuming** | 161:3 | 178:20 | **B** | 185:18 | 70:21 84:1 |
| 35:2 78:17 | 172:11 | **auditing** | **BA** 12:12 | 186:6 | 94:10 |
| 84:14 | 173:3 | 160:1 | **baby** 164:5 | **BAXLEY** | 95:13 96:5 |
| **assumption** | 175:21 | **auditor** | 171:17 | 3:10 8:9 | 97:4,14,19 |
| 77:19 79:2 | 176:20 | 46:20 61:4 | **back** 39:10 | **became** | 98:10,18 |
| 79:7 186:1 | **attachment** | 61:8 105:1 | 42:13 | 17:21 | 110:4 |
| **assumptions** | 55:6 | 105:5,11 | 46:11 54:2 | 75:14,15 | 170:22 |
| 31:19 | **attempt** | 106:1 | 66:8 92:17 | **Becky** 16:16 | 171:2 |
| **assurance** | 21:18 72:7 | 110:12 | 115:20 | **Bed** 156:12 | 180:20 |
| 39:1 46:20 | 129:20 | 124:16 | 135:8 | **before** 3:7 | **belief** 32:16 |
| 48:22 49:6 | 168:18 | 140:9 | 143:15 | 8:8 9:13 | 34:23 |
| 49:12 61:4 | 169:10 | 141:16 | 149:14 | 14:13 18:6 | 76:19 78:3 |
| 61:8 105:1 | 178:15 | 156:10,16 | 177:12 | 37:10 | 84:11 |
| 105:5,10 | **attempted** | 157:6 | 178:11 | 42:11 | 95:12 |
| 105:23 | 162:18 | 158:7,19 | 188:6 | 60:23 | 186:6 |
| 110:11 | **attention** | 160:9 | **bad** 170:5 | 68:10,20 | **believe** |
| 139:1,2 | 94:6 95:10 | **audits** 49:6,7 | **balance** | 73:6,8 74:2 | 32:18,20 |
| 140:9,12 | 96:9 98:14 | 117:23 | 130:1 | 74:6 85:20 | 33:2,4,14 |
| 141:15 | 99:1,3 | 118:18 | **bankruptcy** | 88:10 97:3 | 33:16 |
| **attached** | **attorney** 7:6 | **August** | 13:1 | 98:14 | 35:19 36:8 |
| 54:5 60:18 | 7:13 9:3 | 17:10,12 | **Barry** 7:12 | 107:9 | 37:8 51:13 |
| 63:9 68:6 | 35:18 72:3 | 64:3 | 9:3 | 109:13,14 | 74:15 75:9 |
| 71:14 | 73:10 74:1 | 107:15 | **based** 49:9 | 109:16 | 75:14,18 |
| 85:15 | 74:6 91:22 | 113:2 | 91:16 | 125:8 | 75:22 |
| 87:22 | 145:15 | **authority** | 129:18 | 134:9 | 76:13,18 |
| 102:16 | 146:5 | 60:12 | **basic** 122:10 | 137:21 | 77:22 84:7 |
| 106:22 | 154:3,6 | 139:14 | **basically** | 138:23 | 89:4 91:20 |
| 115:15 | 161:12 | **available** | 13:21 | 143:20 | 103:4 |
| 122:6,13 | 172:20 | 17:21 | 18:20 35:9 | 149:8 | 107:10 |
| 122:14,16 | **attorneys** | 129:21 | 38:8 47:16 | 152:21 | 120:2,3,17 |
| 122:20 | 72:11,15 | **Avenue** 9:19 | 49:5 66:20 | 161:1 | 148:3,11 |
| 123:4,6,7 | **audit** 108:4 | **aware** 53:6 | 82:22 86:6 | 176:23 | 152:5 |
| 123:21 | 108:7,7,8 | 66:8,9 | 91:6 | 186:17 | 176:4 |
| 124:7,17 | 110:2 | 149:15,19 | 100:22 | **beginning** | 186:5,8 |

**American Court Reporting**
**toll-free (877) 320-1050**

believed
  33:23
believes 36:1
  36:3
below 37:15
  124:22
benefits
  16:19
  20:19
  47:10
besides
  36:21 37:6
best 73:20
  88:17
  109:7
  111:1,2
  128:10
between 3:4
  26:17 41:3
  46:11,13
  51:5 65:19
  100:10
  102:3
  118:16
  180:19
  187:11
Bible 40:14
big 185:16
biggest
  111:4,22
  111:23
bill 49:22
  51:12
bills 167:15
birth 63:4
bit 49:14
  62:22
  109:10
  133:6
black 41:19
  42:1 78:10
  78:11,12

78:14
79:14,18
81:2,12
99:22,23
100:5,16
100:18,20
101:17,22
102:2
150:5
blah 35:12
  35:12,13
blank 59:6
Block
  162:13
Bo 59:17,18
  60:7,8
  83:14 84:5
  114:2
  179:17
  180:2,19
  181:2,5
  185:5
board 44:16
Body 14:4,4
  14:6 17:2
  22:9
bogus 90:23
  95:3
bonus 15:22
  16:1,4,11
  20:10,12
  27:4 47:12
  47:14,15
  47:20
  48:13,16
  48:21 62:7
  91:7,8
bonuses
  15:19
  187:18
boss 37:23
  37:23,23

both 55:11
  56:2,3
  125:18
bottom 62:8
  62:9 71:21
bought
  149:15
Bo's 83:19
break 70:19
  70:22 71:1
  71:10
  87:12,15
  132:22
  134:13
  136:19
  180:11
briefly 73:8
bring 45:11
  114:4,8
bringing
  72:12,13
broad
  166:20
brought
  31:6
  162:23
  170:21
  180:23
  181:21,22
  182:10,20
  182:23
Brundidge
  62:16,17
  62:21
Bruntley
  16:16
bucks 18:11
  18:14,15
  48:17
building
  70:20
bullets

138:13
bunch 79:5
burden
  147:3
business
  18:18
  63:15 64:8
  65:15
buy 177:20
  178:15
  179:13,19
B-U-C-K-S
  18:14

_____
C
C 7:1 189:2
  189:2
calculations
  112:9
call 45:7,19
  45:20
  51:23 94:5
  145:21,22
  162:18
  177:13
called 27:20
  46:11
  95:10 96:8
  98:14,16
  99:1,2
  159:11
calling 46:12
  46:12
  56:21
  145:2,4
came 8:7
  44:21 76:3
  82:1 91:9
  94:20,21
  95:20 96:4
  97:13
  158:21

174:21
181:7
186:21
Canada 80:1
cancelled
  167:13,21
  170:22
  171:2
candidate
  138:11
capacity
  144:1
car 108:18
  121:18
card 49:17
  50:3
  128:14
  133:10,15
  177:17
  178:21
care 123:6
  173:18
  174:13
case 9:5 67:7
  67:7 73:12
  73:16 88:5
  109:16
  111:4,22
  145:3,9,16
  146:7,15
  146:22,23
  147:4,12
  148:12,18
  148:23
  174:18
  180:8
  186:11
cases 111:23
casual
  113:22
Cathy 45:4
Caucasian

38:19
81:18
cause 8:12
  101:1
  189:18
cent 44:2,5
center 99:9
  100:11
cents 43:2
  43:19
  129:23
  130:3
  138:8,8
CEO 75:2,6
  76:1 77:18
certain
  149:19
Certificate
  189:21
certify 8:4
  189:5,14
cetera 70:14
change 5:10
  60:22
  75:19 77:3
  157:14
changed
  75:3,10
  76:13 94:6
changes
  123:22
  124:3,8,16
  124:18
changing
  68:21
  77:18
charge 5:13
  71:19
  73:20
  86:11,15
  86:20
  169:7

**American Court Reporting**
**toll-free (877) 320-1050**

Page 5

181:1
182:8,15
**check** 36:5
112:5,8,15
**checking**
139:11
**checks**
112:19
**children**
11:1
**chose** 73:9
**Christian**
104:2
**cities** 101:22
**Civil** 2:5 8:6
**claim** 165:16
165:22
166:4,8,12
**claimed**
165:19
**claiming**
165:8,20
**claims** 145:9
166:22
180:7
186:11
**clarified**
42:14
**clarify** 67:21
**class** 49:9
**classified**
31:17
34:10,21
**classify** 35:6
**clear** 58:12
**close** 11:13
54:1 74:12
84:15
183:16
185:23
186:2
**closely** 157:2

**closer** 57:18
57:20 82:3
82:8
**closing** 86:7
**clothing**
14:5
**COBRA**
168:19,20
171:12
**code** 63:15
64:8,21
188:2
**college** 27:15
29:11
141:6
**Collins**
59:18
60:12 84:6
84:16
114:2
180:2,19
181:2,5
185:5
**combination**
155:17
**come** 44:23
45:11,21
111:18
160:7
177:19
181:15
**comes** 81:14
132:18
**comfortable**
188:18
**coming**
174:22
**commenci...**
3:12
**comments**
132:6,8,10
133:9

**commission**
25:12 27:1
86:3
189:23
**Commissi...**
3:8 8:4
**communic...**
60:9
**communic...**
58:10
**communic...**
51:5 100:9
102:3
150:7,11
**communic...**
100:9
118:16
**company**
18:17
20:20
37:15 44:6
45:15,15
45:16,18
48:1 49:22
51:15,21
51:22 78:5
155:22
185:16
**company's**
49:8 77:23
109:6
**compel**
167:7
**compensat...**
16:18 20:7
25:8 47:12
61:13
**complain**
68:2 83:11
188:11
**complained**
184:15,18

185:8,14
185:21
186:3
**complaint**
5:15 88:3,4
166:17,19
175:11,13
**complete**
116:11
**completely**
89:21
90:11
**compliance**
3:19
**complies**
88:19
107:4
127:6
155:5
173:12
**comply** 52:2
**computer**
111:10
**computer-...**
189:9
**concerned**
34:4
**conduct** 49:6
63:16 64:8
65:15
188:2
**conducting**
110:2
**conflicted**
91:13,19
94:7
**conflicting**
93:16
**conflicts**
70:11
**confused**
33:13 92:6

104:17
**confusing**
50:13
**consider**
11:13
132:1
**consortium**
166:7,8
**constructi...**
90:21 95:2
95:9
**consult**
73:23 74:5
**contact** 84:5
109:23
121:10
162:19
180:1
**contacting**
110:15
**contained**
73:19
88:17
128:9
**contend**
150:2
180:7
**context** 31:3
181:12
182:1
**continue**
134:4
164:6
170:17
**continued**
91:1,15
130:11
**continuou...**
178:22
**contrary**
88:23
**contributing**

77:23
**controls**
76:1
**conversati...**
93:13,15
93:21 97:9
97:10,22
113:22
183:4
**conversati...**
72:10 76:5
98:2
**convey**
114:19
**copies** 91:18
162:6,14
162:17
**copy** 35:15
65:14 66:3
135:23
143:7
144:19
153:12
**corporate**
7:13 42:5
42:11
44:21 45:5
49:16
50:10
51:18 58:8
66:1 70:20
71:2,4 78:6
79:4
101:17
102:2
104:15
109:12
130:11
137:18
144:16
187:9
188:1

**American Court Reporting**
toll-free (877) 320-1050

Page 6

| | | | | | |
|---|---|---|---|---|---|
| corporatio... | 171:22 | 139:15 | 135:6 | 165:22 | 44:10 |
| 149:19 | 175:11,14 | court 2:1 | 137:9 | date 8:5 | 91:15 |
| correct | 177:20 | 3:20 8:1,20 | 139:5,8 | 52:17 63:3 | defendant |
| 33:14 34:2 | 178:17,23 | 88:11 | 141:20 | 74:13 87:8 | 2:12 89:1 |
| 34:8 35:2 | 179:19,22 | 146:22 | 143:22,23 | 104:18 | 89:22 |
| 58:13 | 186:7 | 174:15 | 177:13 | 105:8 | 90:11 99:7 |
| 61:10,14 | 187:10,19 | cousin 11:11 | 178:20 | 107:19 | 136:1 |
| 62:23 63:3 | 188:19 | cover 131:10 | 187:13,14 | dated 64:2 | 173:17 |
| 63:21 64:3 | 189:11 | 135:1 | 188:17 | 116:7 | defendant's |
| 64:22 | correcting | coworker | Croom's | 127:9 | 5:10,11,12 |
| 67:17 | 114:16 | 81:18 | 187:10 | 131:19 | 5:13,14,15 |
| 70:11,15 | correctly | 186:13 | CSA 40:3 | 137:12 | 5:16,17,18 |
| 71:9 75:20 | 108:10,14 | Crawford | 42:5 43:9 | Dave 19:10 | 5:19,20,21 |
| 85:3 87:7 | 112:10 | 7:7 | CSR 2:21 | 19:10,10 | 5:22,23 6:4 |
| 89:5 90:8 | correlation | crazy 170:10 | 3:7 8:1 | David 19:10 | 6:5,6,7,8,9 |
| 90:13,14 | 76:20 | creating | 189:20 | day 3:12 | 6:10 60:15 |
| 96:5,18 | cost 109:8 | 106:8 | current 9:18 | 8:10 32:1,3 | 60:18 63:7 |
| 97:7,14,20 | 109:20 | credit 49:16 | 102:21 | 59:3 | 63:9 68:6,9 |
| 98:15,20 | 177:16 | 50:3 | currently | 122:22 | 71:14,17 |
| 98:21,22 | counsel 3:5 | 129:21 | 10:12 | 123:2 | 76:11 |
| 98:22 | 4:2,4 8:7 | criminal | 13:13 | 127:12 | 85:12,15 |
| 104:20 | 64:19 65:1 | 12:12 | custom | 129:10 | 86:15,19 |
| 115:2,9 | 110:14 | Croom | 88:23 | 164:8 | 87:19,22 |
| 116:3 | 189:15 | 31:22 | customer | 173:18 | 90:22 95:3 |
| 124:1,23 | counselled | 38:16 | 40:3 | 174:12 | 102:14,16 |
| 125:5 | 110:21 | 45:22 46:5 | 158:21 | 178:2,13 | 106:20,22 |
| 126:14 | 111:3 | 49:2 51:5 | 159:13 | 179:12 | 107:22 |
| 127:23 | counselling | 55:5,13 | customers | days 16:21 | 114:23 |
| 129:3,13 | 5:17 | 56:15 | 40:7 | 46:15,18 | 115:13,15 |
| 130:13 | 112:10,21 | 57:16 58:5 | cutoff 75:3 | 134:9 | 122:14 |
| 133:18,23 | 115:1,11 | 59:14 60:3 | 75:10,16 | 146:21,22 | 126:23 |
| 134:5,10 | count 78:6 | 60:5 61:20 | 76:2,13,21 | deal 114:18 | 127:4 |
| 137:11 | 160:5 | 67:8,9,11 | 77:4,18 | decide 43:6 | 130:19,23 |
| 141:10 | COUNTY | 67:12,14 | 91:16,17 | decision | 134:16,18 |
| 142:5 | 189:4 | 67:18 68:3 | 94:6,17 | 75:4 76:9 | 136:23 |
| 143:19,20 | couple 46:15 | 76:6,8 | 98:19 | 76:14 77:3 | 137:3 |
| 144:2 | 46:18 | 93:16 94:9 | | 77:7,19 | 144:9,12 |
| 146:1,22 | 91:11 | 107:14,14 | **D** | 78:1 84:3 | 152:20,23 |
| 147:1,2 | 164:21,22 | 107:21 | D 2:8,16 3:6 | 187:10 | 154:15,17 |
| 150:11 | 175:7 | 113:17 | 5:1 8:11,16 | deductive | 160:22 |
| 159:2,16 | course 58:17 | 131:14,17 | damages | 77:10,12 | 161:3 |
| 170:12,15 | 108:21 | 132:1 | 165:19,20 | deemed | 172:9,11 |

**American Court Reporting**
**toll-free (877) 320-1050**

| | | | | | |
|---|---|---|---|---|---|
| 173:1,3,6 | deposition | 69:10,23 | 96:9,14 | 49:11 | 61:2 62:6 |
| 175:21 | 2:15 3:6,16 | 70:2 | 97:17 | 78:10 | 62:11 63:8 |
| 176:1,4,18 | 3:17 4:7 | **differences** | 98:15,16 | 79:19,19 | 63:12 |
| 176:20 | 9:12 60:19 | 117:11 | 99:2,3 | 79:22 80:4 | 64:12 68:5 |
| **DEFEND...** | 63:10 68:7 | **different** | **discrimina...** | 80:5,8 81:6 | 68:10,19 |
| 7:10 | 71:15 | 18:17 76:7 | 66:17,23 | 110:1 | 70:1,4,9 |
| **degree** 45:2 | 85:16 | 82:19,20 | 67:11,16 | 112:14 | 71:13,18 |
| **delay** 129:5 | 87:23 | 98:8 | 150:2,17 | 120:14 | 74:9,17 |
| **deliver** | 102:17 | 116:12,14 | 152:5,10 | 139:20,22 | 76:11 |
| 164:20 | 106:23 | 116:17,18 | **discrimina...** | 140:7,14 | 85:13,14 |
| 171:16 | 115:16 | 116:19 | 5:12,13 | 140:17,19 | 87:2,20,21 |
| **delivered** | 127:5 | 157:16 | 66:10 68:3 | 142:3,4,10 | 97:2,11 |
| 167:1 | 131:1 | **differently** | 69:5,6 | 142:16,18 | 98:5 |
| **Democrat** | 134:19 | 150:21 | 70:21 | **diversity** | 102:15,19 |
| 180:21 | 137:4 | 151:8 | 71:19 | 99:8 | 103:5 |
| **Demonte** | 144:10 | **differs** 69:17 | 73:20 | **divided** | 106:21 |
| 9:17 11:5 | 153:1 | **direct** 51:4 | 180:7 | 119:16 | 107:3,7 |
| **dental** 16:23 | 154:18 | 67:3 76:20 | **discrimina...** | **DIVISION** | 111:6 |
| 17:2 | 161:4 | 84:5 | 185:14 | 2:3 | 114:23 |
| **deny** 155:19 | 172:12 | **directly** | **discussed** | **DM** 121:10 | 115:14,18 |
| 155:20 | 173:4 | 77:15 | 37:13 38:6 | 138:20,23 | 116:2,10 |
| **department** | 175:22 | 94:21,21 | 107:22 | 139:1,14 | 116:11 |
| 48:5 53:14 | 176:21 | 120:16 | 143:18 | 141:17 | 119:11,12 |
| 65:10 66:1 | 189:6 | 139:15 | 186:10 | **DMs** 139:7 | 119:15,16 |
| 112:14 | **depositions** | 141:19 | **discussing** | 139:10,12 | 120:4 |
| 117:16,17 | 3:21 | **director** | 113:11 | 141:18 | 121:3,13 |
| 117:18 | **derogatory** | 38:21,23 | **discussion** | **doc** 5:20 6:6 | 121:15 |
| 118:16 | 101:6 | 49:12 | 37:7 | 167:10 | 122:7 |
| 120:14 | **deserves** | 52:10 54:3 | 113:10 | **doctor** | 127:2,3,12 |
| 126:8 | 150:6 | 54:15 | **dismissal** | 163:20,21 | 127:14,15 |
| 141:21 | **desire** 59:14 | 74:11 | 5:14 86:4 | 167:12,16 | 128:9,12 |
| 156:13 | **detective** | 135:3 | 91:5 | 167:19 | 129:12,17 |
| 187:9 | 15:7,9,10 | 137:9 | **dismissed** | 168:6,10 | 130:10,20 |
| 188:1 | **determina...** | **disagree** | 86:11,20 | 168:11,12 | 130:22 |
| **departme...** | 86:9 | 113:1 | **dispute** | 171:9 | 131:16 |
| 118:17 | **Develop** | **disagreeing** | 130:6 | **doctors** | 134:17,21 |
| **depending** | 5:18 | 71:8,9 | **disputing** | 169:12 | 137:1,2 |
| 48:1 | **diaries** 163:3 | **disciplined** | 122:12 | **document** | 144:8,13 |
| **depends** | **differ** | 64:16 | **district** 2:1,2 | 32:21 33:6 | 152:21,22 |
| 16:7 | 127:15 | **discrepan...** | 16:17 | 33:17 35:9 | 153:16 |
| **DEPONE...** | 172:7 | 112:2 | 19:15 45:3 | 37:5,7 | 154:16 |
| 189:1 | **differed** | **discrepancy** | | 60:16,17 | 161:1,2,11 |

**www.AmericanCourtReporting.com**
**July 6, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 8

| | | E | | | |
|---|---|---|---|---|---|
| 172:10,14 | 18:9 22:1 | **E** 5:1 7:1,1 | 99:7 104:5 | 68:13,15 | 96:10 97:5 |
| 173:2 | 24:15 | 7:12 189:2 | 104:6,6,7 | 69:1,6,16 | 97:6,10,18 |
| 175:20 | 25:20 41:2 | 189:2 | **eligible** | 86:3 91:1 | 98:4 |
| 176:19,23 | 41:3 42:3,5 | **each** 91:13 | 15:19 16:1 | 91:16 | **evaluations** |
| **document...** | 72:19 | 100:13,23 | 16:3,20 | 103:3 | 91:19 |
| 34:1 49:10 | 81:19 | 124:16 | 17:16,18 | **enough** | 93:16 94:7 |
| 50:18 | 177:14 | 126:7 | 62:7 | 74:12 | **even** 83:9 |
| 118:18 | 188:1 | 149:12 | **eliminated** | **enroll** 17:15 | 97:3 |
| **documents** | **double** | 156:11 | 149:8,14 | 17:19 | 109:14 |
| 79:1 123:3 | 112:5,8,14 | **earlier** 81:21 | 149:20 | **enrollment** | 111:5 |
| 123:8 | **down** 15:3 | 103:2 | **elsewhere** | 17:6,7 | 120:11 |
| 146:2,5,13 | 26:14 | 180:9 | 70:19 | **entailed** 49:7 | 152:14 |
| 147:11,19 | 41:17 | 186:13 | **employed** | **enter** 111:12 | 170:9 |
| 147:23 | 47:23 | 188:3,16 | 13:13 14:3 | **entitled** | 187:4 |
| 148:2,17 | 72:21 75:1 | **early** 167:1 | 14:6,16 | 74:17 | **eventually** |
| 153:6 | 75:1 | **EDRC** 111:8 | 18:22 22:8 | **equal** 68:13 | 26:15 |
| 161:11,14 | 117:18 | 111:13 | 22:22 24:3 | 68:15 69:1 | 32:18 |
| 162:22 | 138:10 | 121:9 | 24:7 52:6 | 69:6,15 | 50:17 |
| 163:6,14 | 189:7 | **education** | 65:12 | 86:3 139:7 | 95:23 |
| 165:18 | **downsizing** | 11:19 | 103:10,15 | **equalled** | 97:15 |
| 175:1 | 36:20 | 12:21 | 106:5 | 19:19 | **ever** 9:12 |
| 178:12 | **drive** 10:4 | 155:17 | 171:22 | **equals** 60:9 | 13:1,3,8 |
| **doing** 37:18 | 179:14 | **EEO** 70:10 | **employee** | **equivalent** | 21:7,10 |
| 48:1 56:18 | **driving** | 86:7,8,11 | 65:21 | 155:17 | 22:6 29:1 |
| 108:10,14 | 179:21 | **EEOC** 86:15 | 66:12 | **errors** 122:4 | 29:12,18 |
| 123:17 | **due** 164:6 | 86:20 | 69:18 | 125:19 | 48:6,13 |
| 181:19 | **duly** 8:17 | **effect** 3:18 | 81:12 85:7 | **Especially** | 49:1 50:8 |
| **dollar** 20:9 | **during** 28:3 | **eight** 25:15 | 85:8 | 122:18 | 50:15 51:8 |
| 20:11 | 32:7,14 | 54:20 | 150:14,22 | **estimate** | 51:20 52:5 |
| **dollars** 27:2 | 36:19 | 62:20 | 151:4 | 18:3 28:21 | 55:21 |
| 54:21 61:9 | 42:10,20 | 89:19 | 152:15 | **et** 70:14 | 56:15 57:5 |
| 91:9 | 46:7 94:11 | 129:21 | 185:13 | **ethics** 63:16 | 57:7,13 |
| 111:21 | 98:17 | 130:2 | **employees** | 64:9,21 | 58:23 65:9 |
| 129:22 | 107:20 | 164:9 | 102:5,7 | 65:15 | 65:21 |
| 130:2 | 110:10 | **either** 30:2 | 145:8,12 | **evaluation** | 67:10 68:2 |
| **done** 55:22 | 123:10 | 65:23 90:5 | 145:15,16 | 37:15 | 68:10 |
| 101:10,14 | 180:10 | 92:2 96:15 | 159:11 | 44:10 | 70:18 71:5 |
| 120:21 | **duties** 49:4,5 | 105:15 | **employers** | 47:17 | 74:5 77:2 |
| **Dothan** 3:11 | 157:6 | 132:18 | 30:14,17 | 76:22 | 78:20,23 |
| 7:8,15 8:10 | 159:1,3 | **elected** 17:5 | 33:1 34:7 | 90:23 91:4 | 79:14 |
| 10:4,10 | **duty** 43:9 | **eleven** 28:21 | 106:2,6 | 91:6,9,14 | 89:15 |
| 11:14 14:7 | | | **employment** | 94:8 95:3,7 | 101:4 |

**American Court Reporting**
**toll-free (877) 320-1050**

Page 9

| | | | | | |
|---|---|---|---|---|---|
| 102:4 | 163:17 | 127:4 | 111:7 | 110:19 | 151:16,19 |
| 104:8 | 169:17 | 130:19,23 | 113:21 | 120:7 | 151:19,20 |
| 105:4 | 173:14 | 134:13,16 | 118:5 | 122:6 | 152:13,13 |
| 112:1 | **everywhere** | 134:18 | 120:20 | 124:2 | 168:16 |
| 115:18 | 78:8 | 136:1,23 | 136:10 | 130:6,15 | 182:11,11 |
| 135:16 | **evidence** 4:7 | 137:3 | 165:19 | 133:3 | **feeling** |
| 137:20 | 79:1,3,7 | 144:9,12 | **explanation** | 134:7 | 181:18 |
| 140:6,14 | 146:6 | 152:20,23 | 143:8,10 | 148:13,15 | 185:20 |
| 140:16,19 | 147:7 | 154:15,17 | **exposed** | 149:7 | **feelings** |
| 142:15,18 | **exact** 52:17 | 160:22 | 90:22 95:3 | 178:19 | 151:22 |
| 156:3 | 53:16 | 161:3 | 95:5 96:13 | 183:10 | **felt** 33:9 |
| 159:18 | 80:12 | 163:18 | **express** | **facts** 49:10 | 66:16,22 |
| 161:1 | 152:3,15 | 172:9,11 | 51:12 | 151:22 | 67:15 |
| 173:21 | **exactly** | 173:1,3,7 | 58:23 | 152:1 | 152:9,11 |
| 180:12 | 28:20 29:5 | 175:21 | 128:14 | 180:5 | **female** 14:5 |
| 185:13 | 40:8 46:13 | 176:1,4,18 | 144:16 | 186:9 | **fifteen** 80:15 |
| **every** 43:4 | 146:19 | 176:20 | 168:15 | **factual** | **fifty** 25:15 |
| 156:11 | **examination** | **EXHIBITS** | 177:16 | 125:19 | 28:21 |
| 158:8 | 5:3 8:13 | 5:7,9 6:1,3 | 178:20 | 186:6 | 80:17,18 |
| 162:3 | 9:1 | **exist** 136:9 | 179:3 | **fail** 130:11 | 81:2 138:8 |
| **everybody** | **examined** | 148:10 | **Extra** 20:14 | **fair** 9:10 | 141:9 |
| 137:17 | 8:17 | **exists** 136:4 | 20:15 | 77:16 99:4 | **figures** |
| 141:20 | **except** 4:2 | **expected** | **extruder** | **fairly** 54:1 | 112:8 |
| **everyone's** | 108:4 | 125:4 | 27:21 | **fall** 144:2 | **file** 86:7 |
| 156:11 | 132:11 | 126:17 | **e-mail** 51:2 | **familiar** | **filed** 13:1 |
| **everything** | **excuse** 41:13 | **expenses** | 51:8 54:6 | 157:6 | 88:11 |
| 81:23 92:5 | 162:21 | 49:19 | 55:10 | **family** 11:10 | 162:3 |
| 92:19 | **exhibit** | 108:19 | 131:16,21 | 11:13 | 173:17 |
| 99:17 | 60:15,18 | **expensive** | 132:3 | **far** 34:3 | **files** 136:10 |
| 103:1 | 63:7,9 68:6 | 169:2 | 137:15 | 49:21 | **fill** 54:3 |
| 108:3 | 68:9 71:14 | **experience** | 143:2 | **fashion** 50:4 | 71:23 |
| 109:10 | 71:17 | 138:20 | **E-X-T-R-...** | 50:20 | **filled** 53:4,8 |
| 116:23 | 76:12 | 141:7 | 27:21 | **fear** 184:22 | 57:5 |
| 119:6 | 85:12,15 | 142:3,6,9 | | **feared** | 135:16 |
| 121:10 | 86:16,19 | 155:15,18 | **F** | 184:20 | 149:8,23 |
| 132:17 | 87:19,22 | 156:7 | **F** 189:2 | **February** | 150:16 |
| 140:11 | 102:14,16 | 157:3,4,8 | **face** 101:9 | 19:2 21:5 | **final** 5:19 |
| 141:17 | 106:20,22 | 157:19,22 | **fact** 31:12 | 53:23 | 123:23 |
| 146:8,12 | 107:23 | 158:1,10 | 51:7 61:12 | 104:19 | 124:9,18 |
| 147:20 | 114:23 | **Expires** | 72:22 | **Federal** 8:5 | 127:20 |
| 156:14 | 115:13,15 | 189:23 | 79:13 | **feel** 34:18 | **find** 106:10 |
| 158:8 | 126:23 | **explain** | 100:5 | 37:9 67:10 | 110:20 |

**American Court Reporting**
**toll-free (877) 320-1050**

| | | | | | |
|---|---|---|---|---|---|
| 169:4,10 | 153:20,22 | 135:8 | 178:21 | **full** 3:19 | 138:2 |
| **fine** 8:23 | 161:6,8 | **following** | **four** 27:2 | 9:15 10:15 | 141:7 |
| 30:15 | 164:4 | 8:13 86:8 | 86:18 | 15:17 | 143:6,11 |
| 132:10,23 | 167:16 | 100:21 | 111:12 | 27:23 28:1 | 146:9 |
| 133:7 | 172:16 | 119:7,8 | 183:14 | 103:13,14 | 147:21 |
| 136:15 | 182:20 | 120:15 | **four-year** | **full-time** | 149:15 |
| 167:8 | **five** 11:7 | 124:13 | 12:14 | 28:7 46:21 | 156:14 |
| 168:15 | 28:12,13 | **follows** 8:18 | **frame** 33:12 | 103:18 | 158:14,14 |
| **finish** | 37:17 | **force** 3:18 | **fraud** | 104:20 | 167:14,23 |
| 149:10 | 54:20 61:7 | 78:1 | 110:18 | **function** | 168:1,19 |
| **fire** 38:11,13 | 75:14,15 | **foregoing** | 111:8 | 160:19 | 174:7 |
| 75:4 76:14 | 76:22,23 | 8:6 189:6 | **free** 169:7 | **funds** 50:12 | 185:13 |
| 77:7,7,9,19 | 79:21 | 189:10 | **friends** | **further** 3:14 | **Gallery's** |
| 139:18 | 80:21 81:1 | **forgot** 17:18 | 22:11 | 3:22 75:1 | 68:14 |
| **fired** 64:16 | 81:6 87:11 | 103:6 | 84:15 | 189:1,14 | 136:10 |
| 74:3,7 77:1 | 91:12 | **form** 4:3 | **from** 19:1 | | **game** 52:10 |
| 174:23 | 94:19 | 5:11,12,14 | 23:3 29:19 | **G** | 53:13,14 |
| 185:21 | 105:17 | 5:22 | 30:3 31:8 | **Gallery** 7:13 | 53:17,18 |
| 186:3 | 111:20 | **formal** 115:5 | 31:12 | 9:4,5 23:2 | 54:3,15 |
| **firing** 60:11 | 129:22 | **formats** | 34:16 51:2 | 23:4 27:10 | 55:1 56:22 |
| 139:13,17 | 130:2 | 122:10 | 61:3 67:5 | 27:12,15 | 74:11 |
| **firm** 73:4,5 | 133:18 | **former** | 69:17,23 | 28:2,8,10 | 135:3,4 |
| **first** 8:17 | 155:12 | 145:11,15 | 76:4 92:5 | 28:16 | 137:7,21 |
| 39:11 | 157:16 | **forty** 61:7 | 92:22 | 29:20 30:1 | 137:23 |
| 62:15,16 | 161:18 | **forty-eight** | 94:21 | 30:4,23 | 138:1,3 |
| 69:15,19 | **fix** 114:12 | 129:22 | 100:17,19 | 31:9,12 | 149:2 |
| 74:3 76:2 | 115:9 | 130:3 | 104:19 | 34:3,16 | 155:15,23 |
| 98:9,10 | **fixed** 114:13 | **forward** | 105:2 | 35:12 | 156:2,4,8 |
| 109:9,10 | **flight** 108:17 | 54:8 | 107:14,21 | 36:20 | 156:12 |
| 113:18 | 121:9,18 | **forwarded** | 111:10 | 39:13 43:1 | 157:3,8,10 |
| 116:12,12 | 177:16 | 55:14 | 120:16 | 47:23 52:7 | 157:11,19 |
| 116:21 | **flip** 154:20 | 124:16 | 131:17 | 57:9 63:15 | 157:19,23 |
| 117:5 | **floor** 40:5 | **found** 24:5 | 141:19 | 64:8,20 | 158:3,4,17 |
| 118:9,13 | 159:4,6,7 | 24:19 | 162:22 | 65:23 66:9 | 159:11,19 |
| 120:13,17 | **Florida** 9:20 | 49:10 | 167:15,23 | 68:3 70:19 | 159:19 |
| 125:11,12 | 12:2,4 | 104:14 | 168:1 | 72:12 74:6 | **gamer** |
| 125:14 | 21:21 | 111:4,17 | 177:14 | 75:6 80:8 | 156:21 |
| 126:5 | **focusing** | 139:16 | **front** 104:23 | 85:6 | **games** |
| 127:23 | 95:5 | 149:6,13 | 115:21 | 103:16,21 | 158:18,20 |
| 128:3 | **follow** 55:21 | 152:14 | 126:3 | 104:16 | 159:15 |
| 133:9 | 167:18 | 170:21 | 181:9 | 105:1 | **gap** 26:17 |
| 144:4 | **followed** | 171:1 | **fulfill** 52:2 | 106:1 | 102:3 |

**American Court Reporting**
**toll-free (877) 320-1050**

Page 11

| | | | | | |
|---|---|---|---|---|---|
| **gaps** 100:9 | 89:15 92:3 | 144:11 | 174:16 | 150:7 | **held** 29:12 |
| **gas** 180:3 | 102:10 | 152:19 | 182:7,11 | 164:7 | 29:23 30:1 |
| **gave** 45:5,6 | 123:1,5,15 | 160:21 | 182:11 | 169:19 | 98:5 |
| 45:10,19 | 124:5 | 167:4,4 | 187:11,17 | 174:10 | **help** 146:14 |
| 55:3,4,18 | 125:12 | 169:17 | **guessing** | 178:4 | 160:2,3,13 |
| 93:7 | 138:6 | 171:11 | 35:1 | **happening** | **her** 14:2 |
| 131:12 | 143:15 | 176:17 | **Guesstimate** | 37:14 | 17:14,20 |
| 135:6 | 144:21 | **gone** 123:14 | 28:21 | 177:22 | 26:10 |
| 136:11 | 146:21,23 | **good** 16:7 | **guys** 59:1 | 183:17 | 41:23 45:3 |
| 137:9 | 152:11 | 48:1,3 | 143:12 | **hard** 119:23 | 138:15 |
| **general** | 153:13 | 181:18,20 | ─────── | **having** | 185:5 |
| 64:19 65:1 | 159:9,9 | **gotten** | **H** | 119:23 | **hey** 59:1 |
| **Georgia** | 164:11 | 174:23 | **H** 162:13 | 164:3 | **hierarchy-**... |
| 179:15,22 | 166:13 | 185:10 | **half** 14:20 | **head** 15:2 | 60:3,5 |
| **getting** 45:1 | 167:16,19 | **graduate** | 120:15,16 | 118:2 | **high** 11:20 |
| 76:23 92:6 | 168:11 | 12:16,18 | **hand** 153:3 | 132:20 | 11:22,23 |
| **give** 14:22 | 169:6 | **Graduated** | 153:8 | 181:1 | 12:8,18 |
| 44:6,8 48:4 | 174:14 | 11:20 | **handbook** | 182:14,15 | 39:23 |
| 54:7 92:18 | 178:11 | 12:11 | 65:22 | **heading** | **him** 26:4 |
| 93:1 | **goes** 159:8 | **graduation** | 66:13 | 69:15 | 37:3,8,10 |
| 119:19 | **going** 9:5,9 | 45:1 | 68:18 69:2 | **headings** | 37:20 |
| **given** 9:12 | 31:15,16 | **grammar** | 69:18,23 | 70:9 | 46:12,12 |
| 21:10 | 35:5,10,11 | 112:19 | **handed** | **health** 16:23 | 54:7 55:18 |
| 49:16 | 39:10 | **grammati...** | 32:22 | 17:1 20:21 | 55:19,22 |
| 74:18 | 60:14 | 122:4 | **handles** | 171:12 | 55:23 56:6 |
| 121:3,13 | 71:16 | 125:19 | 73:12 | **hear** 101:5 | 56:7 60:9 |
| 131:5 | 73:11 | **great** 133:4 | **handwriting** | **heard** 32:10 | 67:17 73:6 |
| 134:8 | 85:11 | 168:15 | 62:13,14 | 32:13 | 73:10,11 |
| 186:14,16 | 87:10,18 | **grounds** 4:5 | 62:15 | 34:16 | 76:20 82:5 |
| 189:12 | 87:19 | **group** 185:3 | **Hang** 153:11 | 56:16 | 82:6 83:9 |
| **giving** 182:6 | 89:17 | 185:7 | **happen** 43:5 | 135:11 | 90:23 92:5 |
| **glad** 9:8 | 93:22 | **grow** 12:3 | 44:12 | 180:12 | 92:18,22 |
| 119:21 | 102:13 | 45:17 | **happened** | **hearing** | 93:1 94:16 |
| **GMX** | 106:19 | **guess** 22:12 | 23:17 | 189:13 | 94:17 |
| 102:22 | 109:17 | 58:14 | 24:17 | **Heath** 31:22 | 97:19 |
| **go** 12:8 13:5 | 111:11,15 | 95:23 96:6 | 44:15 | 45:22 | 108:6,9,16 |
| 18:20 26:1 | 115:12 | 97:12 | 50:10 | 131:14,17 | 109:18,22 |
| 37:1 39:10 | 119:5,19 | 99:16 | 56:10,11 | 141:20 | 110:17 |
| 42:11 47:4 | 126:22 | 120:1 | 93:10 | 180:20 | 112:1,10 |
| 47:23 49:5 | 129:1,19 | 151:12,14 | 108:22,23 | 182:6 | 112:21 |
| 49:22 54:2 | 136:22 | 151:15 | 114:10 | 183:5 | 113:12 |
| 56:15 67:5 | 143:14 | 162:13 | 135:9 | 185:5 | 114:2 |

**American Court Reporting**
**toll-free (877) 320-1050**

119:5
124:2
135:8
136:12
144:5
154:9,10
165:23
167:5
181:13
186:21
188:18,20
himself 73:3
73:17
hired 54:14
105:18
110:8,9
147:5,16
hiring 60:11
110:10
139:13
history 99:8
103:3
178:21
HNIC 181:1
181:14
182:12
hold 27:11
28:7 58:16
117:12
Hollywood
149:16
home 21:23
22:2,6
57:18,20
82:3,9
honest 22:15
honestly
72:16
hope 162:16
hospital
164:11
hostile

180:13
hostility
99:8,12,14
100:4,7
102:4
180:14,16
hotel 180:2
hour 15:15
19:20
28:22 46:3
61:8 87:11
133:5
136:15
138:8
hourly 16:8
20:5 24:19
25:13
138:7
hours 28:11
113:13
164:9
170:5
HR 54:9
Huh 162:11
175:12
human
38:21
hundred
20:9,11,13
25:11
26:23 27:2
34:15
48:17
80:15,15
80:17,18
81:2 91:8
117:7
129:22
130:2
141:13
hungry
133:4

hypothetical
151:17

_____

**I**

identify
60:16
63:11
102:18
immediate
39:2
immigration
70:11
importance
117:22
126:5
improvem...
125:4
126:16
133:22
134:5
inaccurate
173:11
Inaudible
132:13
INC 2:11
incident
50:9
180:15
include
47:10
includes
156:12
including
30:1
income
112:7
174:22
increase
16:8,9
42:20 43:2
46:23 83:1
INDEX 5:7

6:1
indicating
114:17
inform 54:6
informal
115:5
144:1
informally
57:13,14
information
12:13
61:13
73:19
88:16
112:15
128:8
154:10
167:2
172:19
initiator
61:22
insinuation
57:12
instead 15:1
179:22
institution
18:19
instruct
179:14
instruction
115:9,10
insurance
20:21 25:1
25:19
26:13
167:13,20
167:21
168:2,4
170:22
171:2,9,12
intend
145:21

146:6,21
146:23
intends
145:22
147:10
interest
58:23
70:12
109:7
interested
58:5 59:3,7
72:9
189:17
internally
66:22
Interrog 6:8
interrogat...
6:7 173:6
177:6
interview
25:6,7 31:4
45:21 46:2
46:6,8,15
52:20
56:12
74:18,19
78:1 89:1
89:10,17
90:5,17
interviewed
53:1 74:21
74:23 89:7
89:12,16
90:8
150:15
151:5
introduce
146:7
involve
46:23
involved
82:23

111:20
173:21
in-store 43:8
irrelevant
167:5
Isaac 40:13
40:13,14
41:6,11,17
41:19
issue 108:2
128:13,17
128:20
issued 86:11
issues 86:8
Ivan 104:1

_____

**J**

J 13:16
14:12,17
15:6 18:6
106:5,11
Jackson 2:8
2:16 3:6
8:11,16 9:2
9:17 10:17
11:5,7,8
87:17
121:2
124:6
136:21
James 11:23
39:22
January
19:2 21:5
53:23
127:9,19
129:2,2
130:10
131:7,19
143:19
177:13
178:13

**American Court Reporting**
**toll-free (877) 320-1050**

Page 13

| | | | | | |
|---|---|---|---|---|---|
| **January's** 143:20 | 76:4,8,13 77:3,7,11 94:21 | **joined** 27:2 **joke** 181:23 182:2 | 134:8,12 135:7,11 141:22 | 147:17 150:7 163:4,21 | 57:17,19 58:3,11 59:2 60:3,4 |
| **JEFFERS...** 189:4 | **Johnson** 5:4 | **jokingly** | 148:15 | 164:2 | 60:10,20 |
| **job** 5:22 | 7:12 8:22 | 83:13,21 | 152:12 | 168:6,10 | 65:1,7 67:5 |
| 13:20 14:2 | 9:1,3 26:1 | **Jr** 11:5 | 153:3 | 168:12 | 71:11 |
| 14:12 16:7 | 26:5,6 | **July** 2:18 | 159:9 | 169:5 | 72:17 |
| 18:8 21:2,8 | 35:20 36:2 | 3:12 8:11 | 165:23 | 180:23 | 74:20,22 |
| 21:19 | 36:4,6 | 23:9 | 167:21 | **Kitchens** | 80:8,12 |
| 24:21 25:5 | 41:16 | **June** 19:4 | 170:5,10 | 39:8 45:10 | 81:4,8,11 |
| 25:23 26:7 | 60:20 | 23:7 | 174:23 | 185:9 | 81:23 82:3 |
| 26:9,12,16 | 63:11 68:8 | 104:19 | 175:6,19 | 187:12 | 82:7,9,10 |
| 26:18,19 | 71:16 | 105:14 | 176:7 | **knew** 52:1 | 82:11 83:2 |
| 28:7 29:7,8 | 87:10,17 | **just** 18:17 | 181:23 | 58:22 | 83:5,6,14 |
| 29:9,19 | 92:1,8,11 | 24:20 26:3 | 183:13 | 109:1 | 83:15 84:3 |
| 46:7,10,21 | 92:16,20 | 30:14 35:1 | 185:6 | 130:9 | 84:17,19 |
| 49:4,5 | 93:2 | 36:17 | **justice** 12:12 | 171:10 | 84:21 85:1 |
| 52:12 | 102:18 | 37:17,18 | **justify** 75:3 | **know** 18:1 | 85:5,22 |
| 56:20,21 | 107:1 | 38:8 44:18 | 76:14 | 19:20 20:1 | 86:15 |
| 59:7,7 84:4 | 115:17 | 50:13 | 77:18 | 25:8 31:18 | 89:12,14 |
| 96:15 | 132:23 | 57:19 59:8 | | 32:5,6,14 | 90:7,9,12 |
| 104:13 | 133:3 | 59:9 68:22 | **K** | 33:5,8 34:9 | 90:15 91:7 |
| 106:10,14 | 134:12,15 | 71:11 | **K** 27:14,16 | 34:13,15 | 91:10,13 |
| 143:3,7,16 | 134:20 | 72:17,21 | 27:17 | 34:22 35:5 | 94:22 96:3 |
| 151:6,7 | 136:13,17 | 73:11 | 28:11,18 | 35:13 37:8 | 97:8,9 98:3 |
| 157:6 | 136:21 | 77:10 | 29:4,5 | 37:10,17 | 100:8,10 |
| 159:1,3 | 138:18 | 78:13 | 105:19 | 37:18,23 | 100:12,13 |
| 160:11,19 | 144:11 | 81:16 92:3 | **keep** 35:15 | 38:9 39:6 | 100:16,23 |
| 170:18 | 153:2,3,7 | 92:22 96:1 | 56:21 | 43:18,23 | 101:6,7 |
| 184:17,19 | 153:10,15 | 96:7 97:22 | 91:18 92:7 | 45:14,17 | 109:5,17 |
| 184:20,23 | 154:19 | 99:16,17 | 96:15 | 46:13 | 111:15,21 |
| **jobs** 24:9,23 | 157:17 | 100:12 | 160:5 | 48:19 | 114:8,11 |
| 25:16 | 165:4,13 | 113:22 | 162:6 | 52:23 53:2 | 114:13,14 |
| 27:11 | 165:17,23 | 114:3,8 | 175:9 | 53:2,3,5,17 | 114:22 |
| 29:12,23 | 166:2,5,9 | 119:23 | **keeping** | 54:10,12 | 119:2 |
| 34:7 | 166:13,19 | 120:23 | 170:3 | 54:13,16 | 120:23 |
| 103:19 | 166:23 | 121:3,13 | **kept** 50:22 | 55:13,16 | 125:19 |
| 105:7,23 | 167:6,9 | 123:12 | **kin** 189:15 | 55:17,18 | 129:9 |
| 106:4 | 172:13 | 125:11,21 | **kind** 18:18 | 55:20,23 | 135:16,18 |
| 139:12 | 173:5 | 129:16 | 26:21 | 56:1,8,19 | 136:3 |
| **Joe** 75:8,10 | 175:23 | 132:16 | 66:10 | 57:2,3,4,6 | 140:11,12 |
| 75:18,23 | 176:22 | 133:9 | 132:19 | 57:15,16 | 141:16 |

**www.AmericanCourtReporting.com**
**July 6, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 14

143:12
144:5
145:6,6,17
145:18,18
145:19,21
146:6,12
146:16,17
146:18
147:7,13
147:14,15
147:15
148:2,5,8,9
148:11,14
148:17,19
150:6,19
151:12,13
151:15,16
151:18,19
151:19,23
152:2
153:19
154:1
155:3
158:8,9,10
158:23
159:1,3,8
160:5
161:22,23
162:8,9
168:16
169:1
170:4,23
171:6
173:10
175:5
179:7,8,16
181:9,10
181:17,21
182:7
183:5
184:10,10
184:12,12

185:8,9,12
185:17,22
186:4,18
186:21,23
knowing
49:7 82:2,8
knowledge
21:16
51:20
73:21
88:18
111:1,2
128:10
141:1
145:14,17
150:6
155:23
156:15
169:8
known
184:14
knows
141:17
——————
**L**
——————
L 3:1
lady 183:8,9
laid 30:6,8
30:16 31:3
31:8,12,18
32:1,2,7,8
32:12,16
33:2,3,4,8
34:8,10,13
34:21
76:23
94:10
95:13 96:5
97:4,14,19
98:11,19
174:7,23
184:13,15

**laptop** 50:21
135:22
**Large** 3:9
8:3
last 62:10,10
111:12
119:3
125:2
129:23
131:15
134:2,13
149:16
154:20
late 51:11
178:2,13
178:22
179:1,4
later 32:13
45:18 75:1
75:13
law 3:9 7:6
8:8 166:17
laws 3:20
lawsuit
72:12
145:8
151:1
162:23
163:4,22
165:9
166:4
173:17,20
174:2,11
175:2
lawyer 66:20
145:22
147:5,8,16
148:21
174:17
lawyer's
166:14
lay 31:15

38:15
95:21 96:8
laying 36:20
98:23
laymen's
40:4
layoff 76:4
91:5 97:7
layoffs 76:9
lead 139:16
141:18
182:9
leading 4:3
leaked
185:10
learn 141:4
149:22
156:10
least 23:13
43:18
74:18
79:21,21
108:18
149:2
150:5
155:14
170:8
leave 21:2
led 75:9 91:5
Lee 2:21 3:7
8:1 189:20
left 30:23
180:8
legal 65:9
187:23
less 81:23
84:20
let 19:1
25:18
30:19
33:11,11
42:13

57:19 63:6
66:7 71:11
72:8 92:3
95:19
101:7
119:19,21
123:5
130:18
134:15
136:4
138:15
143:15
149:10,14
150:13
154:5,14
155:3
156:23
172:8
173:10
174:20
175:23
180:9
184:4
186:12
lets 92:9
letter 97:11
135:1,19
136:1,3,6
171:4,7
letting 36:23
92:6,7
let's 54:2
80:16
108:5
113:19
123:5
134:12
136:13
level 82:21
82:22
138:20
139:3

142:4
like 11:12
15:20
16:10
17:22 27:4
31:4,15
33:10 37:9
40:14 43:8
45:17
57:16
58:12,16
58:17 59:6
59:22
66:16,23
67:10,15
83:14
102:9
109:13,15
110:10
111:22
113:20
114:2,18
119:18
120:3,9,10
135:20
138:8,9
139:6
141:16
152:9
156:2
170:19
181:8,20
182:4,7,8
182:11,15
184:9
186:20
limited
79:12
line 62:15,16
listen 124:4
124:6
151:2

**American Court Reporting**
**toll-free (877) 320-1050**

Page 15

157:1
literally
146:4
little 33:13
62:22
101:1
109:10
118:23
133:5
live 10:1,5
10:18
lived 9:21
10:7
located
72:17,18
location
18:11
long 9:21
10:5 14:16
18:22 23:8
23:21 25:2
25:3 26:17
40:19
45:16 46:2
46:14 99:7
136:14
155:22
170:6
174:4
longer 129:7
look 69:8
86:16
88:20 99:6
115:22
116:19
122:8
128:16
129:23
131:15
138:10
176:5
looked 134:8

looking
30:18 59:2
71:11 79:4
85:23
106:14,15
looks 116:4
116:17
119:18
losing
141:18
184:20,22
loss 15:7,8
16:17 58:7
59:21
82:13
lost 65:19
164:5
175:6
184:17,19
lot 9:19
54:17
161:18
loud 132:19
Love 81:18
82:4 114:6
low 24:20
LP 49:7
59:21
81:17 82:1
185:4
lump 16:10
lunch
132:22
136:19
180:11

**M**

Machine
27:20
made 4:1
20:6,8,16
54:14

56:20
58:12
75:19 76:9
84:3,19
104:3
120:14
139:5
mail 171:4,7
mailed 87:8
Main 7:14
maintain
162:14
major
114:18
make 4:4
96:7 97:17
106:16
108:17
109:7,15
129:20
135:7
166:4
makes 18:2
76:18
making
43:19
48:10
54:17 61:7
61:9 84:17
84:22
165:15
186:18
Malachi
11:6
Malcolm 7:5
72:5
136:14
Malugen
75:8,10,19
76:9,13
77:11
94:22

Malugen's
77:3,7
manageme...
81:12
89:21
manager
16:17
18:11 19:8
19:15
40:16,16
41:6 43:9
45:2,4
49:12,13
58:8 59:21
59:22
78:10
79:19
82:13
101:8
110:1,1
111:19,19
139:20
140:7,14
140:17,20
142:3,4,10
142:16,19
managers
41:10
78:12
79:11,12
79:13,19
80:8 81:7
99:11,20
99:21,22
99:23
100:6,10
100:11
101:5,17
101:21
102:2
139:22
manner

182:10
many 72:20
79:19,22
80:8,10
160:4,6,16
174:4,5
March 19:4
21:5 52:19
53:23
74:14
137:12
143:16,21
144:20
155:13
Margaret
181:7
183:6
185:6
Margie
181:7,7
183:6
185:5,6
marked
60:17 63:8
68:5,9
71:13
85:14
86:17
87:21
102:15
106:21
115:14
127:3
130:22
134:17
137:2
143:15
144:8
152:22
154:16
161:2
172:10

173:2
175:20
176:1,19
marketing
155:16
marking
60:15 63:6
71:17
85:12
87:18
102:14
106:20
115:13
126:23
130:18
134:16
136:22
152:20
154:15
160:22
172:8,23
176:18
marriages
10:22
married
10:12
math 129:19
129:20
matter 72:22
92:8 124:2
146:11
147:22
183:10
matters
107:22
Max 18:7,16
18:23
19:17
21:19 22:1
22:9,12,14
22:23 23:1
23:7 24:10

**www.AmericanCourtReporting.com**
**July 6, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 16

| | | | | | |
|---|---|---|---|---|---|
| 26:16,18 | 91:2 92:20 | 98:10,17 | 57:13 | **money** 18:20 | 186:18 |
| **maximum** | 95:1,4 | 113:10,17 | 172:6 | 26:21 | **morning** |
| 47:20 | 99:23 | 113:19,19 | 176:5 | 54:13 | 28:13 |
| **Maxx** 13:16 | 101:7 | 121:17 | **Mike** 114:9 | 56:19 | **Most** 50:7 |
| 14:12,17 | 107:18 | 123:10 | 114:9 | 106:16 | **mother's** |
| 15:6 18:6 | 118:10 | **Melissa** 2:21 | 181:9 | 169:14 | 11:12 |
| 106:5,11 | 119:18 | 3:7 8:1 | **mind** 81:14 | 186:19 | **mouth** |
| **may** 3:6 4:4 | 143:11 | 189:20 | 96:7 183:1 | **monitor** | 132:18 |
| 19:2 23:5 | 146:4 | **Memoran...** | **mine** 76:21 | 119:6 | **move** 13:19 |
| 33:20,22 | 158:12 | 5:23 | 81:19 | **monitored** | 19:2 21:3,4 |
| 34:2 37:2 | 164:1 | **mental** | 94:19 | 134:4 | 45:14 |
| 61:17 | 166:3 | 172:3 | **minimum** | **Montgome...** | 167:7,8 |
| 83:13,13 | 169:18 | **mention** | 78:12 | 11:14 25:2 | **moved** 14:13 |
| 105:2,2 | 171:1 | 38:3 | **minor** 12:12 | **month** 14:18 | 14:14 |
| 106:3 | 183:21 | **mentioned** | **minute** | 14:19,20 | 175:7 |
| 129:7 | 185:9 | 36:22 58:5 | 59:12 | 20:13 | **moves** 65:20 |
| 131:11 | 186:20 | 186:12 | 68:20 69:8 | 23:13,13 | **Movie** 7:13 |
| 153:12 | 187:2 | **merger** | 69:14 | 23:22 | 9:3,4 23:2 |
| 182:2 | **means** 14:1 | 149:18 | 87:12 89:4 | 39:16,17 | 23:4 27:10 |
| **maybe** 17:7 | 158:10,13 | 150:1 | 93:6 107:1 | 45:18,18 | 27:12,15 |
| 19:20 | 181:14 | **mess** 49:7 | 134:9 | 46:17 | 28:2,8,9,16 |
| 26:20 29:4 | 189:9 | **message** | 143:15 | 105:16 | 29:19 30:1 |
| 32:13 | **meant** 14:21 | 51:2 | 160:23 | 170:13,20 | 30:4,23 |
| 45:18 | 44:9 | **met** 73:7 | 173:9 | 174:8,8 | 31:8,12 |
| 46:16 69:2 | 133:22 | 78:9 80:21 | **minutes** | **months** 9:23 | 34:3,16 |
| 91:10,11 | 181:4,6 | 81:7 98:9 | 87:11 | 10:8 11:9 | 35:12 |
| 102:3 | 182:2,17 | **Mexicans** | 119:22 | 16:1,3 | 36:20 |
| 109:21 | 182:19,22 | 78:14 | **missed** 17:6 | 32:13 43:5 | 39:13 43:1 |
| 121:15 | **Medicaid** | **Mexico** 80:2 | **missing** | 91:11 | 47:22 52:7 |
| 184:16 | 169:6 | **MGA** 2:11 | 117:5 | 170:8,9 | 57:8 63:15 |
| 185:8 | **medical** | **Michael** 2:8 | 128:11 | 174:5 | 64:8,20 |
| **ma'am** 20:2 | 165:3 | 2:16 3:6 | **misstating** | **more** 16:20 | 65:22 66:9 |
| **McDOUG...** | **medication** | 8:11,16 | 33:14 | 54:17,18 | 68:3,14 |
| 3:10 8:9 | 13:10 | 9:17 11:5 | **mistake** | 54:21 | 70:18 |
| **mean** 20:13 | **meet** 46:4 | **Michael's** | 17:14 | 84:19 | 72:12 74:6 |
| 28:4 31:3 | 79:20 | 123:21 | 163:12 | 106:16 | 75:6 80:8 |
| 37:6 38:23 | **meeting** | 124:8,17 | **mister** 76:5 | 113:7 | 85:6 |
| 43:18 56:7 | 36:12,13 | **Microsoft** | **misunders...** | 119:20 | 103:16,20 |
| 57:11,20 | 36:14,19 | 141:1 | 94:3 | 133:6 | 104:15 |
| 62:12 70:9 | 37:4 38:7 | **middle** 2:2 | **mixed** | 164:9 | 105:1 |
| 80:14 84:6 | 94:13 | 120:22 | 153:11 | 170:21 | 106:1 |
| 84:12 86:5 | 95:21 96:2 | **might** 19:18 | **MOD** 43:8 | 178:4 | 136:9 |

138:1
141:7
143:6,11
146:8
147:20
149:15
156:13
158:14,14
167:14,23
168:1,19
174:7
185:13
movies 40:5
158:15
much 18:1
23:23
42:23 47:3
47:19 48:3
48:15
54:13,18
56:19 57:2
57:21
68:16
115:18
117:13
122:8
125:3
126:16
127:1
130:20
141:12
169:15
176:11
multiple
111:14
mumble
132:14
Murphy
41:22
must 23:9
113:12
Myheir 11:8

myself 81:16
81:17
180:19
M-A-L-A-...
11:7
M-Y-H-E-...
11:8
_____

**N**

N 3:1 5:1 7:1
name 9:2,15
10:15
26:10,10
39:7 45:6
53:16 55:1
57:17 73:1
73:2 74:2
75:7,8
82:11 90:2
104:1
136:6
143:4
185:5
named 57:23
names 11:3
18:17
36:22 38:3
41:9
Nationwide
25:1
necessarily
98:14
necessary
3:23 44:11
need 13:4,6
13:6 24:12
64:5 67:21
68:22
70:16
71:10
79:16
86:22

92:18 98:3
108:17
111:7
112:3
114:12
117:13
122:8
124:11
127:1
130:21
136:14
146:12
155:7
160:2
162:21
164:16
168:12
176:11
needed
108:13
109:19,23
110:20
160:13
168:7
171:9
needs 133:22
neither
189:15
never 44:4
53:8,9 78:9
78:10,11
79:18
85:20 94:1
101:9
102:8
105:7
107:9
110:13
135:8
140:8
149:23
156:23

186:15
new 155:15
Newman 7:5
8:23 25:22
26:3 35:23
36:3 41:14
72:5,11
73:7,14
74:1 87:13
92:3,10,13
92:17,23
132:21
133:1,7
134:14
136:15
138:15
153:5,13
157:15
165:2,11
165:15,21
166:1,3,7
166:11,16
166:21
167:3,8
188:22
next 17:7
77:21
119:4
174:8
Nicole 10:16
nigger 181:1
182:14,15
night 28:15
nights
169:23
nine 90:20
Ninety-five
118:15
Nintendo
138:4
nobody
152:11,12

159:6,7,8
nods 118:2
none 169:21
non-white
79:12
non-whites
78:14 81:5
noon 132:22
Notary 3:8
8:2 189:22
noted 90:23
126:17
notes 62:6
129:18
134:3
163:3
nothing 16:2
70:10
94:20 97:4
145:1,1
notice 70:18
86:4,12
noticed
114:9
notified 53:9
November
53:21
116:7
171:18
number 2:5
9:19 63:1
78:9 80:13
111:14
116:21
132:11
155:12,21
157:16
161:18
163:8
165:6
numbers
111:13,14

numerous
160:6
179:4
_____ **O** _____
o 3:1 37:16
75:13
76:21
94:18
oath 36:7,7
objections
4:1,5
obligation
52:2 92:12
92:14,21
92:23
observatio...
79:8
obviously
9:4
OB/GYN
168:7
occasion
44:7 113:8
177:12
178:7
occasions
179:4
occurred
61:16 87:5
October
87:6
odd 91:8
off 22:20
30:6,8,16
31:3,8,12
31:15,18
32:1,2,7,8
32:12,16
33:2,3,5,9
34:8,10,13
34:21

**American Court Reporting**
**toll-free (877) 320-1050**

Page 18

| | | | | | |
|---|---|---|---|---|---|
| 36:21 | 141:2 | 54:13,22 | 110:4,7 | 153:14,18 | 111:15,19 |
| 38:15 49:9 | 180:17 | 55:21 | 112:7,23 | 155:12 | 111:22 |
| 50:3 62:23 | 183:6,8,9 | 56:19 57:7 | 113:4,7,11 | 156:7,22 | 113:8 |
| 77:1 91:16 | 185:4 | 58:15 | 113:16,19 | 158:15 | 117:2,4,22 |
| 94:10 | 187:9 | 60:23 61:2 | 113:21 | 159:10,14 | 118:8,20 |
| 95:13,21 | 188:1 | 61:12 62:3 | 114:7,21 | 161:5,10 | 118:22,23 |
| 96:5,8 97:4 | **offices** 3:10 | 62:6,13 | 115:12,22 | 162:6,14 | 119:13 |
| 97:14,19 | 8:8 21:20 | 63:13 | 116:22 | 162:20 | 125:16 |
| 98:11,19 | **oh** 19:7 20:4 | 66:12,15 | 117:17 | 163:11,13 | 129:10 |
| 98:23 | 26:5 28:4 | 67:4,10 | 118:5,14 | 164:16,18 | 132:11,11 |
| 117:5 | 38:11 | 68:2,12,21 | 119:10,14 | 167:6,9 | 133:9 |
| 148:8 | 41:16 42:4 | 69:8,19 | 121:12 | 169:1,9,19 | 134:13 |
| 174:7,23 | 103:6 | 70:3 71:7 | 122:3,21 | 170:2,6 | 136:5,12 |
| 180:8 | 122:20 | 72:14,23 | 123:12,14 | 173:9,13 | 149:6 |
| 184:13,15 | 138:17 | 73:23 | 123:18 | 173:16 | 153:11 |
| **offended** | 142:22 | 74:16 75:9 | 126:13,20 | 174:2 | 155:21 |
| 184:2,5 | 155:1 | 75:17,22 | 127:6,14 | 175:16 | 156:3 |
| **offer** 20:20 | 163:11 | 76:7,11,18 | 127:18 | 176:17 | 163:12,23 |
| 20:23 | 168:9 | 77:16 | 128:1,19 | 177:4 | 165:2 |
| 26:21 46:7 | 173:8 | 78:10,11 | 128:19 | 178:16 | 173:23 |
| 46:10,19 | 174:21 | 78:20,23 | 131:12,15 | 179:2,9 | 177:1 |
| 84:4 | **okay** 9:2,11 | 80:7,21 | 134:7,23 | 180:1,5 | 178:2,13 |
| **offered** 4:7 | 10:12 | 81:1,20 | 137:6,12 | 181:12 | 180:22 |
| 24:21 25:5 | 11:10,16 | 82:11 83:3 | 137:17,23 | 182:4,22 | **ones** 123:19 |
| 25:23 26:6 | 12:8 13:8 | 83:18 | 138:18 | 183:3,12 | **one's** 105:9 |
| 26:9,12,18 | 14:3 15:4,5 | 85:22 86:2 | 140:6,15 | 184:7 | **one-day** |
| 26:19 82:5 | 15:12 18:5 | 87:1 88:10 | 140:23 | 185:12 | 129:5 |
| 84:7 151:6 | 20:8 23:9 | 88:20 | 141:4,14 | 186:9 | **one-page** |
| 151:7 | 23:14 26:5 | 90:10,20 | 141:22 | 187:1 | 119:11 |
| 169:6 | 26:9 29:18 | 92:1,16 | 142:1,14 | **older** 183:8 | **online** 24:16 |
| 186:14,21 | 30:7 32:6 | 93:2,6,9,11 | 144:15 | **oldest** 183:9 | **only** 37:22 |
| **office** 42:11 | 32:10 | 94:3,4 95:8 | 145:20 | **once** 178:4 | 48:21 49:1 |
| 44:21 | 33:15,22 | 98:13,23 | 146:2 | **one** 14:18,19 | 51:11 |
| 45:11 58:8 | 34:6,12 | 99:5,6 | 147:7 | 52:10 56:2 | 55:18 |
| 70:20 71:2 | 35:20 36:2 | 100:2 | 148:1,20 | 56:10 59:3 | 59:16 |
| 71:4 78:6 | 36:9 38:14 | 101:10,16 | 148:22 | 69:2 71:7,8 | 79:13 |
| 79:4 81:17 | 39:19 41:9 | 103:2,22 | 149:11,12 | 72:21 | 81:14 |
| 101:17 | 42:6,9,17 | 104:13 | 149:22 | 75:13 | 84:21 92:9 |
| 102:2 | 43:23 | 106:17 | 150:9,13 | 77:15 78:9 | 108:1,2 |
| 104:15 | 44:12,15 | 107:9,13 | 150:20 | 91:7 97:22 | 110:20 |
| 114:3 | 47:9 49:14 | 108:9 | 151:3,23 | 105:10 | 117:21 |
| 137:17,18 | 50:1 51:14 | 109:12,22 | 152:14 | 108:1,2 | 118:19,23 |

**American Court Reporting**
**toll-free (877) 320-1050**

| | | | | | |
|---|---|---|---|---|---|
| 126:4 | 115:16 | 100:5,13 | 152:14 | **page** 5:3,9 | **part** 27:22 |
| 128:11 | 123:22 | 100:23 | 154:5 | 6:3 88:21 | 28:9 40:9 |
| 141:17 | 124:8,17 | 101:3,16 | 159:8 | 104:23 | 40:23 41:1 |
| 148:16 | 127:5 | 102:1 | 169:4,10 | 115:20,20 | 103:13,20 |
| 153:12 | 131:1 | 106:1,6 | 170:21 | 115:21,22 | 186:2 |
| 164:4 | 134:19 | 110:19 | 171:1 | 115:23 | **particular** |
| 170:3 | 137:4 | 117:11 | 177:19 | 116:1,2,12 | 59:1 77:8,9 |
| 173:20 | 144:10 | 118:17 | 185:10 | 116:12 | 123:15,19 |
| 175:18 | 153:1 | 120:16 | 188:6 | 117:5,22 | 149:23 |
| 180:15,21 | 154:18 | 135:21 | **outline** | 118:6,8,9 | 178:7 |
| **onto** 98:5 | 161:4 | 146:5 | 116:22,23 | 118:20,22 | **particularly** |
| **open** 22:17 | 172:12 | 149:13 | 121:6 | 119:13 | 95:5 |
| 45:5,13 | 173:4 | 163:6,14 | **over** 35:17 | 120:12,17 | **parties** 3:4 |
| 59:6 82:2 | 175:22 | 163:16 | 60:6,8,12 | 120:21 | 4:4 180:17 |
| **opening** | 176:21 | 164:19 | 80:16,17 | 123:20 | 189:16 |
| 53:7 59:3 | **Originally** | 167:9,10 | 80:18 | 124:7 | **Partly** |
| **operation** | 179:18 | 169:12 | 91:21 92:4 | 125:13 | 150:12,12 |
| 157:3 | **other** 16:18 | 172:3,4 | 111:18,20 | 126:3,5,7 | **parts** 138:3 |
| **operations** | 16:18 24:9 | 173:23 | 123:1,14 | 127:7,23 | 138:5 |
| 135:3,4 | 24:23 | 180:5 | 123:15 | 128:4 | **pawn** 18:19 |
| 155:16 | 25:16 | 186:9 | 126:2 | 131:15 | 22:16,18 |
| **operator** | 29:12,13 | **others** 187:3 | 139:14 | 134:2 | **pay** 15:13 |
| 27:20 | 29:19 32:1 | 187:6 | 149:12 | 154:20 | 16:19 |
| **opinion** | 32:12 37:4 | **otherwise** | 163:1,17 | **pages** 69:3 | 19:16 |
| 166:15,17 | 41:10 42:2 | 51:9 | 178:1 | **paid** 22:20 | 28:18 |
| **opportunity** | 43:21 | **out** 19:19 | **overlap** | **paragraph** | 35:11 |
| 5:22 68:13 | 44:13 46:4 | 24:6,19 | 105:16 | 69:9,15,19 | 40:17 |
| 68:15 69:7 | 47:12 | 37:16 54:3 | **overlapped** | 75:2 88:20 | 42:20 47:1 |
| 69:16 | 51:21 52:6 | 57:16 72:1 | 105:7 | 89:19 | 49:19 50:3 |
| **opposed** | 53:11 | 79:4 81:19 | **overnight** | 90:20 91:3 | 83:1 104:4 |
| 138:1 | 54:23 57:8 | 81:22 | 98:6 | 99:7 | 130:11 |
| **oral** 8:12 | 57:18,22 | 102:9 | **owe** 171:4 | 117:14,15 | 171:9 |
| **ordinarily** | 58:21,23 | 104:14 | **own** 21:23 | 118:13,23 | 174:12 |
| 132:21 | 59:1,4,13 | 128:11 | 22:2 | 119:3 | 178:10 |
| **original** | 70:9 72:11 | 132:18,19 | **owned** 22:6 | 125:14 | 180:2 |
| 60:19 | 72:11 74:1 | 133:18 | **o-eight-hu...** | 128:16 | **paying** |
| 63:10 68:7 | 79:1,6,7 | 137:15 | 113:13 | 130:1 | 51:12 |
| 71:15 | 84:13,13 | 138:6 | | **paragraphs** | 175:19 |
| 85:16 | 85:1,7 90:1 | 143:2,11 | ——— P ——— | 124:22 | **payment** |
| 87:23 | 90:12 | 143:13 | P 3:1 7:1,1 | 125:15,22 | 178:21 |
| 102:17 | 91:13 | 146:23 | **packet** | 126:4,11 | **people** 30:7 |
| 106:23 | 99:10 | 149:6,13 | 171:15 | **parents** 12:5 | 32:1,12 |

**www.AmericanCourtReporting.com**
**July 6, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

| | | | | | |
|---|---|---|---|---|---|
| 36:23 | 145:10 | 143:17 | 84:8,23 | posting | 55:23 |
| 44:12 | personnel | 171:21 | 85:3,9 89:2 | 137:6 | 129:8 |
| 78:14 79:5 | 93:4 | 180:22 | 89:6,13,21 | practice | 133:5 |
| 90:12 | Phillip 39:8 | pointed | 90:2,5,8,17 | 73:3 | 148:7 |
| 100:16,18 | physical | 37:16 | 104:20 | precisely | 170:8 |
| 100:18,20 | 167:11 | 73:13 | 110:9 | 39:18 | 184:21 |
| percent | 172:3 | policies 49:8 | 135:2,10 | predomin... | problem |
| 25:11 | physically | 51:21,22 | 135:16,21 | 101:22 | 25:11 |
| 26:23 | 123:7 | 52:1 | 136:5 | pregnant | 67:17,22 |
| 34:15 | 156:3 | 144:17 | 137:7 | 24:6 164:8 | 68:1 78:13 |
| 117:7 | place 118:17 | policy 51:16 | 141:19 | prematurely | 133:2 |
| 118:15 | 167:16 | 51:18 66:9 | 144:7 | 164:20 | 150:11 |
| 141:9,13 | 183:4 | 68:14 69:4 | 149:2,7,13 | present | problems |
| percentage | plaintiff 2:9 | 69:9 70:20 | 149:23 | 36:12 | 123:16 |
| 48:3 | 89:1,20 | 109:2,3,4 | 150:3,14 | presented | 133:15 |
| percentages | 90:21 | 188:10 | 151:5 | 116:10,11 | 164:2,19 |
| 112:9 | 165:6 | political | 156:9,11 | pretty 117:9 | 167:11 |
| performan... | PLAINTI... | 180:17 | 186:14,15 | 169:15 | 169:20 |
| 5:20 131:4 | 7:3 | position | positions | prevention | 170:7,18 |
| 131:6 | plan 47:12 | 15:5 18:10 | 45:5 52:6 | 15:7,8 | 170:21 |
| Perhaps | 47:15,21 | 19:7,14 | 53:11 | 16:17 58:7 | 172:4 |
| 150:19 | 62:7 145:2 | 22:17 | 56:17 57:8 | 59:21 | Procedure |
| 179:23 | 145:4 | 27:19 40:2 | 57:18 | 82:13 | 8:6 |
| period 17:7 | planning | 40:20,21 | 58:22 81:6 | previous | procedures |
| 21:22 23:8 | 108:7,8 | 43:8,21 | 85:1,6 | 10:21 | 49:8 |
| 23:21 24:5 | 116:20 | 45:13 | 149:20 | 136:5 | proceedings |
| 32:4,8 | plans 109:7 | 46:19 47:4 | possession | 143:3 | 8:14 |
| 42:10,14 | plant 27:18 | 48:7,22 | 135:20 | previously | Prod 6:6 |
| 42:20 | 105:20 | 49:2 52:21 | 146:3,4,9 | 128:21 | produce |
| 107:20 | play 138:7 | 53:1,3,6,7 | 146:11 | 143:23 | 92:12 |
| 131:10 | point 37:16 | 53:15 | 175:2 | primary | 164:16 |
| 152:13 | 37:17 | 54:23 55:9 | possible | 160:18 | product |
| 185:4 | 45:13 | 55:14 | 109:8 | print-off | 155:15 |
| person 45:7 | 75:13,13 | 56:13 57:4 | 121:2,7,12 | 111:10 | 159:20 |
| 49:1 90:15 | 75:14,15 | 57:22 58:4 | posted 52:13 | prior 4:8 | production |
| personal | 75:16 76:2 | 59:1,5,6 | 54:6 55:10 | 10:1,3,9 | 6:9 153:5 |
| 32:15 | 76:21,22 | 74:11 | 70:21 | 22:22 23:1 | 176:3,9,15 |
| 50:12 | 76:23 | 81:11,13 | 83:22 84:1 | 27:10,12 | profession... |
| personally | 78:12 | 81:16,22 | 84:2 | 88:8 110:1 | 117:23 |
| 99:12 | 91:12,17 | 82:1,5,7,12 | 186:15 | probably | 126:6 |
| 100:6 | 94:18,19 | 82:14 83:3 | poster 71:5 | 13:6 30:20 | program |
| 139:18 | 133:17,21 | 83:7,10,22 | 71:6 | 34:4 35:5 | 12:14 |

**American Court Reporting**
**toll-free (877) 320-1050**

Page 21

| | | | | | |
|---|---|---|---|---|---|
| 39:21 | 53:14 | 138:16 | 189:2 | really 31:13 | 118:6 |
| progress | 56:23 | 140:13,22 | race 38:18 | 33:8 60:4 | 121:17,20 |
| 134:3 | purpose | 141:23 | 41:12,23 | 118:21 | 121:23 |
| promoted | 95:20 96:4 | 142:2,15 | 77:22 78:3 | 133:8 | 122:3 |
| 14:9 59:14 | 106:8 | 148:10 | 78:18,21 | 165:11 | 127:11,16 |
| 187:8 | pursuant | 149:10 | 79:2,8 | 166:12 | 128:5,6 |
| promotion | 8:5 | 151:2,17 | 100:14,15 | 175:8 | 131:21 |
| 14:2 17:20 | put 30:12 | 154:5 | 152:17 | 180:16 | 137:1 |
| 17:23 42:9 | 51:8 81:22 | 157:2,7,13 | races 102:3 | reason 37:11 | 144:12 |
| 42:19 43:7 | 143:13 | 157:14,16 | racial 99:8 | 77:23 | 177:12 |
| 58:13,17 | 147:10 | 159:21 | racially | 84:13 86:7 | 178:12 |
| 58:18 61:3 | putting | 165:4,7,18 | 101:5 | 96:18,20 | 179:15 |
| 82:20 | 30:16 | 169:9 | raise 43:13 | 97:7 179:9 | 188:5 |
| 104:15 | PX 6:7 | questioned | 44:2,5,11 | reasoning | receive 29:1 |
| 186:16 | p.m 136:20 | 94:8 | 48:6,8 | 77:10,13 | 47:20 48:6 |
| prompted | 188:23 | questioning | raises | rebuffed | 48:13 |
| 22:13 | ——————— | 95:6 | 187:17 | 89:22 | 50:11,14 |
| protest | **Q** | 135:11 | **RAMSEY** | 90:11,12 | 50:15,19 |
| 129:15 | QA 118:16 | questions | 3:10 8:8 | recall 23:23 | 65:21 |
| prove | qualified | 4:2,3 9:6 | Randolph | 39:15 | 100:17,19 |
| 146:14 | 144:6 | 64:20 | 40:13,13 | 40:11,17 | 150:3,15 |
| 147:4,11 | 149:1,5 | 65:10 | ranged | 45:8 46:14 | received |
| 148:3,12 | quality | 154:11,12 | 25:10 | 47:3,6 | 23:18,19 |
| 148:23 | 38:23 | 155:2 | rate 15:12 | 52:15 | 24:1 43:3 |
| provide | 46:20 | 172:21 | 16:8,10,19 | 53:15,16 | 48:21 |
| 154:9 | 48:22 49:6 | 188:22 | 19:16 20:5 | 56:6,7,18 | 90:16 |
| 161:10 | 49:12 61:4 | 189:8 | 24:20 | 56:22 | 143:17,19 |
| 172:19 | 61:8 105:1 | Quincy 12:2 | 25:13 | 59:15 64:7 | 149:7 |
| provided | 105:5,10 | 12:4 41:3 | 28:18 | 69:10,18 | 187:17,18 |
| 144:19 | 105:23 | 41:11,12 | 40:17 43:1 | 69:22 | receiving |
| providing | 110:11 | 41:14,15 | 91:16 | 72:23 73:2 | 63:20 64:7 |
| 177:5 | 139:1,2 | 41:17,18 | 94:18 | 83:18 | 107:13,20 |
| psychiatrist | 140:9,12 | 42:7,17 | 104:4 | 104:3 | 127:19 |
| 168:14 | 141:15 | quit 29:7,8,9 | read 64:11 | 107:11,13 | recognize |
| 169:5 | question | 104:13 | 66:5 69:14 | 107:19 | 62:1 70:6 |
| public 3:8 | 9:10 58:3 | 105:14 | 119:20,21 | 108:6,16 | 85:13,17 |
| 8:2 169:7 | 58:21 | quite 47:22 | 119:22 | 109:18,22 | 87:20 |
| 189:22 | 69:12 | 49:14 | 125:7,11 | 110:17 | 107:2,7 |
| pull 178:11 | 75:17 76:8 | ——————— | reading 3:16 | 112:1,21 | 130:20 |
| 188:5 | 77:10 | **R** | 69:18 | 113:4,11 | 134:20 |
| pulled 179:2 | 94:16 | R 7:1,5 | 132:16 | 113:16 | recollection |
| purchasing | 124:6 | 162:13 | ready 45:14 | 115:17 | 65:5 74:10 |

**American Court Reporting**
**toll-free (877) 320-1050**

Page  22

| | | | | | |
|---|---|---|---|---|---|
| 103:7 | 109:23 | 54:16,18 | **removed** | 113:5,12 | **response** |
| 160:15 | **rehired** | 55:1 59:16 | 53:7 | 122:7,13 | 14:23 |
| **record** 5:18 | 21:15 | 59:17 | **rent** 22:4,5 | 122:13 | 83:19,21 |
| 9:16 67:22 | **reimbursed** | 68:17 69:1 | 40:5 138:6 | 141:18 | 97:16,18 |
| 92:4 178:2 | 50:2 51:3,7 | 71:6 72:16 | **rented** | 144:2 | **responsive** |
| **records** 93:4 | 51:9 129:1 | 74:2 83:8 | 159:20 | **represent** | 35:21 |
| 164:13 | **reimburse...** | 83:20,23 | **renting** | 9:4 176:2 | **rest** 70:4,8 |
| 165:3 | 50:11,15 | 84:1 85:10 | 158:19 | **represents** | 126:2 |
| 179:3 | 50:16,20 | 85:21 | 159:15 | 189:11 | **restate** 9:8 |
| **recycling** | 128:13,17 | 88:14 90:2 | **Rent-A-Ce...** | **reprimand...** | **result** |
| 27:17,18 | 128:20 | 106:3 | 24:14 | 21:7 104:9 | 130:12 |
| 105:20 | 177:22,23 | 107:12,16 | 25:14 | **reprimands** | 149:14,18 |
| **reduce** | 178:9 | 107:17 | **repeated** | 29:2 | 165:9 |
| 108:19 | **related** | 108:9,20 | 122:4 | **Republican** | 189:17 |
| 109:8,20 | 78:18,21 | 110:4 | **repeatedly** | 180:21 | **resume** 5:16 |
| **reduced** | 79:9 | 112:10 | 178:22 | **Req** 6:6 | 5:21 45:12 |
| 169:7 | 100:14,15 | 117:20 | 179:1 | **request** | 54:7 55:3,4 |
| **reference** | 155:14,15 | 118:3,3,19 | **rephrase** | 35:22 | 55:14 |
| 181:19 | 163:4,21 | 119:2,4,5 | 156:23 | 153:5,9 | 102:20 |
| **references** | 175:1 | 121:1,4,6 | **report** 5:10 | 176:3,8,14 | 106:9 |
| 135:2 | 178:14 | 121:11,14 | 49:11 | **requested** | 135:1 |
| **referendum** | **relates** 165:2 | 123:17 | 60:22 | 161:11 | 137:10 |
| 139:6 | **relating** 3:20 | 125:13,20 | 66:22 67:2 | 163:18 | 148:13,15 |
| **referred** | **relation** 91:4 | 125:21 | 112:9 | 164:17 | 148:22 |
| 73:14 | **relationship** | 126:3,4,10 | 114:10 | **Requests** 6:4 | **retail** 155:14 |
| **referring** | 60:2 139:9 | 131:2 | 139:22 | 6:5 | 156:1 |
| 180:13 | **relatives** | 136:5 | 140:1 | **required** | 157:3,18 |
| **reflect** 74:9 | 11:16 | 143:4 | 183:20,23 | 71:2 125:4 | 157:22 |
| 103:5 | **relevant** | 144:2 | 184:7 | 126:17 | 158:1,9 |
| **reflects** 61:3 | 133:10,12 | 154:1 | **reported** | **requireme...** | 159:14 |
| 115:1 | 166:12 | 161:8 | 2:21 49:2 | 49:9 149:4 | **retailer** |
| **refresh** 65:5 | **remember** | 172:18 | 79:13 | **reservations** | 158:14,18 |
| 103:7 | 24:2 26:10 | 174:3 | **Reporter** 8:2 | 108:18 | **returns** |
| **refuse** 73:16 | 27:9 28:20 | 175:19 | 8:20 | 121:18 | 161:19 |
| 89:9 | 29:5,6 | 176:13 | **reporting** | **resignation** | 162:1,3,15 |
| **refused** 89:1 | 30:15,16 | 177:1,2,5 | 67:17 | 78:2 | 163:16 |
| **regarding** | 35:14 37:2 | 179:5,6,16 | 108:8 | **resources** | **revenue** 49:9 |
| 64:21 | 37:3 39:7 | 179:23 | 114:1 | 38:21 | **review** 5:20 |
| 107:21 | 39:17 | 180:16 | 117:23 | **respective** | 68:16 |
| 135:20 | 43:17 | 181:6,11 | 122:1 | 3:5 | 88:10,12 |
| **regional** | 48:20 | **reminded** | 126:6 | **responding** | 88:15 |
| 49:13 | 51:10,13 | 180:11 | **reports** | 154:6 | 107:2 |

**www.AmericanCourtReporting.com**
**July 6, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 23

| | | | | | |
|---|---|---|---|---|---|
| 111:9 | 69:20 | 128:8 | **Robindale** | 150:14 | 165:6 |
| 115:19 | 70:13 | 129:11,17 | 10:4 | 152:4,15 | 173:16 |
| 127:1 | 71:23 | 129:20 | **room** 70:19 | 154:21 | **scales** 47:23 |
| 131:4,6,13 | 72:21 | 130:15 | 70:22 71:1 | saw 55:8 | **scholarship** |
| 132:7 | 76:10 77:6 | 133:16,17 | 180:3 | 71:11 | 12:10 |
| 155:2 | 80:7 81:3 | 133:20 | **Roughly** | 79:18 | **school** 11:21 |
| 160:23 | 85:4,5,10 | 134:2 | 113:3 | 116:13 | 11:22,23 |
| 173:9 | 86:12 87:2 | 136:11,13 | **rule** 14:21 | 117:21 | 12:9,19 |
| 176:12 | 87:5,9 89:7 | 136:17 | **rules** 3:20 | 149:4 | 28:2,5,6 |
| **reviewed** | 89:8,9 90:4 | 140:13 | 8:5 | 161:6,9 | 29:10,11 |
| 147:18 | 91:18 | 141:11,14 | **runs** 118:8 | 172:16 | 39:23 |
| **reviews** | 92:20 93:2 | 143:6 | | 186:15 | **school-to-...** |
| 110:18 | 93:3 94:12 | 144:18 | **S** | **saying** 35:23 | 39:21 |
| 111:8 | 94:14 | 146:1,10 | **s** 2:9,12,21 | 36:22 51:1 | **score** 75:3 |
| 112:8 | 95:17,19 | 148:8 | 3:1,1,7 7:1 | 51:3 56:6,7 | 75:10 |
| **Revised** 5:23 | 96:14,17 | 151:18 | 8:1 189:20 | 59:4 78:17 | 76:14 77:4 |
| **re-ask** 72:8 | 97:1,15,21 | 154:14 | **SAITH** | 82:10 86:6 | 77:18 |
| **right** 10:14 | 98:1,9 99:5 | 155:6 | 189:1 | 95:8,16 | 91:12 |
| 11:6 12:21 | 99:6 | 156:5,17 | **salaried** 47:4 | 97:5 98:6 | **scratch** 72:7 |
| 16:2 17:3 | 101:20,21 | 156:18 | **salary** 19:18 | 114:22 | 93:14 |
| 17:17,23 | 102:1 | 157:11 | 19:21,22 | 119:5 | **second** 56:12 |
| 19:4 20:18 | 103:15 | 159:9,17 | 20:4 28:19 | 125:23 | 56:20,21 |
| 23:6 27:10 | 104:17,22 | 159:18 | 28:19 47:5 | 141:16 | 89:20 |
| 28:6 33:7 | 105:22 | 165:1 | **sales** 26:13 | 146:20 | 115:22 |
| 33:11,18 | 106:13 | 166:10 | 40:3 42:15 | 160:8 | 116:1 |
| 34:17,19 | 108:11,15 | 167:1 | 61:3,6 | 171:4 | 117:14 |
| 35:3,7 | 108:16 | 168:4 | 65:23 66:2 | 181:9,10 | 120:12,21 |
| 36:11 | 110:16 | 169:4 | 66:6 | 181:13,18 | 125:13,14 |
| 39:10 40:1 | 111:6 | 171:16 | 159:13 | 181:23 | 126:7 |
| 40:6 41:20 | 112:13 | 172:1 | 160:11 | 182:5 | 153:11 |
| 42:8,18,19 | 114:10,13 | 174:6 | **same** 3:18 | **says** 61:22 | **security** 58:9 |
| 44:19,20 | 114:17,19 | 178:19 | 18:17 32:1 | 88:23 97:5 | 63:1 |
| 44:22 47:3 | 115:3 | 179:12 | 32:3,4 | 97:6 | **see** 19:1 |
| 47:6 52:5 | 116:5 | 180:3 | 47:16 55:2 | 104:18,23 | 25:18 |
| 52:12,23 | 117:6,14 | 182:7 | 82:14,14 | 123:21,23 | 55:22 |
| 54:2 58:19 | 118:11,13 | 183:22 | 82:17,21 | 124:7,15 | 69:11 71:5 |
| 59:10,12 | 119:1,7 | 184:11,20 | 82:22 | 125:3,16 | 73:12 |
| 61:19,23 | 120:11 | 186:22 | 84:22,23 | 127:22 | 80:16 |
| 62:5,22 | 123:5 | 187:15 | 111:14 | 128:3,7 | 86:16 88:7 |
| 63:14,19 | 125:2,3,7 | **rights** 86:4 | 136:12 | 130:15 | 88:21 92:6 |
| 64:2,14,18 | 125:10,15 | **RM** 121:9 | 139:2 | 138:18 | 92:9 101:4 |
| 65:17 | 126:17 | **Roberts** 9:19 | 140:9,21 | 155:12 | 101:10 |

**American Court Reporting**
**toll-free (877) 320-1050**

Page 24

| | | | | | |
|---|---|---|---|---|---|
| 102:8 | 85:20 88:7 | setting 76:21 | 126:22 | 130:16 | sleep 168:16 |
| 111:10 | 101:2,9,14 | settle 174:14 | 130:18 | 132:3 | 169:16,20 |
| 119:8 | 107:9 | Settled | 134:15 | signed 61:19 | 169:20,22 |
| 122:21 | 115:23 | 174:16 | 136:22 | 119:15 | 170:1,17 |
| 124:20 | 147:18,19 | settlement | 143:14 | 120:4 | sleeping |
| 130:4,5 | 152:21 | 175:16 | 144:11 | 122:15,18 | 170:7 |
| 133:20 | 153:15 | seven 28:12 | 152:19 | 124:22 | Social 62:23 |
| 135:9 | 161:1 | 28:12,13 | 154:14 | 125:8 | sold 159:19 |
| 138:21 | 163:20 | 48:16 78:5 | 160:21 | 129:12 | some 9:6 |
| 146:16 | 165:5 | 88:20 91:8 | 172:8,23 | 130:9 | 91:8 |
| 153:18,23 | 167:10 | seventy-five | 174:20 | 188:3 | 116:14 |
| 157:12 | 172:13 | 15:14 | 175:23 | signing 98:4 | 119:20 |
| 167:16,19 | 176:22 | 19:19 | 176:17 | 126:10 | 150:7 |
| 168:7,13 | sell 159:4 | 104:5,6 | 179:3 | 127:11,16 | 168:16 |
| 169:6,13 | selling | several | showed 62:3 | sign-on 27:4 | 169:16,16 |
| 169:13 | 158:20 | 30:14 | 124:2 | similar | 169:23 |
| 186:12 | 159:15 | 36:23 | shows 50:19 | 135:19 | 180:18,22 |
| seeing 68:17 | sells 159:6,7 | 141:18 | 61:6,16 | 136:6,8 | somebody |
| 69:10 71:6 | send 135:5 | severance | 149:1 | 143:2 | 51:3 152:3 |
| 79:5 99:11 | 136:6 | 35:11 | 178:2 | since 33:22 | 169:16 |
| 101:16 | sending | 36:15 | sic 17:21 | 97:17 | 181:7 |
| 102:1 | 131:21 | shaking 15:2 | 100:17 | 106:5,7 | somehow |
| 107:12 | senior 43:9 | Shanks | side 11:12 | sit 129:19 | 119:15 |
| 115:18 | 61:3,6 | 11:23 | sign 31:16 | sitting 34:12 | 120:7 |
| 117:20 | sent 49:11 | 39:22 | 32:21 33:5 | 130:6 | someone |
| 118:6,20 | 137:15 | she'll 17:8 | 33:17 34:1 | 135:15 | 59:13 |
| 121:1 | 143:2,11 | shift 28:15 | 35:4,8 | 145:20 | 66:22 |
| 128:5,6,15 | sentence | Shop 14:4,4 | 36:15 37:5 | situation | 188:12 |
| 137:1 | 62:10 | 14:6 17:2 | 37:7 96:23 | 76:5 | something |
| 144:13 | 77:21 | 22:9 | 97:12 98:5 | 150:20 | 11:12 |
| 177:1,2 | 118:8,9 | short 24:5 | 119:11 | 160:7 | 17:22 |
| seem 133:10 | 120:13,13 | 91:10 | 175:16 | six 10:7 11:6 | 43:22 44:3 |
| 133:12 | 120:15,16 | 118:23 | signature | 11:9 16:1,3 | 48:17 |
| seemed | 120:22 | show 60:14 | 3:15 62:1 | 40:21 41:1 | 50:10 |
| 99:17 | 124:7,20 | 63:6 68:8 | 63:23 | 43:5 44:20 | 53:14,18 |
| seems 78:13 | 125:2,11 | 71:16 | 71:20 | 78:5 | 59:22 76:3 |
| 78:16 | separate | 85:11 | 116:5 | 133:18,22 | 93:23 |
| 120:9,10 | 98:2 | 87:18 | 118:7,12 | sixteen | 111:15 |
| seen 35:21 | separated | 102:13 | 120:5,12 | 165:6 | 114:4,9 |
| 60:23 | 99:17 | 106:19 | 125:3 | sixth 11:11 | 138:9 |
| 68:10,19 | Seriously | 115:12 | 126:18 | six-year | 139:16 |
| 78:11,23 | 162:9 | 122:22 | 127:7 | 42:10,14 | 150:10 |

**American Court Reporting**
**toll-free (877) 320-1050**

Page 25

| | | | | | |
|---|---|---|---|---|---|
| 162:20 | specialize | 60:22 | stressing | 124:17,18 | 16:14 |
| 177:22 | 138:5 | stay 45:16 | 169:17 | 124:19 | 17:11,13 |
| 178:9 | specific | stenotype | structure | summer | 36:10 53:5 |
| 180:23 | 57:22 58:4 | 189:7 | 15:22 | 28:3 | 74:15 83:4 |
| 181:16,17 | 58:22 59:5 | still 29:11 | stuff 50:22 | Sun 156:12 | 83:16,17 |
| 181:18,19 | specifically | 34:13 | 116:14 | sunbathing | 87:13 |
| 181:20,20 | 30:16 | 39:23 | 119:17 | 156:13 | 100:21 |
| 182:4,6,8 | 107:18 | 65:14 66:3 | 147:17 | supervised | 104:2 |
| 183:11 | 123:12 | 76:23 | subject | 140:19 | 117:7,9 |
| 185:1 | 139:9 | 95:18 | 64:15 | 142:18,20 | 119:3 |
| sometimes | spelling | 120:17 | submitted | supervisor | 134:14 |
| 44:1 | 112:17 | 146:12 | 113:13 | 16:15 19:8 | 135:7 |
| 100:23 | spot 138:6 | 150:1 | submitting | 31:14,20 | 139:16 |
| somewhere | spouse 165:3 | 152:5 | 113:4 | 35:4 39:3,5 | 185:19 |
| 46:12 | Sr 9:17 | 155:4 | subordinate | 40:12 | sworn 8:17 |
| 65:20 | stack 176:6 | 167:14 | 102:8 | 47:18 54:7 | systems |
| 174:6 | stand 164:8 | STIPULA... | subsidiary | 54:8 59:23 | 12:13 |
| 183:16 | 164:9 | 3:3,14,22 | 18:16 | 67:3 | |
| 185:11 | standard | stipulations | substance | 103:22 | **T** |
| soon 105:18 | 37:15 | 8:7,21 | 72:9 | 140:4 | T 3:1,1 |
| 109:7,19 | standing | stood 183:1 | substantial | 142:3,21 | 13:16 |
| sorry 13:5 | 183:3 | store 14:5 | 69:10,17 | 142:22 | 14:12,17 |
| 15:23 | start 108:14 | 40:16 45:2 | substantia... | 149:3 | 15:6 18:6 |
| 18:12 24:6 | Starting | 49:8 78:12 | 69:23 | 183:21 | 106:5,11 |
| 24:13 39:1 | 117:16 | 100:10 | successful | 184:11 | 189:2,2 |
| 41:16 64:6 | starts 120:22 | 101:8 | 138:10 | 188:11 | take 15:2 |
| 69:13 | state 3:9 8:2 | 111:18 | sue 35:12 | supervisory | 17:5 68:15 |
| 82:16 | 9:15 12:10 | 137:21 | 86:12 | 138:19 | 69:8,14 |
| 116:16 | 21:21 | 156:19 | sued 174:8 | suppleme... | 73:16 83:3 |
| 138:17 | 75:18 | 157:11,20 | suffered | 6:10 177:6 | 87:11 |
| 153:4 | 189:3 | 159:19 | 165:8,9 | support 99:9 | 107:1 |
| 154:4 | stated 81:21 | stores 42:6 | suing 74:6 | 100:11 | 115:18 |
| 163:11 | statement | 47:17 49:6 | Suite 141:2 | 145:23 | 117:13 |
| sort 17:14 | 77:17 | 71:3 | sum 16:11 | 148:17 | 119:22 |
| sounds | 112:7 | straight | summaries | 165:18 | 122:8 |
| 120:3 | states 2:1 | 33:12 76:4 | 112:14 | 180:7 | 126:23 |
| South 62:21 | 76:12 78:8 | 135:8 | 113:12 | 186:11 | 130:20 |
| SOUTHE... | 80:1,3,20 | street 3:11 | 120:15 | supposed | 132:17,21 |
| 2:3 | stating 35:10 | 7:7,14 8:9 | 123:11,13 | 43:4 54:8 | 134:13 |
| spare 48:4 | stations | 62:19,21 | 123:15,22 | 66:16 | 136:14 |
| speak 82:5 | 138:7 | 72:22 | 123:23,23 | 109:6 | 153:2 |
| 155:7 | status 5:10 | stress 164:6 | 124:8,9,9 | sure 16:13 | 160:22 |

**American Court Reporting**
**toll-free (877) 320-1050**

Page 26

| | | | | | |
|---|---|---|---|---|---|
| 173:9 | 121:11,18 | 103:9 | 31:17,17 | 140:2 | 150:4,17 |
| 176:11 | 121:20,23 | 105:19 | 32:17,19 | 141:19 | 152:16 |
| 177:3 | 122:3 | 107:2 | 33:3,9,10 | 142:21,22 | 155:6,8 |
| taken 3:7 | 151:21,22 | 137:23 | 33:16,20 | thereto 4:8 | 163:13,15 |
| 87:15 | 152:1 | 139:8 | 33:23 34:5 | 189:8 | 164:21 |
| 136:19 | 168:8 | 146:10 | 34:14,20 | thing 55:2 | 170:11 |
| 182:3 | 178:6 | 159:10 | 35:1,6 37:9 | 55:18 | 172:6 |
| 189:7 | 180:10,17 | 160:23 | 37:12 | 59:17 | 174:8 |
| takes 118:17 | 181:16 | 167:5 | 48:10 | 81:14 91:7 | 176:4 |
| taking 3:21 | 182:5 | 169:20 | 90:22 95:2 | 117:21 | 179:17 |
| 182:9 | 188:11 | 175:18 | 95:9 96:13 | 118:19 | 180:9,12 |
| talk 39:11 | talks 128:17 | telling 26:4 | 96:17,21 | 128:11 | 180:19 |
| 72:8,10 | Tallahassee | 37:3,14 | 104:11 | 154:21 | 182:4 |
| 73:6 | 9:20 10:19 | 83:9 87:2,3 | 168:3,20 | 175:18 | 186:11,12 |
| 100:12,22 | 13:17,19 | 97:19 | 171:11 | 180:20 | 188:7,7,8 |
| 108:5 | 14:10,13 | 103:3 | 185:15 | 188:2 | thinking |
| 123:7 | 14:14 21:3 | 108:9,17 | termination | things 92:7,7 | 187:4 |
| 132:15,18 | 21:4,19,21 | 109:18,22 | 34:11 | 115:9 | third 117:15 |
| 132:19 | Tamika | 116:9 | 130:13 | think 10:8 | thirteen |
| 149:12 | 10:16 | 118:22 | 183:18 | 14:18 | 19:19 |
| 152:11 | tapes 163:4 | 119:1,14 | terminology | 16:12,21 | thirty 16:20 |
| talked 59:13 | task 181:19 | 120:23 | 90:13 | 17:10,10 | 18:3 |
| 103:4 | tax 161:19 | 128:21 | terms 40:4 | 19:20 24:8 | 119:22 |
| 121:9 | 161:23 | 131:23 | 101:6 | 24:22 | thirty-five |
| 123:11 | 162:3,15 | 166:5,9 | territory | 25:15,18 | 104:6,7 |
| 128:14 | 163:16 | 178:8 | 79:23 | 27:1,8 | thirty-one |
| 143:23 | tell 11:3,18 | 181:14 | testified 8:18 | 28:12 | 20:10,16 |
| 145:7,11 | 13:22 14:1 | tells 166:23 | 143:22 | 29:14,15 | thirty-two |
| 145:15 | 14:21 | ten 11:20 | 170:11 | 29:16 | 47:8,9 |
| 180:6 | 15:22 30:2 | 15:14 43:2 | testifying | 43:11 45:9 | 48:10 61:9 |
| talking | 30:7 36:19 | 43:18 44:2 | 120:8 | 48:16 | though |
| 11:11 | 36:23 | 44:4 80:14 | 145:16 | 58:10,11 | 17:11 |
| 31:14 | 37:20 41:9 | 134:9 | testimony | 73:5 74:13 | 34:18 |
| 42:15 75:5 | 42:22 52:9 | 163:9 | 2:15 13:11 | 82:6 83:2,4 | 75:17 |
| 90:1 | 58:11 65:4 | 170:5 | 68:22 | 92:5 93:14 | 78:13 |
| 100:16,19 | 69:9,16 | term 91:10 | 110:13 | 103:1 | 97:13 |
| 108:6 | 71:18 73:9 | 96:20 | 118:1 | 104:1 | 100:4 |
| 110:17 | 77:2,5,6,13 | terminate | 144:3 | 125:9 | 120:11 |
| 112:2 | 78:20 | 96:8 | 166:14,15 | 144:6 | 147:6 |
| 113:23 | 88:16 91:2 | terminated | 189:12 | 146:13 | 156:17 |
| 114:19 | 93:1,13 | 21:13 23:3 | their 3:5 | 148:17 | 178:5 |
| 117:2 | 96:4 98:10 | 29:19 30:3 | 11:3 69:4 | 149:5 | thought 93:7 |

**American Court Reporting**
**toll-free (877) 320-1050**

| | | | | | |
|---|---|---|---|---|---|
| 93:8,10 | 179:13,14 | **timely** 50:4 | 37:20 | 155:16 | 148:4 |
| 163:12 | 179:19 | 50:20 | 45:11,12 | **transcribed** | 156:22 |
| 171:14 | **tight** 185:22 | **times** 160:4 | 56:4 75:12 | 189:9 | 189:11 |
| **thousand** | **tightknit** | 160:6,16 | 76:3,8 | **transcript** | **truth** 175:18 |
| 18:4 20:8 | 185:3,7 | 175:8 | 77:15 82:4 | 189:12 | **try** 33:12 |
| 47:8,9 | **time** 4:6,6 | **title** 18:7,11 | 89:4 91:5 | **transcripti...** | 119:7 |
| 48:11 | 15:17 24:7 | 18:13,15 | 91:17 | 189:10 | 167:4 |
| 54:21 61:9 | 26:18 | 18:16,19 | 97:14 | **transfer** | 169:4,16 |
| 62:20 | 27:22,23 | 18:21,22 | 98:18 | 21:18 | **trying** 22:12 |
| 111:21 | 28:1,9 32:4 | 19:17 | 99:10 | **transferred** | 29:16 |
| **three** 9:23 | 32:7,14 | 21:19 22:1 | 110:7 | 14:9 | 58:11 |
| 20:9,11,13 | 33:2,12 | 22:9,11,14 | 128:23 | **travel** 25:2,3 | 59:16 |
| 27:2 35:10 | 38:20 40:9 | 22:16,18 | 139:4,8 | 49:10,14 | 119:23 |
| 116:21 | 40:23 41:1 | 22:23 23:1 | 150:16 | 49:19 | 120:2 |
| 117:3,4 | 41:7 42:20 | 23:7 24:10 | 151:6,9 | 57:21 | **Tuesday** |
| 126:10 | 45:3,4,16 | 26:16,18 | 172:5 | 81:23 | 113:14 |
| 138:19 | 48:9 50:7 | 38:20 | 181:3,8 | 109:7,9,11 | **turn** 26:14 |
| 155:14 | 51:11 62:4 | 40:15 | 186:10,17 | 109:14 | 35:17 |
| 157:8,18 | 65:2 68:16 | 56:22 | 188:16 | 141:9 | 91:21 |
| 170:9 | 71:10 74:3 | 59:20 | **tone** 57:12 | **travelling** | 163:1 |
| 183:13 | 78:6 88:16 | 82:14,17 | **tools** 108:4 | 141:12 | **turned** 92:4 |
| **through** 3:4 | 89:20 | 142:8 | 116:20 | **travels** 78:7 | 163:17 |
| 39:21 45:1 | 103:13,13 | **today** 9:6 | 121:21 | **treated** | **Turner** |
| 47:16,17 | 103:14,16 | 13:10 | **top** 11:20 | 150:21 | 19:11,12 |
| 49:11 76:5 | 103:20 | 29:13 | 118:8 | 151:7 | **twenty-eight** |
| 89:11 | 107:20 | 34:12 | 120:13 | 152:3,15 | 20:8 |
| 92:12 | 114:16 | 85:23 88:8 | 123:20 | **trial** 4:6 | **twenty-five** |
| 103:11 | 115:18 | 130:7 | **topic** 62:23 | 145:3,23 | 138:8 |
| 109:11,12 | 117:13 | 135:15 | **total** 20:16 | 146:7,21 | **two** 26:20 |
| 118:17 | 119:23 | 145:20 | **toward** | 147:1,10 | 30:1 36:17 |
| 128:15 | 122:8 | 151:1 | 99:12 | **Trinity** | 37:16,17 |
| 141:6 | 127:1 | 155:4 | 180:14 | 173:17 | 42:6 57:23 |
| 176:5 | 128:15 | 180:6 | **town** 42:2 | **Troy** 3:11 | 58:22 59:9 |
| 178:11 | 130:12,21 | **Todd** 65:4,7 | 72:19 | 8:9 12:10 | 62:20 69:2 |
| **throughout** | 133:21 | **together** | 73:12 | 12:11,22 | 75:12,14 |
| 48:2 78:7,8 | 141:1,9,13 | 54:1 | **track** 50:22 | 27:18 41:3 | 75:15 |
| 80:19 | 153:20,22 | 187:15 | 123:22 | 41:11,20 | 76:21,22 |
| 160:1 | 156:8 | **told** 23:6 | 124:3,8,15 | 42:7,17 | 76:23 |
| **throw** | 161:6,8 | 29:13 31:2 | 124:18 | 43:12 | 79:13 |
| 146:23 | 172:16 | 31:20 | **Trade** 135:4 | **true** 81:15 | 80:15 |
| **ticket** 177:20 | 176:11 | 32:23 34:7 | **training** | 90:18 | 87:11 |
| 178:17 | 177:3 | 35:4 37:19 | 110:11 | 96:12 | 88:21 |

**American Court Reporting**
**toll-free (877) 320-1050**

Page 28

| | | | | | |
|---|---|---|---|---|---|
| 91:11,12 | 39:12,14 | 188:10 | University | VP 78:11 | 122:15 |
| 91:19 | 42:12 | under 36:6,7 | 12:11 | vs 2:10 | 126:14 |
| 94:18,19 | 61:18 62:2 | 52:2 69:15 | unless | | 127:20 |
| 98:2 | 63:2,22 | 92:11 | 129:20 | **W** | 134:8 |
| 101:18 | 64:4 79:15 | 138:13 | unqualified | W 7:7 27:14 | 143:18 |
| 103:18 | 80:11 81:9 | understand | 91:1,15 | 27:16,17 | warnings |
| 108:3 | 85:18 | 9:7,10 | use 50:12 | 28:11,18 | 29:2 |
| 116:2 | 86:21 | 31:13 36:7 | 73:10 | 29:4,5 | wasn't 17:15 |
| 117:2,4 | 88:13,22 | 47:19 | 90:12 | 105:19 | 17:16,22 |
| 118:6,9 | 89:3,23 | 64:14 66:7 | 101:5 | wait 93:22 | 28:6 44:18 |
| 119:4 | 90:14 | 66:15,21 | used 122:11 | waived 3:17 | 84:2 98:23 |
| 123:20 | 96:22 98:7 | 68:22 | using 112:17 | Wal-Mart | 113:19,20 |
| 124:7,22 | 98:20 | 92:14,21 | Usual 8:20 | 103:4,6,9 | 149:9 |
| 125:14,21 | 101:13 | 97:23 | | 103:23 | 150:15,16 |
| 127:7 | 104:21 | 111:5 | **V** | 104:19 | 150:16 |
| 128:16 | 115:3 | 120:2 | Valerie | 105:4,15 | 151:5,5,6,7 |
| 133:17,21 | 116:8 | 146:19 | 41:22 45:2 | want 20:4 | 158:4 |
| 138:19 | 120:6,19 | 147:3,4 | variance | 45:16,17 | 175:8 |
| 148:16 | 122:5,17 | 158:16 | 96:14 | 51:23 68:8 | 187:4 |
| 149:19 | 122:19 | understan... | verbal 5:17 | 68:16 82:7 | watch 71:12 |
| 155:14 | 124:10,12 | 30:6 31:11 | 14:23 | 89:16 | way 43:6 |
| 157:7,18 | 126:12,19 | 31:23 50:2 | 21:10 29:1 | 92:14 | 69:11,17 |
| 170:8 | 130:5 | 86:10,14 | 107:14,20 | 97:22 | 95:20 |
| two-page | 131:18 | 120:1 | 115:1,6,8,9 | 107:5 | 100:16,19 |
| 119:12,16 | 132:9 | understood | 115:10,11 | 115:19 | 100:22 |
| 121:13,15 | 137:14,16 | 64:18 | verbally | 142:12 | 114:19 |
| type 73:12 | 138:12 | 114:15 | 30:3 | 168:12 | 116:4,19 |
| Typo 105:13 | 145:5 | 115:4,5 | very 69:19 | 169:12 | 127:15 |
| typos 113:5 | 148:6 | 126:13 | 73:8 | 176:5,7 | 136:4 |
| T-A-M-I-... | 151:11 | 127:18 | 120:13 | 188:6 | 152:4,16 |
| 10:16 | 163:2 | 133:21 | 133:4 | wanted | 169:16 |
| T-U-R-N-... | 164:23 | unemployed | 166:19 | 81:22 82:2 | 180:23 |
| 19:13 | 170:14 | 23:8,12 | 185:6 | 82:8 | 181:21 |
| | 173:19 | 24:4,10 | Video | wanting | 182:3 |
| **U** | 176:16 | 25:17 27:7 | 149:16 | 38:9 | week 26:20 |
| U 3:1 | 179:20 | 170:13 | violate 51:21 | warned | 108:18 |
| uh-huh | 183:19 | unemploy... | violated | 110:5 | 109:16 |
| 14:20 | 187:16,20 | 23:15,19 | 64:15 | warning | weeks 23:8 |
| 24:11 | 188:13 | 163:13 | violation | 5:19 21:11 | 32:13 |
| 25:21 | Uh-uh | United 2:1 | 51:15 | 107:14,21 | 35:10 |
| 27:13 30:9 | 121:22 | 78:8 80:1,3 | Virginia | 108:13 | 119:4 |
| 33:21 | uncomfort... | 80:19 | 111:4,17 | 115:8,11 | well 10:10 |

**American Court Reporting**
**toll-free (877) 320-1050**

| | | | | | |
|---|---|---|---|---|---|
| 17:6,20 | 149:22 | 26:6,12 | 110:8,9,14 | 116:10 | 13:23,23 |
| 20:6 22:15 | 150:13,20 | 27:7,22 | 116:10 | 151:9 | 14:2 17:1 |
| 26:15 | 151:21 | 28:11 29:2 | 121:3,12 | **West** 3:11 | 22:8 24:3 |
| 31:13 33:4 | 154:2 | 30:3,8 31:3 | 122:14,16 | 7:14 8:9 | 164:5 |
| 33:11 36:4 | 156:7,10 | 31:11 32:1 | 122:20 | **we'll** 167:7 | 165:8,9,16 |
| 37:18 | 157:12 | 32:2,8,12 | 123:3,3,7 | **we're** 31:15 | 166:1,10 |
| 42:13 43:1 | 158:9 | 32:16 | 127:19 | 36:23 | 167:1 |
| 43:14,22 | 159:10 | 33:16,20 | 128:21,23 | 58:10 | 170:4 |
| 44:6 57:11 | 162:20 | 33:23 34:7 | 129:1 | 89:17 | 171:16 |
| 58:16 | 164:2,4,5 | 34:13 35:1 | 131:5 | **we've** 11:6 | 172:6 |
| 63:17 66:7 | 164:16 | 39:23 40:9 | 139:11 | 87:10 | 180:10 |
| 68:20 69:8 | 165:4 | 40:9 42:7 | 140:2 | 175:7 | **wife's** 10:14 |
| 77:9 79:3 | 166:5,11 | 42:14,15 | 141:12 | 178:1 | **willing** |
| 80:16 82:6 | 166:16 | 48:9,10 | 142:4 | **whatsoever** | 141:8 |
| 88:15 | 167:3,6 | 49:4,5,16 | 144:18,22 | 168:5 | **Wiregrass** |
| 90:13,17 | 169:21 | 50:2 51:11 | 149:15,20 | **while** 24:3 | 11:14 |
| 92:3,10 | 170:11 | 52:1,6 57:8 | 149:22 | 25:17 27:6 | **witness** 3:17 |
| 93:3,6,14 | 171:3,7,10 | 58:4 61:9 | 150:2 | 27:14 29:2 | 8:12 88:19 |
| 94:18 | 175:7,10 | 64:15 | 152:4,5 | 29:4 52:6 | 100:4,6 |
| 95:13,15 | 178:1,9 | 65:12,22 | 157:5 | 57:8 | 102:4 |
| 95:19 97:8 | 180:9,9 | 66:8,16,21 | 158:19 | 167:14 | 107:4 |
| 97:16 98:3 | 181:5 | 67:2 72:14 | 159:5 | **white** 79:5 | 118:2 |
| 98:16 | 182:7 | 73:11 74:2 | 168:3,20 | 81:13 84:8 | 127:6 |
| 99:14,21 | 183:2,21 | 74:7,17,18 | 170:12,19 | 84:12,14 | 133:8 |
| 100:20 | 184:3,4 | 79:11,12 | 171:10,11 | 85:8 90:15 | 138:17 |
| 105:14 | 185:18 | 79:14,14 | 171:21 | 99:11,19 | 145:3 |
| 106:11 | 187:19 | 81:2,19 | 173:16 | 99:21 | 155:5 |
| 107:18 | 188:2 | 84:22,22 | 178:13 | 100:17,18 | 173:12 |
| 108:3,5 | **went** 22:16 | 89:6 90:10 | 179:3,18 | 101:5 | 189:13 |
| 109:5,9 | 23:7 28:1 | 90:12 95:2 | 180:16 | 150:5,14 | **witnessed** |
| 110:7 | 59:10 | 95:9,13,14 | 181:16 | 150:22 | 99:12 |
| 111:8,17 | 182:4 | 96:5,12 | 182:5 | 151:4 | 100:8 |
| 113:18,21 | **were** 8:14 | 97:3,14,19 | 184:2,4,14 | 152:4,15 | 101:2 |
| 118:11 | 10:9 18:5 | 98:10,18 | 184:22 | 186:13 | **witnesses** |
| 119:7 | 18:22 19:8 | 99:19 | 186:2 | **whole** 24:7 | 145:21 |
| 128:15,16 | 19:22 21:7 | 100:5 | 187:8,23 | 41:6 76:4 | 147:11 |
| 132:17 | 21:10,13 | 103:2,9,13 | 188:9,18 | 78:7 80:1,3 | **woe** 105:3 |
| 136:4 | 21:23 22:9 | 103:15 | 189:8 | 80:19 | 117:12,12 |
| 138:3 | 22:22 23:3 | 104:8,11 | **weren't** 28:5 | 116:22,23 | 117:12 |
| 140:10 | 23:8 24:4 | 104:20 | 51:7 96:17 | 121:3 | **word** 35:14 |
| 145:7 | 24:10,21 | 105:5,23 | 108:10 | 128:15 | 35:14 |
| 146:10,21 | 25:5,17,23 | 109:5,17 | 110:21 | **wife** 13:21 | 123:6 |

**www.AmericanCourtReporting.com**
**July 6, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 30

| | | | | | |
|---|---|---|---|---|---|
| **words** | 38:10,11 | 101:23 | **Z** | 130:10 | **136** 5:22 |
| 109:21 | 38:11,13 | 102:20 | **zero** 111:14 | 131:8,9,19 | **14** 5:23 |
| **work** 16:6 | 77:5 82:23 | 103:6 | 111:15,15 | 143:17,19 | 144:9,12 |
| 23:7 28:8 | 177:15 | 105:13 | **Zone** 52:11 | 171:20 | **14th** 127:9 |
| 39:21 | 184:16,19 | 109:21 | 53:13,17 | 177:13 | 127:19 |
| 40:19 42:4 | **wound** | 113:3 | 53:18 54:3 | 178:13 | 130:10 |
| 47:15 | 20:10 | 115:10 | 54:15 55:1 | **06** 17:12 | **143** 5:23 |
| 49:21 | 179:21 | 118:14 | 74:11 | 19:3,3,4 | **15** 6:4 |
| 103:18 | **writing** 51:8 | 123:9 | 135:3,4,4 | 21:6 | 152:20,23 |
| 105:4 | **written** 5:19 | 126:1 | 137:7,21 | 103:11,11 | **15th** 90:21 |
| 119:6 | 21:11 29:2 | 129:11 | 137:23 | | 171:18 |
| 156:19 | 54:4 55:8 | 138:14 | 138:1 | **1** | **151** 6:4 |
| 159:11,14 | 104:8 | 144:5 | 149:2 | **1** 5:10 60:15 | **153** 6:5 |
| 159:18 | 122:14 | 147:5 | 156:1,2,4,8 | 60:18 | **16** 6:5 |
| 164:7 | 126:14 | 153:10 | 156:12 | **1:06CV00...** | 154:15,17 |
| **worked** | 127:20 | 155:6 | 157:9,10 | 2:6 | **16th** 64:3 |
| 27:14 28:1 | 134:8 | 161:17 | 157:19,23 | **1:42** 188:23 | 107:15 |
| 28:2 29:17 | 143:18 | 162:13 | 158:3,5,17 | **10** 5:19 | **160** 6:6 |
| 41:4 42:6 | **wrong** 89:5 | 170:16,19 | 159:12,19 | 126:23 | **17** 6:6 |
| 104:18,23 | 93:12,12 | 174:22 | **Zone/Trade** | 127:4 | 160:2 |
| 137:20 | 93:23 | 175:7 | 74:11 | **10:00** 2:19 | 161:3 |
| 138:2 | 105:3,8,9 | 178:4 | 135:3 | 3:13 | **171** 6:7 |
| 156:3,4,23 | 170:12 | 179:17,23 | | **101** 5:16 | **172** 6:8 |
| 158:4 | **wrote** 41:17 | 186:4,20 | **0** | **105** 5:17 | **174** 6:9 |
| **workers** | | 188:4,7 | **01** 105:2 | **11** 5:20 | **175** 6:10 |
| 100:12 | **X** | **year** 12:16 | **02** 103:11,11 | 130:19,23 | **18** 6:7 172:9 |
| **working** | **X** 5:1 | 12:18 18:4 | **03** 19:3 | **11/13/1981** | 172:11 |
| 18:5 22:1,9 | **X-Box** 138:4 | 20:9,17 | **04** 53:23 | 63:4,5 | 173:7 |
| 27:14 | | 21:6 39:15 | 61:17 64:3 | **11:06** 87:14 | 176:5 |
| 65:22 | **Y** | 39:16,20 | 103:11,12 | **11:09** 87:16 | **19** 6:8 173:1 |
| 81:19 | **yeah** 15:11 | 48:2 61:10 | 104:19,19 | **11:55** 136:18 | 173:3 |
| 141:1 | 19:23 25:6 | 149:16 | 105:12,15 | **114** 5:18 | **1998** 39:20 |
| 155:22,23 | 29:9 31:7 | 162:4 | 107:15 | **12** 5:21 | |
| 156:8,14 | 34:9 38:2 | 171:19 | 113:2 | 134:16,18 | **2** |
| 157:8,10 | 41:17 | **years** 40:22 | 116:7 | 136:1 | **2** 5:11 63:7,9 |
| 157:19,23 | 42:16 45:6 | 41:1 44:21 | 131:11 | **12:59** 136:20 | **20** 6:9 |
| 158:3,7 | 45:9,10 | 78:5 | **05** 19:3,4 | **126** 5:19 | 175:21 |
| 170:4 | 53:13 57:1 | 138:19 | 23:5,7,10 | **129** 5:20 | 176:1 |
| 188:18,20 | 62:12,20 | 155:14 | 33:20,22 | **13** 5:22 | **2000** 12:20 |
| **worth** 35:11 | 70:7 77:11 | 157:8,18 | 34:2 52:19 | 136:23 | **2003** 12:17 |
| **wouldn't** | 80:5,23 | 174:4 | 87:6 105:2 | 137:3 | 144:20 |
| 33:17 | 93:8 97:15 | **Y'all** 168:2 | 127:9 | **133** 5:21 | **2005** 74:14 |
| | 100:1,15 | | | | |

**American Court Reporting**
**toll-free (877) 320-1050**

127:19
137:13
155:13
**2006** 2:18
3:12 8:11
**21** 6:10
176:18,20
**21st** 137:12
**212** 3:10 8:9
**219** 7:7
**23** 74:14
**23rd** 62:21
**24th** 131:7
131:11
155:13
**25** 131:19
**25th** 144:20
**2613** 10:3

**3**

**3** 5:12 68:6
68:10
86:16
**3/24/05** 5:21
**32310** 9:20
**3535** 9:19
**36301** 7:8,15
**36303** 3:11
8:10
**36305** 10:4
**39** 9:19

**4**

**4** 5:13 71:14
71:18
76:12
86:19
**4th** 129:2

**5**

**5** 5:14 85:12
85:15
**5th** 129:2,8

**5/04** 105:18
**59** 5:10
**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**
63:1

**6**

**6** 2:18 5:15
87:19,22
**6th** 3:12
8:10
**6/16/06** 5:16
**62** 5:11
**67** 5:12

**7**

**7** 5:16
102:14,16
**7th** 87:6
**70** 5:13

**8**

**8** 5:17
106:20,22
107:23
115:1
**8th** 116:7
**84** 5:14
**86** 5:15

**9**

**9** 5:18
115:13,15
122:14
**9/16/2006**
189:23
**900** 7:14

**www.AmericanCourtReporting.com**
**July 6, 2006**